# EXHIBIT A

**Michelle Gospodarek**

**Date of Deposition:  November 17, 2022**

_____

**Defendant Smart Mortgage's Former Operations Manager**

**and Current Standard Loan Officer**

Page 1

1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4   BRIAN NOE and EILEEN PRUITT,    )
    et al.,                         )
5                                   )
                     Plaintiff,     )
6                                   )
             -vs-                   ) No. 21 CV 01668
7                                   )
    SMART MORTGAGE CENTERS, INC.,   )
8   RICHARD BIRK and BRIAN BIRK,    )
                                    )
9                    Defendants.    )

10

11

12            Remotely held deposition of MICHELLE

13   GOSPODAREK taken before CAROL CONNOLLY, CSR, CRR, and

14   Notary Public, pursuant to the Federal Rules of Civil

15   Procedure for the United States District Courts

16   pertaining to the taking of depositions, commencing at

17   1:00 p.m. on the 17th day of November, A.D., 2022.

18

19

20

21

22

23

24

Page 2

1    There were present at the taking of this
2 deposition the following counsel:
3    MITCHELL SANDLER, LLC by
     MS. ARIELLE STEPHENSON (via Zoom)
4    1120 20th Street, NW
     Washington, DC 20036
5    (516) 874-3520
     astephenson@mitchellsandler.com
6
          appeared on behalf of the Plaintiff;
7
8    LAW OFFICE OF WILTON A. PERSON by
     MR. WILTON A. PERSON
9    24330 Leski Lane
     Plainfield, Illinois 60585
10   (815) 254-2467
     wperson@personlaw.com
11
          appeared on behalf of the Defendant.
12
13 ALSO PRESENT:
14   Mr. Richard Birk
     Mr. Brian Birk
15
16
17
18
19
20
21
22
23
24

Page 3

1       I N D E X

2 REMOTELY HELD DEPOSITION OF MICHELLE GOSPODAREK

3     TAKEN November 17, 2022

4

5 EXAMINATION BY              PAGE

6 Ms. Stephenson              4, 61

7 Mr. Person                  33, 65

8

9

10     - - - - - - - -

11

12     NO EXHIBITS WERE MARKED

13

14

15

16

17

18

19

20

21

22

23

24

Page 4

1    COURT REPORTER: Due to the need for this deposition
2 to take place remotely because of social distancing, the
3 parties will stipulate that the court reporter may swear
4 in the witness over Veritext virtual videoconference and
5 that the witness has verified that she is in fact
6 Michelle Gospodarek.
7    MS. STEPHENSON: So stipulated by plaintiffs.
8    MR. PERSON: Stipulated.
9          MICHELLE GOSPODAREK,
10 called as a witness herein, having been first duly sworn,
11 was examined upon oral interrogatories and testified as
12 follows:
13          EXAMINATION
14    By Ms. Stephenson:
15    Q   Good afternoon, Ms. Gospodarek. My name is
16 Arielle Stephenson, and I'm from the law firm Mitchell
17 Sandler, and I represent the plaintiffs in this matter,
18 that matter being Noe versus Smart Mortgage Centers
19 pending in the Northern District of Illinois. I'll be
20 the attorney conducting the deposition today.
21        And if we could just start -- if you could
22 state your full name for the record, please?
23    A   Michelle Gospodarek.
24    Q   And are you represented by counsel today?

Page 5

1    A   Wilton, right?
2    MR. PERSON: No, I'm not representing you here.
3    THE WITNESS: No. No.
4    MR. PERSON: I'm here to object to any questions.
5    MS. STEPHENSON: Q   Okay. So just so I have it
6 clear for the record, you're not represented by any
7 counsel today, is that right?
8    A   Correct.
9    Q   Okay. Have you ever been deposed before?
10   A   No.
11   Q   So I'm just going to briefly explain the
12 process and some of the ground rules because it's a
13 little unconventional. And then I'll go ahead and get
14 into some of the questions. But one thing to note is
15 that this will be a conversation of questions, and you
16 are under oath just as if you were before a court or a
17 judge. The court reporter here is transcribing
18 everything that we say, so all of my questions, and all
19 of your answers. Because she is transcribing everything,
20 you'll need to give a verbal answer rather than nodding
21 your head or some other nonverbal response to a question.
22 At any time if you don't understand a question that I
23 ask, please feel free to let me know and I can rephrase
24 it.

2 (Pages 2 - 5)

Page 6

1      In the same vein, if you would like a break at
2  any point to go to the restroom or just to take a pause,
3  feel free to let me know, and we can do that and go off
4  the record. I just ask that if a question is pending,
5  you answer that question first and then we take the
6  break.
7      A   Okay.
8      Q   And then as you know, defendant's counsel,
9  Wilton Person is present. He might object on the record,
10 which just means that he thinks there's something wrong
11 with my question, but you are still required to give an
12 answer, even if he puts an objection on the record. Do
13 you have any questions about those sort of ground rules?
14     A   No.
15     Q   Are you presently taking any medications or
16 under the influence of a substance that would affect your
17 ability to testify truthfully and completely today?
18     A   No.
19     Q   Do you have suffer from any mental,
20 psychological impairment that would affect your ability
21 to testify truthfully and completely today?
22     A   No.
23     Q   Do you have any documents printed out or papers
24 near your screen?

Page 7

1      A   No.
2      Q   Do you have any other windows open on your
3  computer?
4      A   Yes.
5      Q   If you don't mind closing out those windows.
6  You can obviously keep the Zoom open, but any other
7  windows, I would ask that you close those out while we
8  proceed with the deposition.
9      A   Okay.
10     Q   And prior to joining the deposition today, did
11 you review any documents?
12     A   Just the documents that were emailed to me.
13     Q   Okay. And would that be -- Do you know what
14 documents those were?
15     A   I can open my email and tell you. Stuff you
16 e-mailed me yesterday.
17     Q   Okay. So that would just be --
18     A   The summons.
19     Q   Okay. Understood. And it's not necessary for
20 you to retrieve them, that's fine. Besides any documents
21 that I e-mailed you, did you review anything else?
22     A   No.
23     Q   Prior to joining the deposition today, did you
24 have any conversations with anybody who was not an

Page 8

1  attorney about today's deposition?
2      A   Just my company.
3      Q   And who would that be or with who at the
4  company?
5      A   Brian Birk. He was just letting me know that a
6  summons was coming for me and that we were required to
7  have a -- do a deposition.
8      Q   Did you have any other conversations with Brian
9  Birk about the substance of your testimony?
10     A   No. I don't even really know what it's all
11 about.
12     Q   And besides for Brian Birk, is there anybody
13 else who you spoke with at Smart Mortgage about the
14 deposition?
15     A   No.
16     Q   Did anyone provide you with a copy of a court
17 order that was entered in this case?
18     A   I'm not sure.
19     Q   Okay.
20     A   You know what, I think Brian might have
21 e-mailed me a court order. I don't know what it was. I
22 don't know what it was called. He might have e-mailed --
23 text me letting me know he put in writing letting me know
24 someone is coming to serve me.

Page 9

1      Q   Understood. Aside from any conversations you
2  might have had with an attorney, did anybody speak to you
3  at any point about the nature of this case?
4      A   Just that it's something to do with minimum
5  wage wages or something.
6      Q   Okay. And has anyone from Smart Mortgage
7  spoken to you about the case so not in the context of
8  this deposition, but at any other point?
9      MR. PERSON:  Objection to form.
10     MS. STEPHENSON:  Q   You can still answer the
11 question, Ms. Gospodarek.
12     A   Only the minimum stuff that I just explained
13 that Brian told me I'm getting summonsed and there's a
14 court case going on regarding no possible minimum wages
15 or something to do with that.
16     Q   And when Brian emailed you about that, was that
17 the first time you had heard of this case?
18     A   No.
19     Q   When was the first time you heard about it?
20     A   I couldn't tell you. I have no idea. It
21 wasn't a big topic of conversation or anything, but he
22 told me prior to the email he sent me that -- well, no, I
23 think somebody was coming to serve me and a process
24 server was coming -- I don't remember, and I brought it

Page 10

1 up to him, and he told me I'm probably going to be
2 served. He asked me did I get served or did anybody
3 come, he let me know what to expect.
4     Q    Okay. Let's say about a year ago, so before
5 you were served in this case, did you -- were you a part
6 of any conversations at Smart Mortgage about the case
7 itself?
8     A    There was just brief talk because I'm operating
9 manager, that there was a court case going.
10    Q    Besides from that conversation, was there any
11 other details about the case that you discussed with
12 anyone at Smart Mortgage?
13    A    No.
14    Q    You mentioned that you are an operations
15 manager. Is that your title right now, as of today?
16    A    I am -- I'm not managing currently anybody
17 right now, but since things have slowed I'm just a
18 standard loan officer.
19    Q    And when would you say was your last day as an
20 operations manager?
21    A    I can't say I'm not an operations manager
22 because if things pick up again, I'll probably be in that
23 role once again. It's just things have slowed a little
24 bit in our industry.

Page 11

1     Q    I understand. Okay.
2     A    It's probably -- you know what, since we've
3 backed out probably -- been like 2 or 3 months since --
4 since -- it's really not a role quite needed at this
5 time.
6     Q    And do you remember how many years ago or
7 months ago you began the position as operations manager?
8     A    I started -- maybe mid 2020. I don't know the
9 exact date. It's been about a year and a half I would
10 say.
11    Q    Okay. And before that, were you still working
12 at Smart Mortgage?
13    A    I was just a loan officer.
14    Q    And when was your -- how long have you been a
15 loan officer at Smart Mortgage?
16    A    2019, I think. August of 2019. I can look up
17 my date. I don't know.
18    Q    That's okay. The year is fine. And aside --
19 aside from being a loan officer and operations manager,
20 have you held any other title at Smart Mortgage?
21    A    No.
22    Q    Okay. Do you know of Smart Mortgage referring
23 to loan officers as sales managers?
24    A    Sure. They do get those titles.

Page 12

1     Q    Do you know what the difference is between a
2 sales manager and a loan officer?
3     A    You're kind of managing your sales, you're
4 managing your own business. Some people have, you know
5 -- can grow a team and manage a team. There's two of us
6 that do that mainly. Me and Anthony grew a team.
7     Q    And since 2019 would you say you've been a loan
8 officer and a sales manager or at what point --
9     A    We're a producing manager.
10    Q    So it wasn't like -- it wasn't an official job
11 title change at any point to your knowledge?
12    A    To my operations manager, yes, there was a job
13 title change.
14    Q    Yeah. What I mean was there ever a job title
15 change from loan officer to sales manager?
16    A    I don't know. I have no idea.
17    Q    Okay.
18    A    I don't think so.
19    Q    What would you say your duties are as an
20 operations manager?
21    A    I manage a team, I review submissions, I help
22 with scenarios. I did some office help, mortgage call
23 reports, things like that.
24    Q    Would you say that you are responsible for

Page 13

1 supervising loan officers as an operations manager at
2 Smart Mortgage?
3     A    Sure.
4     MR. PERSON:  Objection.
5     MS. STEPHENSON:  Q And could you describe that a
6 little bit? What would you consider to be supervising
7 loan officer as an operations manager?
8     A    Making sure they're compliant with mortgage
9 laws and rules, coaching them to make sure they're
10 submitting quality loans, assisting them with any
11 questions they have.
12    Q    Okay. And how many loan officers would you say
13 you supervised while you were an operations manager at
14 Smart Mortgage?
15    A    On and off depending on who was on board, maybe
16 between five and ten.
17    Q    While you were operations manager, were you the
18 only person in that role?
19    A    No.
20    Q    So how many operations managers have you seen
21 at one time while you've worked at Smart Mortgage?
22    A    Operations, with that title, I just -- me at
23 the Illinois office and Anthony in Florida.
24    Q    Did you ever overlap time as an operations

4 (Pages 10 - 13)

Page 14

1 manager with Jon Butusov?
2    A   Yes, Jon was operations manager prior to me,
3 sorry.  No.  We did an overlap.  Well, I grew my own team
4 so I started growing my own team, Jon had his team.
5 Sorry.  Jon had his own team, I had my own team.
6    Q   Okay.  And so at one point is it fair to say
7 you, Jon, and Anthony were operations managers with your
8 own teams?
9    A   Yes.
10    Q   Okay.  And in your team, did you -- would you
11 consider the people -- the loan officers on your team to
12 be individuals that directly reported to you?
13    A   Yes.
14    Q   Who were those individuals, if you can
15 remember?
16    A   All of them over time?
17    Q   Yes.  If you can't remember someone, I'm not
18 going to hold you to that.  Whoever you can remember.
19    A   Okay.  Michelle Mc Cue.  What's the gentleman's
20 name?  Jose -- I don't remember.  He was there a very
21 short time.  Owen Weddel, Jason -- I don't remember his
22 last name right now.  Ryan Klaic.  Tyrell Allen.  Kristi
23 McCuean (phonetic).  Can I look them up --
24    Q   That's okay.  You know, I appreciate your --

Page 15

1    A   There was a lot of people that were there for a
2 short period of time that didn't stay very long.  It's a
3 hard job.
4    Q   Do you recall ever supervising the plaintiff --
5 one of the plaintiffs in this case Brian Noe?
6    A   Never managed him.
7    Q   Okay.  And do you recall ever supervising
8 Eileen Pruitt?
9    A   Did not supervise her.
10    Q   But you do recall supervising Ryan Klaic, is
11 that correct?
12    A   Yes, for a short period of time.
13    Q   Short period meaning about how long?
14    A   I would say just a few months because Jon had
15 stepped down from being operations manager and his team
16 morphed with my team.
17    Q   Got it.  And in terms of the hierarchy at Smart
18 Mortgage Centers, was there anybody above you in the
19 chain of command?
20    A   Richard Birk, he's the owner, and Brian Birk
21 kind of was also higher than me as the VP.
22    Q   And was there anybody else besides Richard Birk
23 and Brian Birk that you would say was above you?
24    A   No.

Page 16

1    Q   Okay.
2    A   Jon did manage me for a while if that mattered.
3    Q   That's helpful.  Could you describe what kind
4 of business Smart Mortgage is?
5    A   We're loan brokerage.
6    Q   Okay.  Who exactly do you -- does Smart
7 Mortgage broker loans to?
8    A   Wholesale lenders.
9    Q   And do you know what happens to the loans after
10 a loan officer brokers them from Smart Mortgage to the
11 wholesale lender?
12    A   Yes, the lender collects payments and they
13 carry on or they get sold off in the secondary market.
14    Q   Right.  Okay.  And do you know anything about
15 Smart Mortgage's annual sales volume?
16    A   I do mortgage call reports.  Did I add them all
17 up?  I do quarterly report for them, but I don't add them
18 all up.
19    Q   Do you know if it's about $500,000 a year?
20    MR. PERSON:  Objection.
21    Ms. Gospodarek, if I issue an objection, just
22 wait until that objection is on the record before
23 answering, if you don't mind.
24    The objection is asked and answered.  She's

Page 17

1 asking the same question again.
2    MS. STEPHENSON:  Q  Ms. Gospodarek, I'm going to
3 repeat --
4    MR. PERSON:  It's asking the same question twice.
5    MS. STEPHENSON:  Q  So do you know if the annual
6 volume of sales was above $500,000?
7    A   I couldn't tell you.
8    Q   I'd like to talk a little bit about how loan
9 officers are compensated at Smart Mortgage.  Could you
10 describe how they're compensated?
11    A   They are compensated based off a percentage of
12 the loan amount, commission based.
13    Q   Do you know if there's any other opportunity
14 for loan officers to be compensated a different way at
15 Smart Mortgage?
16    A   No.
17    Q   So to your knowledge everyone is compensated --
18 everyone that is a loan officer is compensated commission
19 only?
20    A   Correct.
21    Q   Okay.  And who sets that compensation?
22    A   You know what, let me -- there was a time where
23 some loan officers could choose two different packages.
24 So they could choose a minimum hourly wage an hourly wage

Page 18

1 that they agreed upon and plus commission, or they can be
2 full commission paid at a higher commission tier.
3    Q    Okay.  Understood.  I'm just going to repeat
4 the same question that I had asked.  Do you know who sets
5 the compensation?
6    A    That's between the negotiation of the loan
7 officer and Richard.
8    Q    So to your knowledge Richard Birk sets the
9 compensation at Smart Mortgage?
10    A    You know, it's discussed.  It's both parties
11 agree upon it.  It's a choice kind of.  They offer some
12 things.  Sometimes, you know, they may depending upon
13 experience get a little bit, you know, higher commission
14 or if they chose the package where they wanted hourly
15 wage.
16    Q    So for a loan officer's compensation to be
17 approved, it would have to be signed off by Richard Birk
18 at Smart Mortgage?
19    A    Yes.  We have contracts.
20    Q    And to your knowledge is anybody else involved
21 in approving loan officer compensation besides Richard
22 Birk?
23    A    We -- it's kind of discussed between Richard
24 and Brian and the loan officer depending on the hiring

Page 19

1 process, and if -- I would -- I would be -- if I was the
2 one hiring then I would, you know, present initially what
3 it is to the person who is coming aboard.
4    Q    Okay.  And Brian Birk's involvement in that, do
5 you know anything else about -- I'd just like you to
6 speak a little bit more about your knowledge of his
7 involvement in ultimately making an offer to a loan
8 officer or not.
9    A    Repeat the question.
10    Q    Sure.  Could you tell me anymore information
11 about Brian Birk's involvement in offering a loan officer
12 compensation?
13    A    He does a lot of the recruiting.  So when we
14 bring somebody on board, it's usually all of us in the
15 room interviewing and discussing and offering.  It's
16 me -- usually me, Brian, and Richard, and then the person
17 who would like to work at Smart.
18    Q    Okay.  During your time as an operations
19 manager, were you aware of any deductions from loan
20 officer compensation?
21    A    The only deductions that I can speak upon is if
22 I did not disclose appropriately and enough money or by
23 law I wasn't able to charge a fee, then it is deducted
24 from our journals and deducted from our pay.

Page 20

1    Q    Can you give me an example of a fee that you
2 just referred to?
3    A    Sure.  If I underdisclosed a credit report fee,
4 that is a zero tolerance fee.  So if I only disclosed
5 when I sent out my loan $100 but the appraisal -- credit
6 report fee is $125, then I am -- they're only allowed to
7 collect $100 from the borrower, $25 is collected from the
8 loan officer.
9    Q    And the fee, for example, like a credit
10 reporting fee, was there a standard amount for that fee?
11    A    No.
12    Q    So is it fair to say is it could change based
13 on each borrower?
14    A    Yes.
15    Q    Any other types of fees you could think of
16 besides a credit report fee?
17    A    Maybe verification of employment fee.
18    Q    Was there a set amount for that fee?
19    A    It depends on who is charging.  There's a lot
20 of different types of -- there's different venues I would
21 say that charge you to get a verification of employment.
22 They're all different charges.  Some are between 50, $60
23 each.
24    Q    Aside from these fees for what you said --

Page 21

1 someone not disclosing that fee properly, are there any
2 other deductions that you can think of from loan officer
3 compensation that Smart Mortgage has taken either from
4 your pay or another loan officer's pay?
5    A    No, nothing but the standard taxes and if you
6 have health insurance.
7    Q    So, for example, would it surprise you to find
8 out that Smart Mortgage had -- do you know anything about
9 whether Smart Mortgage has deducted for marketing
10 expenses?
11    MR. PERSON:  Objection.  Assumes facts not in
12 evidence.
13        Where is that information coming from?
14    MS. STEPHENSON:  I'm just asking a question.
15    THE WITNESS:  I've --
16    MS. STEPHENSON:  You can answer.
17    A    I've never been deducted for marketing expenses
18 or heard of that.
19    Q    Okay.  And so on the part where you said you
20 haven't heard of that, does it mean you've never heard --
21 you're not aware of any other loan officer that's
22 complained about deducting for marketing expenses?
23    A    Correct.
24    Q    Okay.  And have you ever heard of a deduction

6 (Pages 18 - 21)

Page 22

1 for a manager compliance fee at Smart Mortgage?
2    A   No.
3    Q   And have you ever heard of Smart Mortgage
4 deducting for poor reviews from customers online?
5    A   No.
6    Q   Have any of your -- the loan officers that you
7 supervised, have they ever come to you and told you that
8 they disagree with a deduction that was reflected on
9 their compensation?
10    A   No.
11    Q   Okay.  And if they wanted to talk to somebody
12 about a deduction that was taken because they disagreed
13 with it, who would they go to?
14    A   They could go to their direct manager or they
15 could go to even Brian or Richard.
16    Q   Okay.  But to your knowledge no one has ever
17 come to you about a dispute?
18    A   No.
19    Q   Do you know if anyone has disputed a deduction
20 with Richard Birk?
21    A   No.
22    Q   Have you ever --
23    A   Any deductions it's pretty much the loan
24 officer's responsibility to disclose properly.

Page 23

1    Q   And were you involved in the process of adding
2 a deduction to a loan officer's compensation?
3    MR. PERSON:  Objection as to form.
4    MS. STEPHENSON:  Q  You can answer if you
5 understand, Ms. Gospodarek.
6    A   No.
7    Q   So who would be in charge of making sure that a
8 deduction, for example, a credit reporting fee was passed
9 to the loan officer?
10    A   Payroll, when payroll is done, they balance
11 each loan, and I'm not part of the payroll process.  And
12 it's I think Kelly usually does the payroll so she
13 advises whoever is -- I think Brian calls in the payroll,
14 she advises Brian of the deduction when she balances out
15 the broker check.
16    Q   And you mentioned that she would send -- she
17 would balance the broker check and send anything that was
18 incorrectly not collected from the borrower -- she would
19 send that information to Brian Birk, is that correct?
20    MR. PERSON:  Objection.  Mischaracterizes
21 Ms. Gospodarek's testimony.
22    MS. STEPHENSON:  Q  You can answer, Ms. Gospodarek.
23    A   You know, I don't really have that -- I don't
24 know that much of the process because I was not involved

Page 24

1 in payroll.  I just know Kelly does the balancing and --
2 in our office we hear we got to get our payroll in by
3 1:00 o'clock, Kelly.  Hurry up.  Finish balancing.  I
4 don't know their exact process.
5    Q   And if there was a deduction on your payroll,
6 how would you find out about it?
7    A   I know before I close the loan.
8    Q   What was the process as a loan officer for
9 generating customers?
10    A   For what?
11    Q   For generating customers.
12    MR. PERSON:  Objection.  Asks for a narrative
13 response.  Can you ask a simple question, one question?
14    MS. STEPHENSON:  Q  I think the question is fine.
15    You can answer, Ms. Gospodarek.
16    MR. PERSON:  The objection is on the record.  You're
17 asking for a narrative.
18    MS. STEPHENSON:  Q  The objection is noted.
19    A   The process for generating their business?
20    Q   Uh-huh.
21    A   They have a choice if they would like to accept
22 company leads or generate their own business and
23 marketing themselves independently.
24    Q   And what would you say most loan officers

Page 25

1 chose?
2    A   It's a split mix.  Not everybody does company
3 leads and -- I mean, it's split.  It's an option.
4    Q   Okay.  And the company-generated leads, how did
5 a loan officer receive those leads?
6    A   We get e-mail, text, call.
7    Q   And was there a certain time of day that those
8 leads would come in?
9    A   They come in all hours because people obviously
10 shop online, but we have to abide by national call times,
11 so we can only contact the customer during set call
12 times.
13    Q   Okay.  And I'd like to know a little bit more
14 about how often did you go into the Smart physical office
15 on a weekly basis.
16    A   I worked 40-hour week.
17    Q   And would you work that 40 hours in the office,
18 or where did you work from?
19    A   When I was an operations manager, I worked in
20 the office 40 hours a week.  I'm no longer in any office.
21 I work from home now.
22    Q   And what about most of your team that you
23 managed, did you -- did they come into the office as
24 well?

7 (Pages 22 - 25)

Page 26

1     A    They did. They -- they weren't there, you know
2  -- they weren't required to be there 8 hours a day. Some
3  prefer to work in the office, some prefer to work at
4  home. I have people that, you know, work mainly
5  remotely. People came in if they just needed to and left
6  when they wanted to.
7     Q    And Ryan Klaic, did -- from your memory, did he
8  work mostly in the office or from home?
9     A    He worked both.
10    Q    Was it frequent for loan officers to talk about
11 their pay amongst each other?
12    A    It wasn't -- it was not allowable to talk about
13 their pay.
14    Q    What do you mean by not allowed?
15    A    It's frowned upon to discuss what you get paid,
16 you know. Frowned upon. It's not illegal or anything.
17 You're not going to get terminated, but it's frowned
18 upon. I honestly -- like I didn't know what Jon's team
19 was making or what Jon was making. It wasn't discussed.
20 They didn't know what I was making.
21    Q    And you're not saying it was a company policy
22 to not disclose your pay, right?
23    A    I don't know if it's in my contract, but it was
24 never -- I was never talked to about don't discuss your

Page 27

1  pay with anybody. That's like any job you have, you
2  don't walk around talking about what you make. It's
3  frowned upon.
4     Q    At any point did anyone mention that they were
5  working -- that they wanted to be paid for overtime
6  hours? Do you recall?
7     A    Never.
8     Q    Okay. And did anyone ever mention to you that
9  they disliked the deductions that were coming out of
10 their pay?
11    A    Never.
12    Q    Okay. And when you were working in the office,
13 did you leave at any point during the day?
14    A    Several trips to Dunkin' Donuts, lunch. I went
15 to buildings. If I was sick, I worked from home.
16    Q    And how often would you say you went to a
17 closing on a monthly basis?
18    A    Before COVID?
19    Q    Yes, before COVID.
20    A    Before COVID, yes. So once or twice a month,
21 but a lot of my closings are in other states, so whatever
22 was local, I tried to go to.
23    Q    Okay. I'm assuming the company wouldn't pay to
24 fly you out to Florida, for example, for a closing?

Page 28

1     A    No.
2     Q    And then during COVID, so let's say, the tail
3  end of 2019 on, did that number reduce at all?
4     A    Absolutely.
5     Q    And would you say that other people who were
6  working in the office, other loan officers that you saw
7  working in the office, were they frequently leaving or
8  did they mostly stay inside?
9     MR. PERSON: Objection. Form. Who are you
10 referring to?
11    MS. STEPHENSON: Q    You can answer if you
12 understood.
13    A    Loan officers came in and went as they pleased.
14 They didn't have set hours. A lot of people use the
15 printer. So some would just come in, print and leave,
16 come in for help.
17    Q    Do you know how common it was to attend an
18 application rather than a closing as a loan officer?
19    A    It's not too common. It's kind of an
20 old-fashioned dinosaur.
21    Q    How many do you think you attended in your
22 entire time at Smart Mortgage?
23    A    Maybe four. Let's say seven. Sometimes people
24 come in, walk in, and that's a live application.

Page 29

1     Q    How many would you say were not at the Smart
2  physical office?
3     A    Under five.
4     Q    Okay. And the company-generated leads, did the
5  company ever make statements about how to handle those
6  leads?
7     A    Sure.
8     Q    Can you tell me about those?
9     A    Sure. You should call your lead once you
10 receive it. It should be called within 15 minutes,
11 supposed to follow up on new leads every day for 7 days,
12 follow up on your applications, and -- couple times a
13 week and keep your leads -- we have like a system that
14 keeps them organized for you, so keep your mail box up to
15 date.
16    Q    And are you aware of any deductions for
17 compensation for failure to keep the mail box up to date?
18    A    No.
19    Q    Okay. And you mentioned that it was encouraged
20 to call the leads within 15 minutes. Is that so -- so
21 that, you know, Smart Mortgage is the first person to
22 reach that customer or do you know the reasoning for
23 that?
24    A    Sure. That's just good sales tactic.

8 (Pages 26 - 29)

Page 30

1    Q    Okay.  And -- You can finish.
2    A    That's okay.
3    Q    And if a lead came in at, say, 9:00 p.m. in the
4  evening, would that 15-minute rule generally still apply?
5    A    No.  It's outside the national call time.
6    Q    And did you work mostly off of
7  company-generated leads?
8    A    I did.
9    Q    What percentage would you say?
10   A    I would say 90.
11   Q    I think now is a good time for a quick 5- to
12  10-minute break.  Is that okay with you, Ms. Gospodarek?
13   A    Sure.
14   Q    Okay.  Let's plan to be back around 2:45.
15       (Off the record)
16   MS. STEPHENSON:  Q  Ms. Gospodarek, when you joined
17  Smart Mortgage in 2019, did you have a book of business
18  that you brought over?
19   A    Not too much.
20   Q    So did you rely on the company-generated leads
21  to help you obtain a commission?
22   A    Yes.
23   Q    And was it slow for a period or did it just
24  kind of pick up for you?

Page 31

1    A    You always have to take some time to build, but
2  it picked up pretty quickly.
3    Q    And how many months or -- Strike that.
4        How long did it take you to build up?
5    A    Couple of months.
6    Q    Two to three, is that fair?
7    A    Sure.
8    Q    And during that time, did you have any other
9  job?
10   A    When I first started, I was doing something on
11  the side.
12   Q    Is it common for loan officers at Smart
13  Mortgage to have more than one job?
14   A    Not common.
15   Q    In those two to three months that you were
16  building up your clientele, did you make any commission,
17  or was it sort of zero until you were able to close
18  several loans and then it rose after that?
19   A    I was granted a draw and it was deducted from
20  the commission once I made it.
21   Q    Can you describe that a little bit more?
22   A    So I don't even remember what it was.  It was
23  like $200 a week maybe, something like that, and then --
24  and it was to be deducted from my commission once I

Page 32

1  closed loans so I can get started.
2    Q    Okay.  And if you did not have that draw, you
3  would be making zero dollars until you were able to close
4  loans, is that right?
5    A    Correct.
6    Q    Did you ever go into the Smart physical office
7  on the weekends?
8    A    Very rarely.
9    Q    And when you were in the office on the
10  weekdays, would Richard Birk be in the office as well?
11   A    Yes.
12   Q    How often would you say was Richard Birk in the
13  office?
14   A    Every day.
15   Q    Do you know what time he would get in and
16  leave?
17   A    He left way after us usually.  I don't know
18  what time he left.  He came in maybe early afternoon.
19   Q    And when you were in the office on a weekday,
20  how often would Brian Birk come in?
21   A    Every day.
22   Q    Do you know if Richard or Brian Birk ever went
23  in on the weekends to the Smart physical office?
24   A    I have no clue.  I mean, I might have bumped

Page 33

1  into Richard once on the weekend.
2    MS. STEPHENSON:  That's all the questions that I
3  have right now.  So at this point Mr. Person might have
4  some questions for you, and depending on his questions, I
5  might have a few more, but I'll go ahead and let him ask
6  you some questions.
7            EXAMINATION
8        By Mr. Person:
9    Q    You mentioned earlier that you supervised a
10  team.  When you use the word supervise, what do you mean
11  by that?
12   A    It's more like support, kind of, you know, made
13  sure that they were, you know, submitting good loans and
14  I also, you know, helped them, coach them, help them with
15  hard scenarios.
16   Q    So did you have an occasion to or have the
17  authority to fire anyone on your team?
18   A    No.  No.
19   Q    And in this case there's two plaintiffs.  One
20  is Ryan Noe, one is Eileen Pruitt.  And did you ever
21  supervise -- I believe in your testimony you said you did
22  not, but I just wanted to confirm.  You never supervised
23  either of them in terms of your supervision?
24   MS. STEPHENSON:  Object as to form.

9 (Pages 30 - 33)

Page 34

1    THE WITNESS: Never supervised them.
2    MR. PERSON: Q One other issue that has come up --
3  Brian Noe, how long did you work with Brian Noe when he
4  was at Smart Mortgage?
5    A  So I started in I believe August and he was
6  gone within a month or two that I was there. I mean, had
7  half a conversation with him, nothing more than hello.
8    Q  Okay. So you really don't know how long he
9  stayed at the office or what he was doing because you
10  weren't there that long with him, is that --
11    A  Correct.
12    Q  Okay. Do you recall your official start date
13  is September 6th, 2019? Is that an accurate date to your
14  knowledge?
15    A  Sounds accurate, yes. I didn't know off the
16  top of my head. I'd have to look it up.
17    Q  As you mentioned earlier, Brian Noe and Eileen
18  Pruitt were not on your team or a team you supervised, so
19  you would have no idea how many hours they worked or did
20  not work, right?
21    A  Correct.
22    Q  Going back to your definition of supervise as
23  support. Did you require anyone on your team to come
24  into the office at a certain time?

Page 35

1    A  No, unless they chose the hourly wage. If they
2  chose to be hourly employee, then, yes, they worked 9:00
3  to 5:00.
4    Q  Okay. So your understanding is someone could
5  have the opportunity to choose hourly or commission, is
6  that accurate?
7    A  Correct, a -- a few of the loan officers were
8  offered that when we were doing one hiring spree.
9    Q  Ms. Stephenson asked a question about loan
10  officers having other jobs. I just wanted to clarify.
11  Is it your testimony that loan officers at Smart Mortgage
12  did not have other jobs or is it your testimony that
13  Smart Mortgage loan officers did not work for any other
14  loan officers -- any other mortgage companies? I just
15  want to clarify that.
16    A  Definitely didn't work for any other mortgage
17  companies, and if they did something part-time that
18  really -- it would have been something that we are not
19  related to or anything that had to do anything with us.
20  Like if somebody worked a nighttime job at McDonald's, I
21  don't know.
22    Q  You mentioned on your team -- Who was on your
23  team at Smart Mortgage or who is on your team rather?
24    A  Who is on my team currently?

Page 36

1    Q  Yes.
2    A  Right now I'm not managing, but when I finished
3  managing it was Owen Wedell, Kristi McCuean, Jason. I
4  don't know why I can't remember his last name.
5    Q  What's Owen's last name?
6    A  Wedell.
7    Q  Wedell. Did you have occasion to know that he
8  worked a part-time job?
9    A  Yes.
10    Q  Okay. Where did he work, if you recall?
11    A  The part-time job?
12    Q  Yes.
13    A  Sometimes he would do Uber.
14    Q  Uber. Jason, did he have any other work
15  besides Smart Mortgage as a part-time job?
16    A  I've never discussed that directly with Jason.
17  I think possibly he was Uber as well.
18    Q  Just to clarify, I mean it's your testimony
19  that people did not work other jobs besides Smart. Did
20  you include part-time jobs, or you were not including
21  part-time jobs when you made that statement?
22    A  Say that one more time.
23    Q  When you made the statement that the majority
24  -- I think you said something to the effect majority of

Page 37

1  Smart Mortgage employees don't work other places. Were
2  you including part-time work or not?
3    A  Sure. Yes, the majority do not. The majority
4  just standardly work at Smart.
5    Q  Without other part-time jobs?
6    A  Correct.
7    Q  And are you aware that some Smart Mortgage
8  employees have their license at Smart Mortgage but they
9  don't really close loans, is that -- Are you aware of
10  that or no?
11    A  Yes.
12    Q  Going back to your definition of supervision.
13  You mentioned supporting or there was -- there is a hard
14  case or a question, you're there to support that
15  particular employee, is that accurate?
16    A  Yes.
17    Q  And we talked about -- I think in your
18  testimony you mentioned about determining the commission
19  rate if someone wants to be hired by Smart Mortgage. Did
20  you personally -- did you make that decision, that final
21  decision, or did you just provide input?
22    A  I presented it to the loan officer. I did not
23  make the decision on it.
24    Q  Is it fair to say Richard Birk made the final

10 (Pages 34 - 37)

Page 38

1 decision about the commission that would be paid by Smart
2 Mortgage?
3    A   Yes.
4    Q   Is it fair to say that when you were having
5 conversations between yourself, Brian, and Richard that
6 you were providing input?
7    A   Input --
8    Q   In terms of what a commission rate should be
9 for a particular individual.
10    A   Yes.
11    Q   You were asked questions about deductions. In
12 your case in particular were you a salary employee?
13    A   I was.
14    Q   You were?
15    A   Yes.
16    Q   What timeframe were you salaried?
17    A   When I became operations manager.
18    Q   And approximately when did you become
19 operations manager?
20    A   I would say December -- November, December
21 2019.
22    Q   Okay. And Brian Noe resigned from Smart
23 Mortgage in December of 2019, is that correct, or do you
24 know?

Page 39

1    A   I'm not aware of the exact date when he was
2 gone.
3    Q   But your time overlapping with him was very
4 short, is that fair?
5    A   Fair.
6    Q   What about Eileen Pruitt, did you have occasion
7 to see her often in the office or not?
8    A   No. I didn't see her -- I maybe saw her twice,
9 three times max.
10    Q   Three times the whole time that she was still
11 employee of Smart Mortgage?
12    A   Yes.
13    Q   You mentioned in your time about lead mail box.
14 You mentioned that -- was -- you mentioned -- Was there a
15 requirement that a person had to be called back within 15
16 minutes? Was that a requirement?
17    A   It's a company policy and how to manage
18 appropriately in order to maximize your commission and
19 obviously more calls in to take that lead is an option.
20 So you don't even have to take that lead. So it's proper
21 etiquette to manage it appropriately to work it instead
22 of waste it.
23    Q   So from a sales perspective, as you mentioned
24 in your testimony, it makes sense to try to get in

Page 40

1 contact with that potential customer as soon as possible,
2 is that fair?
3    A   Yes.
4    Q   But it was not a requirement from Smart
5 Mortgage to do so, correct?
6    A   No, nobody has ever been fired or anything like
7 that for not.
8    Q   Okay. Were you aware of any deductions
9 yourself before payroll occurred?
10    A   Brian gives us a commission sheet with a
11 breakdown before payroll, but as a loan officer, you know
12 when you close your loan what was not collected
13 appropriately.
14    Q   Okay. And I know that it was not talked about
15 directly, but do you recall signing an employment
16 agreement that talked about deductions?
17    A   Yes.
18    Q   Okay. And what do you remember about that
19 agreement in terms of deductions?
20    A   Just that it states it's our responsibility if
21 we aren't disclosing legally and it's deducted from our
22 pay.
23    Q   In terms of your -- What you deem to be
24 supervision, you didn't set anyone on your team's work

Page 41

1 schedule, correct?
2    A   Correct. Except for the hourly.
3    Q   Except for hourly. Okay. And you yourself
4 personally -- you didn't require anyone to show up who
5 wasn't hourly at the office at a certain time, is that
6 correct?
7    A   Correct.
8    Q   And you mentioned also about Richard Birk being
9 at the office after everyone left. Are you saying that
10 Richard Birk would be in the office after, say, Brian Noe
11 left and after Eileen Pruitt left and Ryan Klaic left?
12    A   Sure, yes. I don't know exactly what time
13 those individuals left, but Richie stayed pretty late.
14    Q   In terms of Ryan Klaic, you mentioned that you
15 supervised him. You couldn't fire Ryan Klaic, could you?
16    A   No.
17    Q   You couldn't set Ryan Klaic's schedule, could
18 you?
19    A   No.
20    Q   You couldn't require him to be at work at a
21 certain time and leave at a certain time, correct?
22    A   No.
23    Q   You didn't set his commission rate with Smart
24 Mortgage, did you?

11 (Pages 38 - 41)

Page 42

1    A   No.
2    Q   So is it fair to say your definition of
3  supervision is more related -- relateable to being a
4  support person to the loan officers?
5    A   Yes.
6    Q   Is that correct?
7    A   Correct.
8    Q   So when you say that -- supervise, I'm not
9  saying that -- I'm just saying when you say to supervise,
10  you didn't really mean you supervise, you meant support?
11    A   Correct.
12    Q   Just to be clear, what is your definition of
13  supervise just so we understand that?
14    A   You know, I just handled, you know, that they
15  were doing stuff in compliance, submitting quality loans,
16  I'd be the one that would speak to them if there was a
17  complaint and I take over that complaint and try to, you
18  know, satisfy the customer.
19    Q   So is maybe a better word than supervise maybe
20  a mentor?
21    A   Definitely.  I was probably more of that.
22    Q   Okay.  You mentioned -- you were asked
23  questions about deductions from payroll.  Do you recall
24  any occasion where Ryan Klaic or Brian Noe or Eileen

Page 43

1  Pruitt came to you and said, I don't agree with this
2  deduction or complained about it?
3    A   Never.
4    Q   So to your knowledge were there any improper
5  deductions that you were aware of during your time at
6  Smart Mortgage?
7    MS. STEPHENSON:  Object as to form.  Sorry,
8  Michelle.  Object as to form.
9    MR. PERSON:  Q   I'm sorry.  I didn't hear your
10  answer.
11    A   I was unaware of any deductions.  They weren't
12  told to me.  I didn't know anything about what they had
13  on their payroll.
14    Q   Okay.  So maybe this is not clear.  Did you
15  even see your team's payroll or no?
16    A   No.
17    Q   So you didn't even have access to see what
18  someone was paid, another loan officer, correct?
19    A   Didn't -- I know the commission percentage for
20  the people that were hired new on my team, but when Brian
21  came onto my team, I was never disclosed what even his
22  commission or his pay was.  I had no knowledge of it.
23    Q   Okay.  And could you have changed his
24  commission if you wanted to?

Page 44

1    A   No.
2    Q   So during your time that you were salaried, how
3  many hours a week did you work typically?
4    A   40.
5    Q   Okay.  And during -- Go ahead.
6    A   Standardly I was in the office 40.
7    Q   40.  Okay.  During your time at Smart Mortgage,
8  do you ever recall any loan officer making any statements
9  about overtime pay?
10    A   Never.
11    Q   Do you recall any loan officers making any
12  statement about not being paid minimum wage?
13    A   Never.
14    Q   Just to clarify, you never heard anyone make
15  any complaints about not receiving overtime pay, is that
16  correct?
17    A   Correct.
18    Q   Counsel asked you a few questions about what
19  were some of the deductions that you were aware of.  You
20  mentioned verification of employment, is that correct?
21    A   Correct.
22    Q   And how much was that typically?
23    A   Between 50 and $60.
24    Q   And what about -- you also mentioned about a

Page 45

1  credit report.  What do those typically cost?
2    A   Depends on the complexity of the loan.  Could
3  be 50 bucks, could be 200.  Some of them only allow to
4  charge 100.
5    Q   Okay.  And to your knowledge everyone or all
6  the loan officers should have been aware of any
7  deductions prior to payroll, is that correct?
8    A   Correct.
9    Q   And if they were aware of that, did they have
10  an opportunity to discuss that with Smart Mortgage?
11    A   Of course.  They could always talk to Richie or
12  Brian.
13    Q   Speaking of this particular lawsuit, you
14  mentioned you did not know much about it, and counsel did
15  not provide you much detail about it, but this is a
16  lawsuit involving overtime pay -- alleged overtime
17  violations and alleged minimum wage violations.  Were you
18  aware of that?
19    A   That's all I was aware of.
20    Q   Okay.  And a third piece is also improper
21  deductions relating to those nominal fees you mentioned,
22  verification of employment and also credit report fees.
23  In your testimony you did recognize that that was in your
24  agreement that all of the loan officers -- Let me ask you

12 (Pages 42 - 45)

Page 46

1 this.
2    MS. STEPHENSON: Object as to form, counsel.
3 Counsel has been testifying. There hasn't been a
4 question for several sentences now.
5    MR. PERSON: Q Okay. Thank you. So,
6 Ms. Gospodarek, were you aware that all of the loan
7 officers signed similar employment agreements?
8    A Yes.
9    Q And within that employment agreement you
10 testified earlier that there was a provision that any
11 deductions could be taken from the loan officer's
12 commission, any deductions that were not properly taken
13 before, is that correct?
14    MS. STEPHENSON: Object as to form.
15    THE WITNESS: Correct.
16    MR. PERSON: Q So was there anyone else besides
17 yourself, for example, on your team -- You mentioned Ryan
18 Klaic was on your team for a short period of time. Did
19 you ever go to Mr. Klaic for any support or any questions
20 yourself?
21    A Not that I'm aware of.
22    Q Okay. So I guess my question is, is the loan
23 officers -- did you work together as a team?
24    A Yes, yes.

Page 47

1    Q Did you bounce ideas off of each other?
2    A Yes.
3    Q Okay. And when you were salaried, did you
4 recall offhand what you were paid?
5    A Yes. When I started it was I believe a
6 thousand dollars a week. You know -- I don't even
7 remember, then I had gotten a raise come this next year.
8 I have to look at my payroll.
9    Q But you were salary?
10    A I was salary, yes.
11    Q Okay. And was there any time where you were
12 not salary at Smart Mortgage?
13    A Short period of time when I first started from
14 that September to when I started as an operations
15 manager.
16    Q And you started as operations manager -- which
17 I believe to be -- sometime in November or December of
18 2019?
19    A Yes, yes.
20    Q And with your salary, were you -- did you
21 receive any type of commission on top of your salary?
22    A Yes.
23    Q And what -- I mean without -- I mean, do you
24 recall the percentage, or would it vary?

Page 48

1    A The percentage of my commission?
2    Q Yes. Per loan, did you have the same
3 commission rate for all loans or did it vary?
4    A Same commission rate unless it was a self-gen.
5 So there's a two different pay rates, if it's a company
6 lead or a lead that I brought in.
7    Q Okay. You mentioned earlier that basically 90
8 percent of your loans were based on Smart Mortgage leads,
9 is that accurate?
10    A Correct.
11    Q Just going into the lead mail box, did you have
12 access to all of the customers of Smart Mortgage when you
13 would access lead mail box or only a certain number?
14    A Just my personal leads.
15    Q Okay. Going back to lead mail box. How would
16 that work -- For example, how does lead mail works? If
17 you received a lead and you were not available, what
18 would happen?
19    A It would show the address, and Brian sometimes
20 would give us a reminder, hey, this has been sitting,
21 please call it, and then I circle back and call it.
22    Q Your percentage is 90 percent from Smart
23 Mortgage leads, 10 percent I guess from referrals, is
24 that correct?

Page 49

1    A Correct.
2    Q Is that split -- is that typical for most loan
3 officers, or do you know?
4    A They're all different. Not everybody sold or
5 did leads.
6    Q Were there some loan officers that did not use
7 leads to your knowledge?
8    A Yes.
9    Q Who were they if you recall?
10    A Eduardo did not, June did not. Those are the
11 people that I -- list of the people that I managed. Some
12 people part time took leads. I believe when I was
13 managing Ryan Klaic I don't believe he was on leads. I
14 believe he was mainly self-gen.
15    Q So he did not take any leads?
16    MS. STEPHENSON: Object to form.
17    MR. PERSON: Q Did he use Smart Mortgage leads?
18    A When I was managing I don't believe he was on
19 leads.
20    Q When you say on leads, what do you mean by on
21 leads? He would not turn on his lead mail box?
22    A Correct. It's an option. So you could turn
23 on, turn off.
24    Q How would you know that he did not take leads

13 (Pages 46 - 49)

Page 50

1 to your knowledge?
2    A    I don't -- I don't -- most loans that he turned
3 in were self-gen, but I -- I don't think -- I don't think
4 he was on it because usually, you know, when somebody --
5 like, say, somebody on my team didn't address a lead
6 appropriately or something, I would be asked to address
7 my team member, but I don't believe when I was managing
8 him, he had an active account taking new active like
9 leads.
10    Q    Okay.  So if someone takes leads, just, for
11 example, if someone takes the leads, would that require
12 more time than a self-generated referral, is that an
13 accurate statement?
14    A    They all deserve the same follow up, the same
15 work.  I'm not sure how to answer that.
16    Q    So to distinguish the lead, if you get a lead
17 and you follow up with that person, would that
18 necessarily require more time than a self-generated
19 referral, or are you saying it's all the same amount of
20 time?
21    A    It's all the same.
22    Q    Yourself, how often did you use lead mail box?
23 I know you mentioned 90 percent, but did you always have
24 it off?

Page 51

1    A    All day every day.
2    Q    In terms of Klaic, you don't know if he had the
3 leads on or not, is that correct?
4    A    That's correct.
5    Q    There's no way you would know if he had leads
6 on or had the leads off?
7    A    Correct.
8    Q    And was there any point that you -- obviously
9 you were salaried, you worked 40 hours a week.  I'm not
10 getting into the actual amount you earned, but did you
11 earn over six figures just working 40 hours a week?
12    A    Yes.
13    Q    So just in your opinion if someone worked,
14 allegedly worked more than 40 hours a week, would you
15 believe that they would be over six figures?
16    A    Yes.
17    Q    So you mentioned in your testimony that you
18 only have access to your customer leads at Smart
19 Mortgage?
20    A    Correct.
21    MS. STEPHENSON:  Object as to form.
22    MR. PERSON:  Q  Is that correct?
23    A    That's correct.
24    Q    Okay.  And are you able -- you're not able to

Page 52

1 see any leads from any other loan officer at Smart
2 Mortgage, correct?
3    MS. STEPHENSON:  Object as to form.
4    THE WITNESS:  Correct.
5    MR. PERSON:  Q  What about people on your team, are
6 you able to see their leads?
7    A    No.
8    Q    Okay.  Are you familiar with Smart Mortgage's
9 VPN system?
10    A    Yes.
11    Q    Did you ever have occasion to use it?
12    A    Yes.
13    Q    And do you recall any type of -- when you would
14 use the VPN, do you recall any type of warning when you
15 would use the VPN when you would open up the VPN?
16    A    There is a warning.  Never read it.
17    Q    Okay.
18    A    I think it's just something about property of
19 Smart Mortgage.
20    Q    Okay.  So you do agree that there's a warning
21 on the VPN when you use it?
22    A    Yes, yes.
23    Q    Just to clarify, during your time at Smart
24 Mortgage, no loan officer on your team or otherwise has

Page 53

1 ever come to you and said, I've -- I have an improper
2 deduction from Smart Mortgage?
3    A    No.
4    Q    And you're not aware of the amount of hours or
5 alleged hours that anyone worked at Smart Mortgage other
6 than yourself, correct?
7    A    Correct.
8    Q    Is it your understanding that you were not
9 required to track your hours in terms of loan officers
10 who were on commission?
11    A    Correct.
12    Q    Now, when you're on salary, you obviously --
13 you did not track your hours either, is that correct?
14    A    That's correct.
15    Q    Just one moment.  So the only individuals that
16 tracked their hours were hourly workers, right?
17    A    Correct.
18    Q    Such as loan processors?
19    A    Yes.
20    Q    Okay.  And you were asked about a title at
21 Smart Mortgage, sales manager or loan officer and what
22 was the difference.  Do you recall that question?
23    A    Yes.
24    Q    Okay.  And at this point in terms of the sales

14 (Pages 50 - 53)

Page 54

1 manager, were all of the loan officers considered to be
2 sales managers?
3   A   Yes.
4   Q   And did they -- the loan officers, did they
5 supervise loan processors?
6   A   No.
7   Q   No.  Okay.  So in terms of sales manager, what
8 is your definition -- what did you understand that to be?
9   A   You're managing your sales, you're the manager
10 of your business, book of business.
11   Q   Okay.  You mentioned book of business.  Is it
12 your understanding that the clients or the generated
13 leads that you have at Smart Mortgage, are those your
14 clients, or are they Smart Mortgage's clients?
15   A   They're Smart Mortgage's clients.
16   Q   Okay.  And why do you believe that?
17   A   When you bring a customer in, they become the
18 property of Smart Mortgage, you're running your loan
19 through them, and that's what our contract is.
20   Q   Okay.  You did have occasion to read the
21 contract that you signed, correct?
22   A   Yes.
23   Q   So you yourself -- you mentioned during your
24 testimony you knew about the provision about the

Page 55

1 deductions, correct?
2   A   Yes.
3   Q   You knew about the property or customers being
4 -- being owned by Smart Mortgage, correct?
5   A   Yes.
6   Q   Okay.  Are you aware of any individual, any
7 loan officer that did not sign an employment agreement?
8   A   No.
9   Q   So in terms of time -- obviously we're talking
10 about the pandemic as well -- do you recall the provision
11 in the contract about outside sales employees?
12   A   I don't remember.
13   Q   Okay.  Just one moment.
14       So when you would receive a lead through lead
15 mail box and you were not able to, I guess, accept the
16 lead, what would you do?  What happens to the lead at
17 that point?
18   A   Brian sends a reminder if you can't address it.
19 He can transfer it.  It just depends.  And then he asks
20 you to please turn your leads off if you're unable.
21   Q   Okay.  So if someone turns a lead -- leads off,
22 what instances would someone turn that leads off
23 typically to your knowledge?
24   A   They are busy or they are not feeling like

Page 56

1 accepting any working and making calls or they just don't
2 want leads at that time.
3   Q   Okay.  What instances would you turn off your
4 leads?
5   A   I was going to go into a meeting or if I had a
6 family event, I wanted to go to the zoo with my family
7 or, you know, personal time.
8   Q   And when you would have a lead, it would come
9 into your, I guess, lead mail box and you didn't have
10 time to follow up, what would you do?  Would you -- what
11 would you do at that point?
12   A   Get to it as soon as I could.
13   Q   Okay.  But you mentioned in your testimony
14 about the "do not call" after 9:00 o'clock, correct?
15   A   Correct.
16   Q   So if you received something, for example, at
17 -- after 9:00, how would you handle that particular lead?
18   A   I just wait until the morning, until national
19 call time opens up.
20   Q   Okay.  So you were not required by Smart
21 Mortgage to respond after hours or after 6:00 o'clock or
22 after 7:00 o'clock, correct?
23   A   No, no.
24   Q   So that was your discretion whether you

Page 57

1 responded at that time or not, correct?
2   A   Legal, can't -- You're not allowed to.
3   Q   So I mean let's put a little bit more -- I
4 guess going into that, you're not allowed to, what is
5 your understanding of that timeframe?
6   A   9:00 to -- 9:00 to -- 8:00 in the morning to
7 9:00 at night, I believe.
8   Q   Okay.  And what about emails, could you -- I
9 mean if you wanted to, could you send an email after
10 hours if you wanted to?
11   A   If you wanted to.
12   Q   And what was your approach to accepting a late
13 might email to a potential customer?
14   A   I standardly didn't do it unless there was an
15 active customer and I wanted to just catch up on my
16 emails at night, but our lead mail box sends them
17 automatically.  So there was really no need to send an
18 email or a text after hours.
19   Q   So the email or text, what is that typically?
20   A   Oh.
21   MS. STEPHENSON:  He's frozen for me as well.
22   MR. PERSON:  Q  I'm sorry, Ms. Gospodarek.  Can you
23 repeat your answer?
24   A   Can you repeat the question?  It froze.

15 (Pages 54 - 57)

Page 58

1 Q Okay. So my question is what is the content of
2 the text message or email that's sent automatically by
3 Smart Mortgage through lead mail box?
4 A It's standard, like thank you for contacting
5 Smart Mortgage, a representative will be with you as soon
6 as possible. Small general email.
7 Q Okay. So you didn't feel obligated to email or
8 text after hours because of that generated email and
9 text?
10 A Correct.
11 Q Just one moment. Just going to double check.
12 In fact, let me just take a short break if that's okay,
13 Ms. Stephenson.
14 MS. STEPHENSON: That's fine.
15 (Off the record)
16 MR. PERSON: Q Just a few more questions.
17 Do you recall any occasion where you sent a
18 text message, called, or email Ryan Klaic after, let's
19 say, 6:00 o'clock p.m. and said hey, you got to follow up
20 on this lead?
21 A Not once.
22 Q Okay. And personally, yourself personally,
23 you're not aware -- there's nothing you recall in terms
24 of any type of overtime wages or minimum wages you did to

Page 59

1 cause someone to work overtime yourself, is that correct?
2 MS. STEPHENSON: Object as to form.
3 MR. PERSON: Q I mean, for example, did you require
4 -- and you saw Ryan Klaic in the office and you said,
5 Mr. Klaic, you need to stay longer today, did you ever do
6 that?
7 A No.
8 Q Did you ever tell Mr. Klaic he needs to get in
9 at 6:00 in the morning or particular time in the morning?
10 A No.
11 Q Did you ever tell him he needs to stay until
12 9:00 o'clock at night and continue to work?
13 A No.
14 Q Did you ever tell him he needs to work from
15 home until 9:00 o'clock at night?
16 A No.
17 Q Did you ever tell him he had to come into the
18 office or not?
19 A No.
20 Q Is it fair to say to control -- you didn't have
21 any controls over Smart Mortgage's business operations,
22 correct?
23 A No.
24 Q Did you ever tell anyone on your team that you

Page 60

1 need to be at work at a certain time?
2 A No.
3 Q Did you ever tell anyone on your team that they
4 need to stay late and finish up a project?
5 A No.
6 Q And you mentioned earlier in your testimony you
7 weren't aware of any issues or any complaints about loan
8 officers complaining about overtime or minimum wage,
9 correct?
10 MS. STEPHENSON: Object as to form.
11 THE WITNESS: Correct.
12 MR. PERSON: Q You already stated earlier you did
13 not supervise or support Brian Noe or Eileen Pruitt,
14 correct?
15 MS. STEPHENSON: Object as to form.
16 MR. PERSON: Q You did not supervise Brian Noe or
17 Eileen Pruitt, correct?
18 MS. STEPHENSON: Object as to form.
19 THE WITNESS: Correct.
20 Q And personally, you're not aware of
21 any unlawful wage practices by Smart Mortgage, right?
22 MS. STEPHENSON: Object as to form.
23 THE WITNESS: Correct.
24 MR. PERSON: Q Brian Noe and Eileen Pruitt were

Page 61

1 never on your team, correct?
2 A Correct.
3 Q You mentioned with Mr. Klaic that you had no
4 control over what he was paid with Smart Mortgage, is
5 that an accurate statement?
6 MS. STEPHENSON: Object as to form.
7 THE WITNESS: Yes.
8 MR. PERSON: Q So even though he was on your team,
9 you could not change his commission rate, is that
10 correct?
11 A Correct.
12 Q You couldn't fire him, correct?
13 A Correct.
14 Q You couldn't discipline him either, correct?
15 A Correct.
16 MR. PERSON: No further questions. Thank you for
17 your time.
18 FURTHER EXAMINATION
19 By Ms. Stephenson:
20 Q Ms. Gospodarek, based on some of those
21 questions, I have a few follow ups, but I don't think it
22 will take very long.
23 Do you want to take a break or can I ask those
24 few questions now?

16 (Pages 58 - 61)

Page 62

1   A   You can go ahead.
2   Q   We've been talking about loan officers using
3   email, phone, and text to communicate with borrowers.
4   Would you say that's the most common method of
5   communicating with a borrower as a loan officer?
6   A   Correct.
7   Q   And would that be true regardless of whether or
8   not loans are self-generated or company generated?
9   A   Correct.
10   Q   And we were talking about the automated message
11   that Smart Mortgage sends out to a lead.  That automated
12   message wouldn't be sent out for an active customer that
13   a loan officer was working on collecting paperwork for,
14   is that right?
15   A   There's different emails that go out to all
16   kind of clients, follow-up emails that are automated that
17   we're all aware of.
18   Q   Right.  So if a loan officer was working with a
19   borrower on collecting some paperwork, there's no
20   automated message that Smart sends, you know, saying,
21   this paperwork isn't sufficient, I need some more
22   documentation, is that right?
23   A   Correct.
24   Q   Okay.  And would you agree that an operations

Page 63

1   manager is a higher position than a loan officer?
2   MR. PERSON:  Objection as to form.
3   MS. STEPHENSON:  Q   You can answer.
4   A   Correct.
5   Q   And so would it be fair to say that it goes
6   loan officer, operations manager, and then Richard and
7   Brian Birk in their capacity as owner of the company and
8   vice president?
9   MR. PERSON:  Objection as to form.
10   THE WITNESS:  Correct.
11   MS. STEPHENSON:  Q   You can answer.  Okay.  And we
12   talked briefly about the fact that there are loan
13   officers that are licensed but don't actually close any
14   loans regularly.  Do you know if those loan officers who
15   hold their license at Smart Mortgage but don't actively
16   close loans, are they considered employees by the
17   company?
18   MR. PERSON:  Objection as to -- I mean, this witness
19   would not have knowledge what they were classified.
20   That's asking for a legal conclusion.
21   MS. STEPHENSON:  Your objection is noted.
22   Q   If you know the answer, Ms. Gospodarek, you can
23   answer.
24   A   I do not.

Page 64

1   Q   Okay.  I'm sorry.  Did you say something?
2   A   No.
3   Q   You mentioned that this company policy to
4   encourage loan officers to call back leads within 15
5   minutes, that was done to maximize commission.  Was there
6   anything else, any other type of advice that came from
7   Smart Mortgage about how else to maximize commission?
8   A   No.  And it wasn't a policy.  It was a -- just
9   a guide and how to manage them appropriately.
10   Q   Understood.  So it wasn't -- aside from just
11   being good business practice to call someone back within
12   15 minutes, were there any other tips that the company
13   provided to loan officers in communicating with their
14   clients?
15   MR. PERSON:  Objection as to form.
16   THE WITNESS:  No.
17   MS. STEPHENSON:  Q   Okay.  And would you agree that
18   an operations manager has additional duties above and
19   beyond those of a loan officer?
20   A   Correct.
21   MS. STEPHENSON:  I have no further questions.
22
23
24

Page 65

1       FURTHER EXAMINATION
2       By Mr. Person:
3   Q   I have just a few follow-up questions.
4       You mentioned -- counsel mentioned policy --
5   there was no written policy from Smart Mortgage, is that
6   correct?
7   A   Correct.
8   Q   It wasn't really going into your history, but
9   how long had you worked as a loan officer?
10   A   Since -- as a loan officer, 2015.
11   Q   2015?
12   A   Yes.
13   Q   And is it common to have or occasionally have
14   deductions from a commission statement of fees not
15   collected?
16   A   Yes.
17   Q   And did you previously have any type of
18   business yourself in terms of being a loan or mortgage
19   broker?
20   A   Yes.
21   Q   Is it common in the industry to have 100
22   percent commissions for loan officers?
23   A   Yes.
24   Q   One last question about the VPN.  How often --

17 (Pages 62 - 65)

Page 66

1 When you were working at Smart Mortgage -- obviously
2 you're still working. When you opened a VPN and you're
3 not at the Smart Mortgage, are you typically working on a
4 loan file or are you not?
5     A  Yes.
6     Q  Okay. So is it fair to say if your VPN is not
7 open or you don't have access to it, you probably are not
8 working on a loan?
9     A  No. I could be working calls or something
10 else.
11     Q  Okay. But if you were working a call, would
12 you not have your VPN open for the contact information?
13     A  No.
14     Q  And where would you get your contact
15 information from?
16     A  Lead mail box if you log in on your phone, on
17 your standard PC. It's web based.
18     Q  Okay. So you would either -- Let me back up.
19 So if you're working, you would either be logged into the
20 VPN or into lead mail box?
21     A  Sure.
22     Q  Typically?
23     A  Typically, yes.
24     MR. PERSON: No further questions.

Page 67

1     MS. STEPHENSON: I don't have any further questions
2 either.
3     MR. PERSON: Thank you, Ms. Gospodarek.
4     MS. STEPHENSON: Ms. Gospodarek, as part of the
5 deposition, you as the witness are entitled to review the
6 transcript and make any corrections that you'd like to
7 make, and so you'll receive a copy of the transcript and
8 it will have instructions there about how to submit any
9 corrections if you choose to do so.
10     THE WITNESS: All right.
11     (Off the record at 4:55 p.m.)
12     - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

Page 68

1 STATE OF ILLINOIS )
            ) SS:
2 COUNTY OF C O O K )
3
4     The within and foregoing deposition of the
5 aforementioned witness was taken before CAROL CONNOLLY,
6 CSR, CRR and Notary Public, at the place, date and time
7 aforementioned.
8     There were present during the taking of the
9 deposition the previously named counsel.
10     The said witness was first duly sworn and was
11 then examined upon oral interrogatories; the questions
12 and answers were taken down in shorthand by the
13 undersigned, acting as stenographer and Notary Public;
14 and the within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the forementioned witness, at the time
17 and place hereinabove referred to.
18     The signature of the witness was not waived,
19 and the deposition was submitted, pursuant to Rule 30 (e)
20 and 32 (d) 4 of the Rules of Civil Procedure for the
21 United States District Courts, to the deponent per copy
22 of the attached letter.
23
24

Page 69

1     The undersigned is not interested in the within
2 case, nor of kin or counsel to any of the parties.
3     Witness my official signature and seal as
4 Notary Public in and for Cook County, Illinois on this
5 23rd day of November, A.D.
6 2022.
7
8         *Carol Connolly*
9     CAROL CONNOLLY, CSR, CRR
    CSR No. 084-003113
10     Notary Public
    One North Franklin Street
11     Suite 3000
    Chicago, Illinois 60606
12     Phone: (312) 386-2000
13
14
15
16
17
18
19
20
21
22
23
24

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 70

1     Noe, Brian Et Al v. Smart Mortgage Centers Inc Et Al
2              Michelle Gospodarek
3       INSTRUCTIONS TO THE WITNESS
4        Please read your deposition over
5     carefully and make any necessary corrections.
6     You should state the reason in the
7     appropriate space on the errata sheet for any
8     corrections that are made.
9        After doing so, please sign the errata
10    sheet and date it.
11       You are signing same subject to the
12    changes you have noted on the errata sheet,
13    which will be attached to your deposition.
14       It is imperative that you return the
15    original errata sheet to the deposing
16    attorney within thirty (30) days of receipt
17    of the deposition transcript by you.  If you
18    fail to do so, the deposition transcript may
19    be deemed to be accurate and may be used in
20    court.
21
22
23
24    5581200

Page 72

1  Noe, Brian Et Al v. Smart Mortgage Centers Inc Et Al
2              Michelle Gospodarek
3       ACKNOWLEDGMENT OF DEPONENT
4        I, _____, do
5     hereby certify that I have read the foregoing
6     pages and that the same is a correct
7     transcription of the answers given by
8     me to the questions therein propounded,
9     except for the corrections or changes in form
10    or substance, if any, noted in the attached
11    Errata Sheet.
12
13    _____        _____
14    DATE              SIGNATURE
15
16
17
18
19
20
21
22
23
24    5581200

Page 71

1     Noe, Brian Et Al v. Smart Mortgage Centers Inc Et Al
2              Michelle Gospodarek
3         E R R A T A
4         - - - - -
5     PAGE  LINE   CHANGE
6     ___ ___ ___  _____
7     Reason:_____
8     ___ ___ ___  _____
9     Reason:_____
10    ___ ___ ___  _____
11    Reason:_____
12    ___ ___ ___  _____
13    Reason:_____
14    ___ ___ ___  _____
15    Reason:_____
16    ___ ___ ___  _____
17    Reason:_____
18    ___ ___ ___  _____
19    Reason:_____
20    ___ ___ ___  _____
21    Reason:_____
22    ___ ___ ___  _____
23    Reason:_____
24    5581200

**[01668 - allowed]**                                        Page 1

| **0** | **3** | **7** | |
|---|---|---|---|
| **01668**  1:6 | **3**  11:3 | **7**  29:11 | **acting**  68:13 |
| **084-003113**  69:9 | **30**  68:19 70:16 | **7:00**  56:22 | **active**  50:8,8 |
| **1** | **3000**  69:11 | **8** | 57:15 62:12 |
| **10**  30:12 48:23 | **312**  69:12 | **8**  26:2 | **actively**  63:15 |
| **100**  20:5,7 45:4 | **32**  68:20 | **815**  2:10 | **actual**  51:10 |
| 65:21 | **33**  3:7 | **874-3520**  2:5 | **add**  16:16,17 |
| **1120**  2:4 | **386-2000**  69:12 | **8:00**  57:6 | **adding**  23:1 |
| **125**  20:6 | **4** | **9** | **additional**  64:18 |
| **15**  29:10,20 30:4 | **4**  3:6 68:20 | **90**  30:10 48:7,22 | **address**  48:19 |
| 39:15 64:4,12 | **40**  25:16,17,20 | 50:23 | 50:5,6 55:18 |
| **17**  3:3 | 44:4,6,7 51:9,11 | **a** | **advice**  64:6 |
| **17th**  1:17 | 51:14 | **a.d.**  1:17 69:5 | **advises**  23:13,14 |
| **1:00**  1:17 24:3 | **4:55**  67:11 | **abide**  25:10 | **affect**  6:16,20 |
| **2** | **5** | **ability**  6:17,20 | **aforementioned** |
| **2**  11:3 | **5**  30:11 | **able**  19:23 31:17 | 68:5,7 |
| **200**  31:23 45:3 | **50**  20:22 44:23 | 32:3 51:24,24 | **afternoon**  4:15 |
| **20036**  2:4 | 45:3 | 52:6 55:15 | 32:18 |
| **2015**  65:10,11 | **500,000**  16:19 | **aboard**  19:3 | **ago**  10:4 11:6,7 |
| **2019**  11:16,16 | 17:6 | **absolutely**  28:4 | **agree**  18:11 43:1 |
| 12:7 28:3 30:17 | **516**  2:5 | **accept**  24:21 | 52:20 62:24 |
| 34:13 38:21,23 | **5581200**  70:24 | 55:15 | 64:17 |
| 47:18 | 71:24 72:24 | **accepting**  56:1 | **agreed**  18:1 |
| **2020**  11:8 | **5:00**  35:3 | 57:12 | **agreement**  40:16 |
| **2022**  1:17 3:3 | **6** | **access**  43:17 | 40:19 45:24 |
| 69:6 | **60**  20:22 44:23 | 48:12,13 51:18 | 46:9 55:7 |
| **20551**  69:8 | **60585**  2:9 | 66:7 | **agreements**  46:7 |
| **20th**  2:4 | **60606**  69:11 | **account**  50:8 | **ahead**  5:13 33:5 |
| **21**  1:6 | **61**  3:6 | **accurate**  34:13 | 44:5 62:1 |
| **23rd**  69:5 | **65**  3:7 | 34:15 35:6 | **al**  1:4 70:1,1 |
| **24330**  2:9 | **6:00**  56:21 58:19 | 37:15 48:9 | 71:1,1 72:1,1 |
| **25**  20:7 | 59:9 | 50:13 61:5 | **alleged**  45:16,17 |
| **254-2467**  2:10 | **6th**  34:13 | 68:14 70:19 | 53:5 |
| **2:45**  30:14 | | **acknowledgm...** | **allegedly**  51:14 |
| | | 72:3 | **allen**  14:22 |
| | | | **allow**  45:3 |
| | | | **allowable**  26:12 |
| | | | **allowed**  20:6 |
| | | | 26:14 57:2,4 |

**amount** 17:12
20:10,18 50:19
51:10 53:4
**annual** 16:15
17:5
**answer** 5:20 6:5
6:12 9:10 21:16
23:4,22 24:15
28:11 43:10
50:15 57:23
63:3,11,22,23
**answered** 16:24
**answering** 16:23
**answers** 5:19
68:12,16 72:7
**anthony** 12:6
13:23 14:7
**anybody** 7:24
8:12 9:2 10:2,16
15:18,22 18:20
27:1
**anymore** 19:10
**appeared** 2:6,11
**application**
28:18,24
**applications**
29:12
**apply** 30:4
**appraisal** 20:5
**appreciate** 14:24
**approach** 57:12
**appropriate**
70:7
**appropriately**
19:22 39:18,21
40:13 50:6 64:9
**approved** 18:17

**approving** 18:21
**approximately**
38:18
**arielle** 2:3 4:16
**aside** 9:1 11:18
11:19 20:24
64:10
**asked** 10:2 16:24
18:4 35:9 38:11
42:22 44:18
50:6 53:20
68:15
**asking** 17:1,4
21:14 24:17
63:20
**asks** 24:12 55:19
**assisting** 13:10
**assumes** 21:11
**assuming** 27:23
**astephenson** 2:5
**attached** 68:22
70:13 72:10
**attend** 28:17
**attended** 28:21
**attorney** 4:20
8:1 9:2 70:16
**august** 11:16
34:5
**authority** 33:17
**automated** 62:10
62:11,16,20
**automatically**
57:17 58:2
**available** 48:17
**aware** 19:19
21:21 29:16
37:7,9 39:1 40:8
43:5 44:19 45:6

45:9,18,19 46:6
46:21 53:4 55:6
58:23 60:7,20
62:17

**b**

**back** 30:14
34:22 37:12
39:15 48:15,21
64:4,11 66:18
**backed** 11:3
**balance** 23:10,17
**balances** 23:14
**balancing** 24:1,3
**based** 17:11,12
20:12 48:8
61:20 66:17
**basically** 48:7
**basis** 25:15
27:17
**began** 11:7
**behalf** 2:6,11
**believe** 33:21
34:5 47:5,17
49:12,13,14,18
50:7 51:15
54:16 57:7
**better** 42:19
**beyond** 64:19
**big** 9:21
**birk** 1:8,8 2:14
2:14 8:5,9,12
15:20,20,22,23
18:8,17,22 22:20
23:19 32:10,12
32:20,22 37:24
41:8,10 63:7

**birk's** 19:4,11
**bit** 10:24 13:6
17:8 18:13 19:6
25:13 31:21
57:3
**board** 13:15
19:14
**book** 30:17
54:10,11
**borrower** 20:7
20:13 23:18
62:5,19
**borrowers** 62:3
**bounce** 47:1
**box** 29:14,17
39:13 48:11,13
48:15 49:21
50:22 55:15
56:9 57:16 58:3
66:16,20
**break** 6:1,6
30:12 58:12
61:23
**breakdown**
40:11
**brian** 1:4,8 2:14
8:5,8,12,20 9:13
9:16 15:5,20,23
18:24 19:4,11,16
22:15 23:13,14
23:19 32:20,22
34:3,3,17 38:5
38:22 40:10
41:10 42:24
43:20 45:12
48:19 55:18
60:13,16,24 63:7
70:1 71:1 72:1

**brief** 10:8
**briefly** 5:11
  63:12
**bring** 19:14
  54:17
**broker** 16:7
  23:15,17 65:19
**brokerage** 16:5
**brokers** 16:10
**brought** 9:24
  30:18 48:6
**bucks** 45:3
**build** 31:1,4
**building** 31:16
**buildings** 27:15
**bumped** 32:24
**business** 12:4
  16:4 24:19,22
  30:17 54:10,10
  54:11 59:21
  64:11 65:18
**busy** 55:24
**butusov** 14:1

**c**

**c** 68:2
**call** 12:22 16:16
  25:6,10,11 29:9
  29:20 30:5
  48:21,21 56:14
  56:19 64:4,11
  66:11
**called** 4:10 8:22
  29:10 39:15
  58:18
**calls** 23:13 39:19
  56:1 66:9

**capacity** 63:7
**carefully** 70:5
**carol** 1:13 68:5
  69:9
**carry** 16:13
**case** 8:17 9:3,7
  9:14,17 10:5,6,9
  10:11 15:5
  33:19 37:14
  38:12 69:2
**catch** 57:15
**cause** 59:1
**centers** 1:7 4:18
  15:18 70:1 71:1
  72:1
**certain** 25:7
  34:24 41:5,21,21
  48:13 60:1
**certify** 72:5
**chain** 15:19
**change** 12:11,13
  12:15 20:12
  61:9 71:5
**changed** 43:23
**changes** 70:12
  72:9
**charge** 19:23
  20:21 23:7 45:4
**charges** 20:22
**charging** 20:19
**check** 23:15,17
  58:11
**chicago** 69:11
**choice** 18:11
  24:21
**choose** 17:23,24
  35:5 67:9

**chose** 18:14 25:1
  35:1,2
**circle** 48:21
**civil** 1:14 68:20
**clarify** 35:10,15
  36:18 44:14
  52:23
**classified** 63:19
**clear** 5:6 42:12
  43:14
**clientele** 31:16
**clients** 54:12,14
  54:14,15 62:16
  64:14
**close** 7:7 24:7
  31:17 32:3 37:9
  40:12 63:13,16
**closed** 32:1
**closing** 7:5 27:17
  27:24 28:18
**closings** 27:21
**clue** 32:24
**coach** 33:14
**coaching** 13:9
**collect** 20:7
**collected** 20:7
  23:18 40:12
  65:15
**collecting** 62:13
  62:19
**collects** 16:12
**come** 10:3 22:7
  22:17 25:8,9,23
  28:15,16,24
  32:20 34:2,23
  47:7 53:1 56:8
  59:17

**coming** 8:6,24
  9:23,24 19:3
  21:13 27:9
**command** 15:19
**commencing**
  1:16
**commission**
  17:12,18 18:1,2
  18:2,13 30:21
  31:16,20,24 35:5
  37:18 38:1,8
  39:18 40:10
  41:23 43:19,22
  43:24 46:12
  47:21 48:1,3,4
  53:10 61:9 64:5
  64:7 65:14
**commissions**
  65:22
**common** 28:17
  28:19 31:12,14
  62:4 65:13,21
**communicate**
  62:3
**communicating**
  62:5 64:13
**companies** 35:14
  35:17
**company** 8:2,4
  24:22 25:2,4
  26:21 27:23
  29:4,5 30:7,20
  39:17 48:5 62:8
  63:7,17 64:3,12
**compensated**
  17:9,10,11,14,17
  17:18

**[compensation - defendant's]**

**compensation**
17:21 18:5,9,16
18:21 19:12,20
21:3 22:9 23:2
29:17
**complained**
21:22 43:2
**complaining**
60:8
**complaint** 42:17
42:17
**complaints**
44:15 60:7
**complete** 68:15
**completely** 6:17
6:21
**complexity** 45:2
**compliance** 22:1
42:15
**compliant** 13:8
**computer** 7:3
**conclusion** 63:20
**conducting** 4:20
**confirm** 33:22
**connolly** 1:13
68:5 69:9
**consider** 13:6
14:11
**considered** 54:1
63:16
**contact** 25:11
40:1 66:12,14
**contacting** 58:4
**content** 58:1
**context** 9:7
**continue** 59:12
**contract** 26:23
54:19,21 55:11

**contracts** 18:19
**control** 59:20
61:4
**controls** 59:21
**conversation**
5:15 9:21 10:10
34:7
**conversations**
7:24 8:8 9:1
10:6 38:5
**cook** 69:4
**copy** 8:16 67:7
68:21
**correct** 5:8
15:11 17:20
21:23 23:19
32:5 34:11,21
35:7 37:6 38:23
40:5 41:1,2,6,7
41:21 42:6,7,11
43:18 44:16,17
44:20,21 45:7,8
46:13,15 48:10
48:24 49:1,22
51:3,4,7,20,22
51:23 52:2,4
53:6,7,11,13,14
53:17 54:21
55:1,4 56:14,15
56:22 57:1
58:10 59:1,22
60:9,11,14,17,19
60:23 61:1,2,10
61:11,12,13,14
61:15 62:6,9,23
63:4,10 64:20
65:6,7 72:6

**corrections** 67:6
67:9 70:5,8 72:9
**cost** 45:1
**counsel** 2:2 4:24
5:7 6:8 44:18
45:14 46:2,3
65:4 68:9 69:2
**county** 68:2 69:4
**couple** 29:12
31:5
**course** 45:11
**court** 1:1 4:1,3
5:16,17 8:16,21
9:14 10:9 70:20
**courts** 1:15
68:21
**covid** 27:18,19
27:20 28:2
**credit** 20:3,5,9
20:16 23:8 45:1
45:22
**crr** 1:13 68:6
69:9
**csr** 1:13 68:6
69:9,9
**cue** 14:19
**currently** 10:16
35:24
**customer** 25:11
29:22 40:1
42:18 51:18
54:17 57:13,15
62:12
**customers** 22:4
24:9,11 48:12
55:3
**cv** 1:6

**d**

**d** 3:1 68:20
**date** 11:9,17
29:15,17 34:12
34:13 39:1 68:6
70:10 72:14
**day** 1:17 10:19
25:7 26:2 27:13
29:11 32:14,21
51:1,1 69:5
**days** 29:11 70:16
**dc** 2:4
**december** 38:20
38:20,23 47:17
**decision** 37:20
37:21,23 38:1
**deducted** 19:23
19:24 21:9,17
31:19,24 40:21
**deducting** 21:22
22:4
**deduction** 21:24
22:8,12,19 23:2
23:8,14 24:5
43:2 53:2
**deductions**
19:19,21 21:2
22:23 27:9
29:16 38:11
40:8,16,19 42:23
43:5,11 44:19
45:7,21 46:11,12
55:1 65:14
**deem** 40:23
**deemed** 70:19
**defendant** 2:11
**defendant's** 6:8

**[defendants - example]** Page 5

**defendants** 1:9
**definitely** 35:16
  42:21
**definition** 34:22
  37:12 42:2,12
  54:8
**depending** 13:15
  18:12,24 33:4
**depends** 20:19
  45:2 55:19
**deponent** 68:21
  72:3
**deposed** 5:9
**deposing** 70:15
**deposition** 1:12
  2:2 3:2 4:1,20
  7:8,10,23 8:1,7
  8:14 9:8 67:5
  68:4,9,19 70:4
  70:13,17,18
**depositions** 1:16
**describe** 13:5
  16:3 17:10
  31:21
**deserve** 50:14
**detail** 45:15
**details** 10:11
**determining**
  37:18
**difference** 12:1
  53:22
**different** 17:14
  17:23 20:20,20
  20:22 48:5 49:4
  62:15
**dinosaur** 28:20
**direct** 22:14

**directly** 14:12
  36:16 40:15
**disagree** 22:8
**disagreed** 22:12
**discipline** 61:14
**disclose** 19:22
  22:24 26:22
**disclosed** 20:4
  43:21
**disclosing** 21:1
  40:21
**discretion** 56:24
**discuss** 26:15,24
  45:10
**discussed** 10:11
  18:10,23 26:19
  36:16
**discussing** 19:15
**disliked** 27:9
**dispute** 22:17
**disputed** 22:19
**distancing** 4:2
**distinguish**
  50:16
**district** 1:1,1,15
  4:19 68:21
**division** 1:2
**documentation**
  62:22
**documents** 6:23
  7:11,12,14,20
**doing** 31:10 34:9
  35:8 42:15 70:9
**dollars** 32:3 47:6
**donuts** 27:14
**double** 58:11
**draw** 31:19 32:2

**due** 4:1
**duly** 4:10 68:10
**dunkin** 27:14
**duties** 12:19
  64:18

**e**

**e** 3:1 7:16,21
  8:21,22 25:6
  68:19 71:3
**earlier** 33:9
  34:17 46:10
  48:7 60:6,12
**early** 32:18
**earn** 51:11
**earned** 51:10
**eastern** 1:2
**eduardo** 49:10
**effect** 36:24
**eileen** 1:4 15:8
  33:20 34:17
  39:6 41:11
  42:24 60:13,17
  60:24
**either** 21:3 33:23
  53:13 61:14
  66:18,19 67:2
**email** 7:15 9:22
  57:9,13,18,19
  58:2,6,7,8,18
  62:3
**emailed** 7:12
  9:16
**emails** 57:8,16
  62:15,16
**employee** 35:2
  37:15 38:12
  39:11

**employees** 37:1
  37:8 55:11
  63:16
**employment**
  20:17,21 40:15
  44:20 45:22
  46:7,9 55:7
**encourage** 64:4
**encouraged**
  29:19
**entered** 8:17
**entire** 28:22
**entitled** 67:5
**errata** 70:7,9,12
  70:15 72:11
**et** 1:4 70:1,1
  71:1,1 72:1,1
**etiquette** 39:21
**evening** 30:4
**event** 56:6
**everybody** 25:2
  49:4
**evidence** 21:12
**exact** 11:9 24:4
  39:1
**exactly** 16:6
  41:12
**examination** 3:5
  4:13 33:7 61:18
  65:1
**examined** 4:11
  68:11
**example** 20:1,9
  21:7 23:8 27:24
  46:17 48:16
  50:11 56:16
  59:3

**exhibits** 3:12
**expect** 10:3
**expenses** 21:10
  21:17,22
**experience** 18:13
**explain** 5:11
**explained** 9:12

**f**

**fact** 4:5 58:12
  63:12
**facts** 21:11
**fail** 70:18
**failure** 29:17
**fair** 14:6 20:12
  31:6 37:24 38:4
  39:4,5 40:2 42:2
  59:20 63:5 66:6
**familiar** 52:8
**family** 56:6,6
**fashioned** 28:20
**federal** 1:14
**fee** 19:23 20:1,3
  20:4,6,9,10,10
  20:16,17,18 21:1
  22:1 23:8
**feel** 5:23 6:3
  58:7
**feeling** 55:24
**fees** 20:15,24
  45:21,22 65:14
**figures** 51:11,15
**file** 66:4
**final** 37:20,24
**find** 21:7 24:6
**fine** 7:20 11:18
  24:14 58:14

**finish** 24:3 30:1
  60:4
**finished** 36:2
**fire** 33:17 41:15
  61:12
**fired** 40:6
**firm** 4:16
**first** 4:10 6:5
  9:17,19 29:21
  31:10 47:13
  68:10
**five** 13:16 29:3
**florida** 13:23
  27:24
**fly** 27:24
**follow** 29:11,12
  50:14,17 56:10
  58:19 61:21
  62:16 65:3
**following** 2:2
**follows** 4:12
**foregoing** 68:4
  68:14 72:5
**forementioned**
  68:16
**form** 9:9 23:3
  28:9 33:24 43:7
  43:8 46:2,14
  49:16 51:21
  52:3 59:2 60:10
  60:15,18,22 61:6
  63:2,9 64:15
  72:9
**four** 28:23
**franklin** 69:10
**free** 5:23 6:3
**frequent** 26:10

**frequently** 28:7
**frowned** 26:15
  26:16,17 27:3
**froze** 57:24
**frozen** 57:21
**full** 4:22 18:2
**further** 61:16,18
  64:21 65:1
  66:24 67:1

**g**

**gen** 48:4 49:14
  50:3
**general** 58:6
**generally** 30:4
**generate** 24:22
**generated** 25:4
  29:4 30:7,20
  50:12,18 54:12
  58:8 62:8,8
**generating** 24:9
  24:11,19
**gentleman's**
  14:19
**getting** 9:13
  51:10
**give** 5:20 6:11
  20:1 48:20
**given** 72:7
**gives** 40:10
**go** 5:13 6:2,3
  22:13,14,15
  25:14 27:22
  32:6 33:5 44:5
  46:19 56:5,6
  62:1,15
**goes** 63:5

**going** 5:11 9:14
  10:1,9 14:18
  17:2 18:3 26:17
  34:22 37:12
  48:11,15 56:5
  57:4 58:11 65:8
**good** 4:15 29:24
  30:11 33:13
  64:11
**gospodarek** 1:13
  3:2 4:6,9,15,23
  9:11 16:21 17:2
  23:5,22 24:15
  30:12,16 46:6
  57:22 61:20
  63:22 67:3,4
  70:2 71:2 72:2
**gospodarek's**
  23:21
**gotten** 47:7
**granted** 31:19
**grew** 12:6 14:3
**ground** 5:12
  6:13
**grow** 12:5
**growing** 14:4
**guess** 46:22
  48:23 55:15
  56:9 57:4
**guide** 64:9

**h**

**half** 11:9 34:7
**handle** 29:5
  56:17
**handled** 42:14
**happen** 48:18

**happens** 16:9
  55:16
**hard** 15:3 33:15
  37:13
**head** 5:21 34:16
**health** 21:6
**hear** 24:2 43:9
**heard** 9:17,19
  21:18,20,20,24
  22:3 44:14
**held** 1:12 3:2
  11:20
**hello** 34:7
**help** 12:21,22
  28:16 30:21
  33:14
**helped** 33:14
**helpful** 16:3
**hereinabove**
  68:17
**hey** 48:20 58:19
**hierarchy** 15:17
**higher** 15:21
  18:2,13 63:1
**hired** 37:19
  43:20
**hiring** 18:24
  19:2 35:8
**history** 65:8
**hold** 14:18 63:15
**home** 25:21 26:4
  26:8 27:15
  59:15
**honestly** 26:18
**hour** 25:16
**hourly** 17:24,24
  18:14 35:1,2,5
  41:2,3,5 53:16

**hours** 25:9,17,20
  26:2 27:6 28:14
  34:19 44:3 51:9
  51:11,14 53:4,5
  53:9,13,16 56:21
  57:10,18 58:8
**huh** 24:20
**hurry** 24:3

**i**

**idea** 9:20 12:16
  34:19
**ideas** 47:1
**illegal** 26:16
**illinois** 1:1 2:9
  4:19 13:23 68:1
  69:4,11
**impairment** 6:20
**imperative**
  70:14
**improper** 43:4
  45:20 53:1
**include** 36:20
**including** 36:20
  37:2
**incorrectly**
  23:18
**independently**
  24:23
**individual** 38:9
  55:6
**individuals**
  14:12,14 41:13
  53:15
**industry** 10:24
  65:21
**influence** 6:16

**information**
  19:10 21:13
  23:19 66:12,15
**initially** 19:2
**input** 37:21 38:6
  38:7
**inside** 28:8
**instances** 55:22
  56:3
**instructions** 67:8
  70:3
**insurance** 21:6
**interested** 69:1
**interrogatories**
  4:11 68:11
**interviewing**
  19:15
**involved** 18:20
  23:1,24
**involvement**
  19:4,7,11
**involving** 45:16
**issue** 16:21 34:2
**issues** 60:7

**j**

**jason** 14:21 36:3
  36:14,16
**job** 12:10,12,14
  15:3 27:1 31:9
  31:13 35:20
  36:8,11,15
**jobs** 35:10,12
  36:19,20,21 37:5
**joined** 30:16
**joining** 7:10,23
**jon** 14:1,2,4,5,7
  15:14 16:2

  26:19
**jon's** 26:18
**jose** 14:20
**journals** 19:24
**judge** 5:17
**june** 49:10

**k**

**k** 68:2
**keep** 7:6 29:13
  29:14,17
**keeps** 29:14
**kelly** 23:12 24:1
  24:3
**kin** 69:2
**kind** 12:3 15:21
  16:3 18:11,23
  28:19 30:24
  33:12 62:16
**klaic** 14:22
  15:10 26:7
  41:11,14,15
  42:24 46:18,19
  49:13 51:2
  58:18 59:4,5,8
  61:3
**klaic's** 41:17
**knew** 54:24 55:3
**know** 5:23 6:3,8
  7:13 8:5,10,20
  8:21,22,23,23
  10:3 11:2,8,17
  11:22 12:1,4,16
  14:24 16:9,14,19
  17:5,13,22 18:4
  18:10,12,13 19:2
  19:5 21:8 22:19
  23:23,24 24:1,4

**[know - manager]** Page 8

24:7 25:13 26:1
26:4,16,18,20,23
28:17 29:21,22
32:15,17,22
33:12,13,14 34:8
34:15 35:21
36:4,7 38:24
40:11,14 41:12
42:14,14,18
43:12,19 45:14
47:6 49:3,24
50:4,23 51:2,5
56:7 62:20
63:14,22
**knowledge** 12:11
17:17 18:8,20
19:6 22:16
34:14 43:4,22
45:5 49:7 50:1
55:23 63:19
**kristi** 14:22 36:3

**l**

**lane** 2:9
**late** 41:13 57:12
60:4
**law** 2:8 4:16
19:23
**laws** 13:9
**lawsuit** 45:13,16
**lead** 29:9 30:3
39:13,19,20 48:6
48:6,11,13,15,16
48:17 49:21
50:5,16,16,22
55:14,14,16,16
55:21 56:8,9,17
57:16 58:3,20

62:11 66:16,20
**leads** 24:22 25:3
25:4,5,8 29:4,6
29:11,13,20 30:7
30:20 48:8,14,23
49:5,7,12,13,15
49:17,19,20,21
49:24 50:9,10,11
51:3,5,6,18 52:1
52:6 54:13
55:20,21,22 56:2
56:4 64:4
**leave** 27:13
28:15 32:16
41:21
**leaving** 28:7
**left** 26:5 32:17
32:18 41:9,11,11
41:11,13
**legal** 57:2 63:20
**legally** 40:21
**lender** 16:11,12
**lenders** 16:8
**leski** 2:9
**letter** 68:22
**letting** 8:5,23,23
**license** 37:8
63:15
**licensed** 63:13
**line** 71:5
**list** 49:11
**little** 5:13 10:23
13:6 17:8 18:13
19:6 25:13
31:21 57:3
**live** 28:24
**llc** 2:3

**loan** 10:18 11:13
11:15,19,23 12:2
12:7,15 13:1,7
13:12 14:11
16:5,10 17:8,12
17:14,18,23 18:6
18:16,21,24 19:7
19:11,19 20:5,8
21:2,4,21 22:6
22:23 23:2,9,11
24:7,8,24 25:5
26:10 28:6,13,18
31:12 35:7,9,11
35:13,14 37:22
40:11,12 42:4
43:18 44:8,11
45:2,6,24 46:6
46:11,22 48:2
49:2,6 52:1,24
53:9,18,21 54:1
54:4,5,18 55:7
60:7 62:2,5,13
62:18 63:1,6,12
63:14 64:4,13,19
65:9,10,18,22
66:4,8
**loans** 13:10 16:7
16:9 31:18 32:1
32:4 33:13 37:9
42:15 48:3,8
50:2 62:8 63:14
63:16
**local** 27:22
**log** 66:16
**logged** 66:19
**long** 11:14 15:2
15:13 31:4 34:3
34:8,10 61:22

65:9
**longer** 25:20
59:5
**look** 11:16 14:23
34:16 47:8
**lot** 15:1 19:13
20:19 27:21
28:14
**lunch** 27:14

**m**

**mail** 25:6 29:14
29:17 39:13
48:11,13,15,16
49:21 50:22
55:15 56:9
57:16 58:3
66:16,20
**mailed** 7:16,21
8:21,22
**majority** 36:23
36:24 37:3,3
**making** 13:8
19:7 23:7 26:19
26:19,20 32:3
44:8,11 56:1
**manage** 12:5,21
16:2 39:17,21
64:9
**managed** 15:6
25:23 49:11
**manager** 10:9,15
10:20,21 11:7,19
12:2,8,9,12,15
12:20 13:1,7,13
13:17 14:1,2
15:15 19:19
22:1,14 25:19

38:17,19 47:15
47:16 53:21
54:1,7,9 63:1,6
64:18
**managers** 11:23
13:20 14:7 54:2
**managing** 10:16
12:3,4 36:2,3
49:13,18 50:7
54:9
**marked** 3:12
**market** 16:13
**marketing** 21:9
21:17,22 24:23
**matter** 4:17,18
**mattered** 16:2
**max** 39:9
**maximize** 39:18
64:5,7
**mc** 14:19
**mccuean** 14:23
36:3
**mcdonald's**
35:20
**mean** 12:14
21:20 25:3
26:14 32:24
33:10 34:6
36:18 42:10
47:23,23 49:20
57:3,9 59:3
63:18
**meaning** 15:13
**means** 6:10
**meant** 42:10
**medications**
6:15

**meeting** 56:5
**member** 50:7
**memory** 26:7
**mental** 6:19
**mention** 27:4,8
**mentioned** 10:14
23:16 29:19
33:9 34:17
35:22 37:13,18
39:13,14,14,23
41:8,14 42:22
44:20,24 45:14
45:21 46:17
48:7 50:23
51:17 54:11,23
56:13 60:6 61:3
64:3 65:4,4
**mentor** 42:20
**message** 58:2,18
62:10,12,20
**method** 62:4
**michelle** 1:12
3:2 4:6,9,23
14:19 43:8 70:2
71:2 72:2
**mid** 11:8
**mind** 7:5 16:23
**minimum** 9:4,12
9:14 17:24
44:12 45:17
58:24 60:8
**minute** 30:4,12
**minutes** 29:10
29:20 39:16
64:5,12
**mischaracterizes**
23:20

**mitchell** 2:3 4:16
**mitchellsandle...**
2:5
**mix** 25:2
**moment** 53:15
55:13 58:11
**money** 19:22
**month** 27:20
34:6
**monthly** 27:17
**months** 11:3,7
15:14 31:3,5,15
**morning** 56:18
57:6 59:9,9
**morphed** 15:16
**mortgage** 1:7
4:18 8:13 9:6
10:6,12 11:12,15
11:20,22 12:22
13:2,8,14,21
15:18 16:4,7,10
16:16 17:9,15
18:9,18 21:3,8,9
22:1,3 28:22
29:21 30:17
31:13 34:4
35:11,13,14,16
35:23 36:15
37:1,7,8,19 38:2
38:23 39:11
40:5 41:24 43:6
44:7 45:10
47:12 48:8,12,23
49:17 51:19
52:2,19,24 53:2
53:5,21 54:13,18
55:4 56:21 58:3
58:5 60:21 61:4

62:11 63:15
64:7 65:5,18
66:1,3 70:1 71:1
72:1
**mortgage's**
16:15 52:8
54:14,15 59:21

**n**

**n** 3:1
**name** 4:15,22
14:20,22 36:4,5
**named** 68:9
**narrative** 24:12
24:17
**national** 25:10
30:5 56:18
**nature** 9:3
**near** 6:24
**necessarily**
50:18
**necessary** 7:19
70:5
**need** 4:1 5:20
57:17 59:5 60:1
60:4 62:21
**needed** 11:4 26:5
**needs** 59:8,11,14
**negotiation** 18:6
**never** 15:6 21:17
21:20 26:24,24
27:7,11 33:22
34:1 36:16 43:3
43:21 44:10,13
44:14 52:16
61:1
**new** 29:11 43:20
50:8

**night** 57:7,16
  59:12,15
**nighttime** 35:20
**nodding** 5:20
**noe** 1:4 4:18
  15:5 33:20 34:3
  34:3,17 38:22
  41:10 42:24
  60:13,16,24 70:1
  71:1 72:1
**nominal** 45:21
**nonverbal** 5:21
**north** 69:10
**northern** 1:1
  4:19
**notary** 1:14 68:6
  68:13 69:4,10
**note** 5:14
**noted** 24:18
  63:21 70:12
  72:10
**november** 1:17
  3:3 38:20 47:17
  69:5
**number** 28:3
  48:13
**nw** 2:4

**o**

**o** 68:2,2
**o'clock** 24:3
  56:14,21,22
  58:19 59:12,15
**oath** 5:16
**object** 5:4 6:9
  33:24 43:7,8
  46:2,14 49:16
  51:21 52:3 59:2

60:10,15,18,22
  61:6
**objection** 6:12
  9:9 13:4 16:20
  16:21,22,24
  21:11 23:3,20
  24:12,16,18 28:9
  63:2,9,18,21
  64:15
**obligated** 58:7
**obtain** 30:21
**obviously** 7:6
  25:9 39:19 51:8
  53:12 55:9 66:1
**occasion** 33:16
  36:7 39:6 42:24
  52:11 54:20
  58:17
**occasionally**
  65:13
**occurred** 40:9
**offer** 18:11 19:7
**offered** 35:8
**offering** 19:11
  19:15
**offhand** 47:4
**office** 2:8 12:22
  13:23 24:2
  25:14,17,20,20
  25:23 26:3,8
  27:12 28:6,7
  29:2 32:6,9,10
  32:13,19,23 34:9
  34:24 39:7 41:5
  41:9,10 44:6
  59:4,18
**officer** 10:18
  11:13,15,19 12:2

12:8,15 13:7
  16:10 17:18
  18:7,21,24 19:8
  19:11,20 20:8
  21:2,21 23:9
  24:8 25:5 28:18
  37:22 40:11
  43:18 44:8 52:1
  52:24 53:21
  55:7 62:5,13,18
  63:1,6 64:19
  65:9,10
**officer's** 18:16
  21:4 22:24 23:2
  46:11
**officers** 11:23
  13:1,12 14:11
  17:9,14,23 22:6
  24:24 26:10
  28:6,13 31:12
  35:7,10,11,13,14
  42:4 44:11 45:6
  45:24 46:7,23
  49:3,6 53:9 54:1
  54:4 60:8 62:2
  63:13,14 64:4,13
  65:22
**official** 12:10
  34:12 69:3
**oh** 57:20
**okay** 5:5,9 6:7
  7:9,13,17,19
  8:19 9:6 10:4
  11:1,11,18,22
  12:17 13:12
  14:6,10,19,24
  15:7 16:1,6,14
  17:21 18:3 19:4

19:18 21:19,24
  22:11,16 25:4,13
  27:8,12,23 29:4
  29:19 30:1,2,12
  30:14 32:2 34:8
  34:12 35:4
  36:10 38:22
  40:8,14,18 41:3
  42:22 43:14,23
  44:5,7 45:5,20
  46:5,22 47:3,11
  48:7,15 50:10
  51:24 52:8,17,20
  53:20,24 54:7,11
  54:16,20 55:6,13
  55:21 56:3,13,20
  57:8 58:1,7,12
  58:22 62:24
  63:11 64:1,17
  66:6,11,18
**old** 28:20
**once** 10:23 27:20
  29:9 31:20,24
  33:1 58:21
**online** 22:4
  25:10
**open** 7:2,6,15
  52:15 66:7,12
**opened** 66:2
**opens** 56:19
**operating** 10:8
**operations** 10:14
  10:20,21 11:7,19
  12:12,20 13:1,7
  13:13,17,20,22
  13:24 14:2,7
  15:15 19:18
  25:19 38:17,19

47:14,16 59:21
62:24 63:6
64:18
**opinion** 51:13
**opportunity**
17:13 35:5
45:10
**option** 25:3
39:19 49:22
**oral** 4:11 68:11
**order** 8:17,21
39:18
**organized** 29:14
**original** 70:15
**outside** 30:5
55:11
**overlap** 13:24
14:3
**overlapping**
39:3
**overtime** 27:5
44:9,15 45:16,16
58:24 59:1 60:8
**owen** 14:21 36:3
**owen's** 36:5
**owned** 55:4
**owner** 15:20
63:7

**p**

**p.m.** 1:17 30:3
58:19 67:11
**package** 18:14
**packages** 17:23
**page** 3:5 71:5
**pages** 72:6
**paid** 18:2 26:15
27:5 38:1 43:18

44:12 47:4 61:4
**pandemic** 55:10
**papers** 6:23
**paperwork**
62:13,19,21
**part** 10:5 21:19
23:11 35:17
36:8,11,15,20,21
37:2,5 49:12
67:4
**particular** 37:15
38:9,12 45:13
56:17 59:9
**parties** 4:3 18:10
69:2
**passed** 23:8
**pause** 6:2
**pay** 19:24 21:4,4
26:11,13,22 27:1
27:10,23 40:22
43:22 44:9,15
45:16 48:5
**payments** 16:12
**payroll** 23:10,10
23:11,12,13 24:1
24:2,5 40:9,11
42:23 43:13,15
45:7 47:8
**pc** 66:17
**pending** 4:19 6:4
**people** 12:4
14:11 15:1 25:9
26:4,5 28:5,14
28:23 36:19
43:20 49:11,11
49:12 52:5
**percent** 48:8,22
48:23 50:23

65:22
**percentage**
17:11 30:9
43:19 47:24
48:1,22
**period** 15:2,12
15:13 30:23
46:18 47:13
**person** 2:8,8 3:7
4:8 5:2,4 6:9 9:9
13:4,18 16:20
17:4 19:3,16
21:11 23:3,20
24:12,16 28:9
29:21 33:3,8
34:2 39:15 42:4
43:9 46:5,16
49:17 50:17
51:22 52:5
57:22 58:16
59:3 60:12,16,20
60:24 61:8,16
63:2,9,18 64:15
65:2 66:24 67:3
**personal** 48:14
56:7
**personally** 37:20
41:4 58:22,22
60:20
**personlaw.com**
2:10
**perspective**
39:23
**pertaining** 1:16
**phone** 62:3
66:16 69:12
**phonetic** 14:23

**physical** 25:14
29:2 32:6,23
**pick** 10:22 30:24
**picked** 31:2
**piece** 45:20
**place** 4:2 68:6,17
**places** 37:1
**plainfield** 2:9
**plaintiff** 1:5 2:6
15:4
**plaintiffs** 4:7,17
15:5 33:19
**plan** 30:14
**please** 4:22 5:23
48:21 55:20
70:4,9
**pleased** 28:13
**plus** 18:1
**point** 6:2 9:3,8
12:8,11 14:6
27:4,13 33:3
51:8 53:24
55:17 56:11
**policy** 26:21
39:17 64:3,8
65:4,5
**poor** 22:4
**position** 11:7
63:1
**possible** 9:14
40:1 58:6
**possibly** 36:17
**potential** 40:1
57:13
**practice** 64:11
**practices** 60:21
**prefer** 26:3,3

**present**  2:1,13
  6:9 19:2 68:8
**presented**  37:22
**presently**  6:15
**president**  63:8
**pretty**  22:23
  31:2 41:13
**previously**  65:17
  68:9
**print**  28:15
**printed**  6:23
**printer**  28:15
**prior**  7:10,23
  9:22 14:2 45:7
**probably**  10:1
  10:22 11:2,3
  42:21 66:7
**procedure**  1:15
  68:20
**proceed**  7:8
**process**  5:12
  9:23 19:1 23:1
  23:11,24 24:4,8
  24:19
**processors**  53:18
  54:5
**producing**  12:9
**project**  60:4
**proper**  39:20
**properly**  21:1
  22:24 46:12
**property**  52:18
  54:18 55:3
**propounded**
  72:8
**provide**  8:16
  37:21 45:15

**provided**  64:13
**providing**  38:6
**provision**  46:10
  54:24 55:10
**pruitt**  1:4 15:8
  33:20 34:18
  39:6 41:11 43:1
  60:13,17,24
**psychological**
  6:20
**public**  1:14 68:6
  68:13 69:4,10
**pursuant**  1:14
  68:19
**put**  8:23 57:3
**puts**  6:12

### q

**quality**  13:10
  42:15
**quarterly**  16:17
**question**  5:21,22
  6:4,5,11 9:11
  17:1,4 18:4 19:9
  21:14 24:13,13
  24:14 35:9
  37:14 46:4,22
  53:22 57:24
  58:1 65:24
**questions**  5:4,14
  5:15,18 6:13
  13:11 33:2,4,4,6
  38:11 42:23
  44:18 46:19
  58:16 61:16,21
  61:24 64:21
  65:3 66:24 67:1
  68:11,15 72:8

**quick**  30:11
**quickly**  31:2
**quite**  11:4

### r

**r**  71:3,3
**raise**  47:7
**rarely**  32:8
**rate**  37:19 38:8
  41:23 48:3,4
  61:9
**rates**  48:5
**reach**  29:22
**read**  52:16 54:20
  70:4 72:5
**really**  8:10 11:4
  23:23 34:8
  35:18 37:9
  42:10 57:17
  65:8
**reason**  70:6 71:7
  71:9,11,13,15,17
  71:19,21,23
**reasoning**  29:22
**recall**  15:4,7,10
  27:6 34:12
  36:10 40:15
  42:23 44:8,11
  47:4,24 49:9
  52:13,14 53:22
  55:10 58:17,23
**receipt**  70:16
**receive**  25:5
  29:10 47:21
  55:14 67:7
**received**  48:17
  56:16

**receiving**  44:15
**recognize**  45:23
**record**  4:22 5:6
  6:4,9,12 16:22
  24:16 30:15
  58:15 67:11
  68:15
**recruiting**  19:13
**reduce**  28:3
**referral**  50:12
  50:19
**referrals**  48:23
**referred**  20:2
  68:17
**referring**  11:22
  28:10
**reflected**  22:8
**regarding**  9:14
**regardless**  62:7
**regularly**  63:14
**relateable**  42:3
**related**  35:19
  42:3
**relating**  45:21
**rely**  30:20
**remember**  9:24
  11:6 14:15,17,18
  14:20,21 31:22
  36:4 40:18 47:7
  55:12
**reminder**  48:20
  55:18
**remotely**  1:12
  3:2 4:2 26:5
**repeat**  17:3 18:3
  19:9 57:23,24
**rephrase**  5:23

**report** 16:17 20:3,6,16 45:1 45:22
**reported** 14:12
**reporter** 4:1,3 5:17
**reporting** 20:10 23:8
**reports** 12:23 16:16
**represent** 4:17
**representative** 58:5
**represented** 4:24 5:6
**representing** 5:2
**require** 34:23 41:4,20 50:11,18 59:3
**required** 6:11 8:6 26:2 53:9 56:20
**requirement** 39:15,16 40:4
**resigned** 38:22
**respond** 56:21
**responded** 57:1
**response** 5:21 24:13
**responsibility** 22:24 40:20
**responsible** 12:24
**restroom** 6:2
**retrieve** 7:20
**return** 70:14
**review** 7:11,21 12:21 67:5

**reviews** 22:4
**richard** 1:8 2:14 15:20,22 18:7,8 18:17,21,23 19:16 22:15,20 32:10,12,22 33:1 37:24 38:5 41:8 41:10 63:6
**richie** 41:13 45:11
**right** 5:1,7 10:15 10:17 14:22 16:14 26:22 32:4 33:3 34:20 36:2 53:16 60:21 62:14,18 62:22 67:10
**role** 10:23 11:4 13:18
**room** 19:15
**rose** 31:18
**rule** 30:4 68:19
**rules** 1:14 5:12 6:13 13:9 68:20
**running** 54:18
**ryan** 14:22 15:10 26:7 33:20 41:11,14,15,17 42:24 46:17 49:13 58:18 59:4

**s**

**salaried** 38:16 44:2 47:3 51:9
**salary** 38:12 47:9,10,12,20,21 53:12

**sales** 11:23 12:2 12:3,8,15 16:15 17:6 29:24 39:23 53:21,24 54:2,7,9 55:11
**sandler** 2:3 4:17
**satisfy** 42:18
**saw** 28:6 39:8 59:4
**saying** 26:21 41:9 42:9,9 50:19 62:20
**scenarios** 12:22 33:15
**schedule** 41:1,17
**screen** 6:24
**seal** 69:3
**secondary** 16:13
**see** 39:7,8 43:15 43:17 52:1,6
**seen** 13:20
**self** 48:4 49:14 50:3,12,18 62:8
**send** 23:16,17,19 57:9,17
**sends** 55:18 57:16 62:11,20
**sense** 39:24
**sent** 9:22 20:5 58:2,17 62:12
**sentences** 46:4
**september** 34:13 47:14
**serve** 8:24 9:23
**served** 10:2,2,5
**server** 9:24
**set** 20:18 25:11 28:14 40:24

41:17,23
**sets** 17:21 18:4,8
**seven** 28:23
**sheet** 40:10 70:7 70:10,12,15 72:11
**shop** 25:10
**short** 14:21 15:2 15:12,13 39:4 46:18 47:13 58:12
**shorthand** 68:12
**show** 41:4 48:19
**sick** 27:15
**side** 31:11
**sign** 55:7 70:9
**signature** 68:18 69:3,8 72:14
**signed** 18:17 46:7 54:21
**signing** 40:15 70:11
**similar** 46:7
**simple** 24:13
**sitting** 48:20
**six** 51:11,15
**slow** 30:23
**slowed** 10:17,23
**small** 58:6
**smart** 1:7 4:18 8:13 9:6 10:6,12 11:12,15,20,22 13:2,14,21 15:17 16:4,6,10,15 17:9,15 18:9,18 19:17 21:3,8,9 22:1,3 25:14 28:22 29:1,21

30:17 31:12 32:6,23 34:4 35:11,13,23 36:15,19 37:1,4 37:7,8,19 38:1 38:22 39:11 40:4 41:23 43:6 44:7 45:10 47:12 48:8,12,22 49:17 51:18 52:1,8,19,23 53:2,5,21 54:13 54:14,15,18 55:4 56:20 58:3,5 59:21 60:21 61:4 62:11,20 63:15 64:7 65:5 66:1,3 70:1 71:1 72:1

**social** 4:2

**sold** 16:13 49:4

**somebody** 9:23 19:14 22:11 35:20 50:4,5

**soon** 40:1 56:12 58:5

**sorry** 14:3,5 43:7,9 57:22 64:1

**sort** 6:13 31:17

**sounds** 34:15

**space** 70:7

**speak** 9:2 19:6 19:21 42:16

**speaking** 45:13

**split** 25:2,3 49:2

**spoke** 8:13

**spoken** 9:7

**spree** 35:8

**ss** 68:1

**standard** 10:18 20:10 21:5 58:4 66:17

**standardly** 37:4 44:6 57:14

**start** 4:21 34:12

**started** 11:8 14:4 31:10 32:1 34:5 47:5,13,14,16

**state** 4:22 68:1 70:6

**stated** 60:12

**statement** 36:21 36:23 44:12 50:13 61:5 65:14

**statements** 29:5 44:8

**states** 1:1,15 27:21 40:20 68:21

**stay** 15:2 28:8 59:5,11 60:4

**stayed** 34:9 41:13

**stenographer** 68:13

**stephenson** 2:3 3:6 4:7,14,16 5:5 9:10 13:5 17:2,5 21:14,16 23:4,22 24:14,18 28:11 30:16 33:2,24 35:9 43:7 46:2,14

49:16 51:21 52:3 57:21 58:13,14 59:2 60:10,15,18,22 61:6,19 63:3,11 63:21 64:17,21 67:1,4

**stepped** 15:15

**stipulate** 4:3

**stipulated** 4:7,8

**street** 2:4 69:10

**strike** 31:3

**stuff** 7:15 9:12 42:15

**subject** 70:11

**submissions** 12:21

**submit** 67:8

**submitted** 68:19

**submitting** 13:10 33:13 42:15

**substance** 6:16 8:9 72:10

**suffer** 6:19

**sufficient** 62:21

**suite** 69:11

**summons** 7:18 8:6

**summonsed** 9:13

**supervise** 15:9 33:10,21 34:22 42:8,9,10,13,19 54:5 60:13,16

**supervised** 13:13 22:7 33:9,22 34:1,18 41:15

**supervising** 13:1 13:6 15:4,7,10

**supervision** 33:23 37:12 40:24 42:3

**support** 33:12 34:23 37:14 42:4,10 46:19 60:13

**supporting** 37:13

**supposed** 29:11

**sure** 8:18 11:24 13:3,8,9 19:10 20:3 23:7 29:7,9 29:24 30:13 31:7 33:13 37:3 41:12 50:15 66:21

**surprise** 21:7

**swear** 4:3

**sworn** 4:10 68:10

**system** 29:13 52:9

**t**

**t** 71:3

**tactic** 29:24

**tail** 28:2

**take** 4:2 6:2,5 31:1,4 39:19,20 42:17 49:15,24 58:12 61:22,23

**taken** 1:13 3:3 21:3 22:12 46:11,12 68:5,12

**takes** 50:10,11
**talk** 10:8 17:8
  22:11 26:10,12
  45:11
**talked** 26:24
  37:17 40:14,16
  63:12
**talking** 27:2 55:9
  62:2,10
**taxes** 21:5
**team** 12:5,5,6,21
  14:3,4,4,5,5,10
  14:11 15:15,16
  25:22 26:18
  33:10,17 34:18
  34:18,23 35:22
  35:23,23,24
  43:20,21 46:17
  46:18,23 50:5,7
  52:5,24 59:24
  60:3 61:1,8
**team's** 40:24
  43:15
**teams** 14:8
**tell** 7:15 9:20
  17:7 19:10 29:8
  59:8,11,14,17,24
  60:3
**ten** 13:16
**terminated**
  26:17
**terms** 15:17
  33:23 38:8
  40:19,23 41:14
  51:2 53:9,24
  54:7 55:9 58:23
  65:18

**testified** 4:11
  46:10
**testify** 6:17,21
**testifying** 46:3
**testimony** 8:9
  23:21 33:21
  35:11,12 36:18
  37:18 39:24
  45:23 51:17
  54:24 56:13
  60:6
**text** 8:23 25:6
  57:18,19 58:2,8
  58:9,18 62:3
**thank** 46:5 58:4
  61:16 67:3
**thing** 5:14
**things** 10:17,22
  10:23 12:23
  18:12
**think** 8:20 9:23
  11:16 12:18
  20:15 21:2
  23:12,13 24:14
  28:21 30:11
  36:17,24 37:17
  50:3,3 52:18
  61:21
**thinks** 6:10
**third** 45:20
**thirty** 70:16
**thousand** 47:6
**three** 31:6,15
  39:9,10
**tier** 18:2
**time** 5:22 9:17
  9:19 11:5 13:21
  13:24 14:16,21

15:2,12 17:22
  19:18 25:7
  28:22 30:5,11
  31:1,8 32:15,18
  34:24 35:17
  36:8,11,15,20,21
  36:22 37:2,5
  39:3,10,13 41:5
  41:12,21,21 43:5
  44:2,7 46:18
  47:11,13 49:12
  50:12,18,20
  52:23 55:9 56:2
  56:7,10,19 57:1
  59:9 60:1 61:17
  68:6,16
**timeframe** 38:16
  57:5
**times** 25:10,12
  29:12 39:9,10
**tips** 64:12
**title** 10:15 11:20
  12:11,13,14
  13:22 53:20
**titles** 11:24
**today** 4:20,24
  5:7 6:17,21 7:10
  7:23 10:15 59:5
**today's** 8:1
**told** 9:13,22 10:1
  22:7 43:12
**tolerance** 20:4
**top** 34:16 47:21
**topic** 9:21
**track** 53:9,13
**tracked** 53:16
**transcribing**
  5:17,19

**transcript** 67:6,7
  70:17,18
**transcription**
  72:7
**transfer** 55:19
**tried** 27:22
**trips** 27:14
**true** 62:7 68:14
**truthfully** 6:17
  6:21
**try** 39:24 42:17
**turn** 49:21,22,23
  55:20,22 56:3
**turned** 50:2
**turns** 55:21
**twice** 17:4 27:20
  39:8
**two** 12:5 17:23
  31:6,15 33:19
  34:6 48:5
**type** 47:21 52:13
  52:14 58:24
  64:6 65:17
**types** 20:15,20
**typical** 49:2
**typically** 44:3,22
  45:1 55:23
  57:19 66:3,22,23
**tyrell** 14:22

---

**u**

---

**uber** 36:13,14,17
**uh** 24:20
**ultimately** 19:7
**unable** 55:20
**unaware** 43:11
**unconventional**
  5:13

**underdisclosed** 20:3
**undersigned** 68:13 69:1
**understand** 5:22 11:1 23:5 42:13 54:8
**understanding** 35:4 53:8 54:12 57:5
**understood** 7:19 9:1 18:3 28:12 64:10
**united** 1:1,15 68:21
**unlawful** 60:21
**ups** 61:21
**use** 28:14 33:10 49:6,17 50:22 52:11,14,15,21
**usually** 19:14,16 23:12 32:17 50:4

**v**

**v** 70:1 71:1 72:1
**vary** 47:24 48:3
**vein** 6:1
**venues** 20:20
**verbal** 5:20
**verification** 20:17,21 44:20 45:22
**verified** 4:5
**veritext** 4:4
**versus** 4:18
**vice** 63:8

**videoconference** 4:4
**violations** 45:17 45:17
**virtual** 4:4
**volume** 16:15 17:6
**vp** 15:21
**vpn** 52:9,14,15 52:15,21 65:24 66:2,6,12,20
**vs** 1:6

**w**

**wage** 9:5 17:24 17:24 18:15 35:1 44:12 45:17 60:8,21
**wages** 9:5,14 58:24,24
**wait** 16:22 56:18
**waived** 68:18
**walk** 27:2 28:24
**want** 35:15 56:2 61:23
**wanted** 18:14 22:11 26:6 27:5 33:22 35:10 43:24 56:6 57:9 57:10,11,15
**wants** 37:19
**warning** 52:14 52:16,20
**washington** 2:4
**waste** 39:22
**way** 17:14 32:17 51:5

**we've** 11:2 62:2
**web** 66:17
**weddel** 14:21
**wedell** 36:3,6,7
**week** 25:16,20 29:13 31:23 44:3 47:6 51:9 51:11,14
**weekday** 32:19
**weekdays** 32:10
**weekend** 33:1
**weekends** 32:7 32:23
**weekly** 25:15
**went** 27:14,16 28:13 32:22
**wholesale** 16:8 16:11
**wilton** 2:8,8 5:1 6:9
**windows** 7:2,5,7
**witness** 4:4,5,10 5:3 21:15 34:1 46:15 52:4 60:11,19,23 61:7 63:10,18 64:16 67:5,10 68:5,10 68:16,18 69:3 70:3
**word** 33:10 42:19
**work** 19:17 25:17,18,21 26:3 26:3,4,8 30:6 34:3,20 35:13,16 36:10,14,19 37:1 37:2,4 39:21 40:24 41:20

44:3 46:23 48:16 50:15 59:1,12,14 60:1
**worked** 13:21 25:16,19 26:9 27:15 34:19 35:2,20 36:8 51:9,13,14 53:5 65:9
**workers** 53:16
**working** 11:11 27:5,12 28:6,7 51:11 56:1 62:13,18 66:1,2 66:3,8,9,11,19
**works** 48:16
**wperson** 2:10
**writing** 8:23
**written** 65:5
**wrong** 6:10

**x**

**x** 3:1

**y**

**yeah** 12:14
**year** 10:4 11:9 11:18 16:19 47:7
**years** 11:6
**yesterday** 7:16

**z**

**zero** 20:4 31:17 32:3
**zoo** 56:6
**zoom** 2:3 7:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.