# EXHIBIT R

Page 1

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF ILLINOIS

2                    EASTERN DIVISION

3

4    BRIAN NOE and EILEEN PRUITT,    )

     et al.,                         )

5                                    )

                          Plaintiff,  )

6                                    )

               -vs-                   ) No. 21 CV 01668

7                                    )

     SMART MORTGAGE CENTERS, INC.,    )

8    RICHARD BIRK and BRIAN BIRK,     )

                                     )

9                    Defendants.  )

10

11

12            Remotely held deposition of JON BUTUSOV taken

13    before CAROL CONNOLLY, CSR, CRR, and Notary Public,

14    pursuant to the Federal Rules of Civil Procedure for the

15    United States District Courts pertaining to the taking of

16    depositions, commencing at 9:02 a.m. on the 17th day of

17    November, A.D., 2022.

18

19

20

21

22

23

24

Page 2

1    There were present at the taking of this
2  deposition the following counsel:
3    MITCHELL SANDLER, LLC by
     MS. ARIELLE STEPHENSON (via Zoom)
4    1120 20th Street, NW
     Washington, DC  20036
5    (516) 874-3520
     astephenson@mitchellsandler.com
6
        appeared on behalf of the Plaintiff;
7
8    LAW OFFICE OF WILTON A. PERSON by
     MR. WILTON A. PERSON
9    24330 Leski Lane
     Plainfield, Illinois  60585
10   (815) 254-2467
     wperson@personlaw.com
11
        appeared on behalf of the Defendant.
12
13  ALSO PRESENT:
14    Mr. Richard Birk
      Mr. Brian Birk
15
16
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
2    REMOTELY HELD DEPOSITION OF JON BUTUSOV
3       TAKEN November 17, 2022
4
5  EXAMINATION BY                    PAGE
6  Ms. Stephenson                4
7  Mr. Person                    34
8
9
10          - - - - - - - -
11
12       NO EXHIBITS WERE MARKED
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1    MS. STEPHENSON:  I agree it is permissible for the
2  deposition to be conducted over Zoom and for the witness
3  to be sworn in remotely.
4    MR. PERSON:  Yes, I agree as well to having the
5  deposition via Zoom.
6         JON BUTUSOV,
7  called as a witness herein, having been first duly
8  sworn, was examined upon oral interrogatories and
9  testified as follows:
10         EXAMINATION
11      By Ms. Stephenson:
12   Q   All right. Mr. Butusov, my name is Arielle
13  Stephenson.  I am from the law firm of Mitchell Sandler,
14  and I represent the plaintiffs in this matter, and I'll
15  be the attorney conducting the deposition.  If you don't
16  mind, could you please state your full name for the
17  record.
18   A   Yes, Jon Butusov.
19   Q   And are you represented by counsel today?
20   A   No.
21   Q   Have you ever been deposed before?
22   A   No.
23   Q   I'm going to briefly explain the ground rules
24  for the deposition so you have an awareness of how things

Page 5

1  will happen.  You'll just be asked a series questions
2  under oath as if you were in front of a court or a judge.
3  The court reporter here, Carol, is transcribing
4  everything I say, as well as all of your answers or
5  comments.
6       So I'm going to need you to provide a verbal
7  answer rather than a nod or some other nonverbal cue in
8  response to a question.  If you don't understand a
9  question at any time, please let me know, and I'd be
10  happy to rephrase it.  And in the same light, if you
11  would like to take a break at any point, please let me
12  know.  I just ask that you answer any question I've
13  asked before taking that break so no question is pending
14  before we all go off the record.
15       And as you can see defendant's counsel Wilton
16  Person is present.  He may object to a question that I
17  ask you at some point.  That just means that he thinks
18  there's a problem with my question.  But if I don't
19  rephrase it, you're still required to provide an answer,
20  but we'll give him the opportunity to object so that the
21  court reporter can write that down.
22       Do you have any questions about those rules?
23   A   No.
24   Q   Are you presently under the influence of any

2 (Pages 2 - 5)

Page 6

1  substance or medication that would affect your ability to
2  testify truthfully and honestly today?
3     A   No.
4     Q   And do you suffer from any physical, mental, or
5  psychological impairment that would affect your ability
6  to testify truthfully and completely today?
7     A   No.
8     Q   Do you have any documents near your computer
9  screen that you would be referring to?
10    A   What do you mean by that?
11    Q   Do you have any notes that you wrote down or
12  just any papers or documents sort of near your area for
13  the deposition?
14    A   No.
15    Q   Do you have any other windows open on your
16  computer besides the Zoom meeting?
17    A   I think it's only Zoom.
18    Q   If there are others --
19    A   Your Veritext.
20    Q   Thank you.  That's sufficient.  Prior to
21  joining the deposition this morning, did you review any
22  documents?
23    A   Just what you sent me.
24    Q   And would that be the exhibits that I sent

Page 7

1  or -- or anything else that you reviewed?
2     A   Just the papers that they served me obviously,
3  I read those, and the -- I don't know what it was,
4  overview of what you sent me last night.
5     Q   Okay.  And prior to this deposition, did you
6  have any conversations with anybody about attending the
7  deposition?
8     A   No.
9     Q   To confirm, you didn't speak with anybody from
10  Smart Mortgage about the deposition?
11    A   No, I asked if I should call them, and you told
12  me you didn't need to.
13    Q   I'm sorry.  Who -- who asked you if you could
14  call them?
15    A   No.  I asked you yesterday if I should call
16  them to get the link that they sent to my work email.
17    Q   All right.  Understood.  What happened after
18  that?
19    A   You told me I didn't need to, that you would
20  send it to me.
21    Q   Okay.  Did you receive that link?
22    A   I did.
23    Q   And have you had any conversations with anybody
24  not specifically about the deposition but about any part

Page 8

1  of this case?
2     A   No.
3     Q   So when the case was filed, nobody from Smart
4  Mortgage reached out to you to discuss the case?
5     A   No, I was aware of the case because at that
6  point I was in and out of the office so I mean --
7     Q   How did you -- I'm sorry.  You can finish.
8     A   I was just aware of the situation.
9     Q   How did you become aware?  Did someone tell
10  you?
11    MR. PERSON:  I'm going to object.  Can you ask a
12  different question?  Which case are you referring to?
13    MS. STEPHENSON:  Q  I'm referring to the case Noe
14  versus Smart Mortgage Centers pending in the Northern
15  District of Illinois, and it's against Richard Birk and
16  Brian Birk, and it concerns claims for minimum wage,
17  overtime, and deductions.
18        Is that the case that you understood I was
19  referring to, Mr. Butusov, in those questions?
20    A   Yes, I was -- knew about both cases actually.
21    Q   Okay.  And so for the rest of these questions
22  I'm referring to the case that I just described, the one
23  regarding minimum wage, overtime, and deductions.  So how
24  were you made aware of that lawsuit?

Page 9

1     A   I believe I was actually present in the office
2  when they served the papers there.
3     Q   And then were there any internal conversations
4  that you were a part of about that lawsuit?
5     A   No.
6     Q   Do you currently work for Smart Mortgage?
7     A   I do, yeah.  I'm also doing my own work as well
8  outside so I really haven't been in the office I don't
9  think since like May of this year.
10    Q   But you're still an employee, is that correct?
11    A   Technically, yes.
12    Q   And is there any reason that you've sort of
13  slowed down your work at Smart Mortgage or pursued other
14  opportunities?
15    A   The industry itself was slowing down so I
16  decided I'd look for a different opportunity.
17    Q   And what's your current job title?
18    A   Where?
19    Q   At Smart Mortgage.  Apologies.
20    A   Loan originator.
21    Q   Has that always been your title at Smart
22  Mortgage?
23    A   It's -- I've had that title, and operations
24  manager.

3 (Pages 6 - 9)

Page 10

1    Q    And when were you operations manager?

2    A    It's hard to say. I can't recall the exact

3  dates. I've been there a while and I was originator for

4  a while, then I was operations manager for a while, and

5  then originator again. So to tell you the exact dates, I

6  can't tell you that. I don't recall.

7    Q    Understood. And when it changed to operations

8  manager, what was the reason for that change?

9    A    I would assume promotion.

10   Q    And what would you say the duties of operations

11  manager were?

12   A    Work with the state as far as doing audits,

13  supported the originators if they had questions on files,

14  pricing loans, assisting processing staff as well,

15  working with account executives, operations, you know.

16   Q    Okay. And how long have you been employed by

17  Smart Mortgage?

18   A    Quite a few years. I would say probably close

19  to 20 maybe.

20   Q    Would you say it's definitely more than ten?

21   A    Yeah.

22   Q    And did you have anybody reporting to you when

23  you served as operations manager at Smart Mortgage?

24   A    Definition of reporting to me --

Page 11

1    MR. PERSON: Objection to form. Can you ask a

2  different question?

3    MS. STEPHENSON: Q    Did you have anybody who you

4  were directly responsible for supervising when you were

5  at Smart Mortgage Centers as an operation manager?

6    A    I mean, I would be the person the loan officers

7  would go to if they needed help on stuff. As far as

8  supervisor, I think there's definitely different

9  definitions to a supervisor in different fields.

10  Honestly, I'm really not sure if supervisor would

11  technically be the definition of my role there.

12   Q    Okay. Are you aware of loan officers being

13  given the title of sales manager at any point while you

14  were employed at Smart Mortgage centers?

15   A    That's pretty much the consensus of I think

16  most originators describe themselves.

17   Q    Do any of the employment agreements that you

18  have with Smart Mortgage Centers call you a sales

19  manager?

20   MR. PERSON: Objection. Can you show the employment

21  agreement you're referring to?

22   MS. STEPHENSON: Q    I'll let the witness answer.

23  You can answer.

24   A    I don't recall. I would actually have to see

Page 12

1  the employment agreement to be honest with you.

2    Q    That's okay. Can you describe your

3  understanding of what type of business Smart Mortgage

4  Centers is?

5    A    It's a mortgage company. We are -- originate

6  mortgages, and that's what we do.

7    Q    Do you know what happens after a loan officer

8  assists someone in originating a mortgage? Like what's

9  next in the process?

10   A    So when we originate the loan and then we

11  process the loan and then the file closes.

12   Q    Yes. After that process, uh-huh.

13   A    After the file closes?

14   Q    Yes.

15   A    That's pretty much the end of the originator's

16  job. And then from that point the operations manager

17  would then make sure the file was stacked accordingly and

18  nicely and put away in a file so it's there for any state

19  audits.

20   Q    And do you know anything about what -- whether

21  Smart loans are resold on the secondary market?

22   A    I don't know.

23   Q    And do you know anything about Smart Mortgage's

24  annual sales volume?

Page 13

1    A    I don't recall those.

2    Q    Do you know -- do you believe or do you know if

3  it's above $500,000 per year?

4    A    I wouldn't be able to tell you that. Any time

5  I would do the state audits when it got to the point of

6  payroll or any income, I handed the file over to Richie,

7  Rich Birk.

8    Q    Okay. And do you have anybody who you report

9  to at Smart Mortgage Centers?

10   A    Rich Birk was my person.

11   Q    And what's his title?

12   A    President.

13   Q    Did you report to anybody else besides Richard

14  Birk?

15   A    No, he was the main person.

16   Q    So you don't report to Brian Birk, for example?

17   A    I don't report to him, no.

18   Q    Are you supervised at all -- Are you supervised

19  by Richard Birk?

20   A    Yes, I would say he would be my supervisor.

21   Q    And are you supervised by Brian Birk?

22   A    I wouldn't say that, no.

23   Q    Do you know how many loan officers there are

24  currently at Smart Mortgage?

4 (Pages 10 - 13)

Page 14

1    A   I have no idea what's going on.  Like I said, I
2  haven't been there like since May.
3    Q   And when you were an operations manager, were
4  there any others besides you?
5    MR. PERSON:  Objection.
6    THE WITNESS:  Any other?
7    MS. STEPHENSON:  Q  Operations managers.
8    A   Michelle might have been at one point.
9    Q   So is it fair to say there was one to two
10  operations managers while you have been employed at Smart
11  Mortgage?
12    A   Yeah.
13    Q   And how are loan officers paid at Smart
14  Mortgage?
15    A   Commission.  If they were on that plan, or if
16  they had an hourly plan, then they would have been paid
17  hourly.
18    Q   Do you know whether most loan officers were
19  paid commission or hourly?
20    A   I'm pretty sure most were commission.
21    Q   And how could a loan officer, you know,
22  increase their commission?
23    A   They would write more loans.  That's how
24  commission works.

Page 15

1    Q   And how would -- How would they be able to
2  obtain, you know, more loans?  What would be the process
3  for that?
4    A   Well, they can do more marketing.  They could
5  have bought leads, got referrals from clients.
6    Q   Does Smart Mortgage provide any leads or any
7  ways -- any referrals sources for loans?
8    A   They did provide leads, yes.
9    Q   And would you say -- what would you say about
10  the percentage of leads that loan officers worked off of?
11    MR. PERSON:  Objection as to form.
12    THE WITNESS:  Do I still answer?
13    MS. STEPHENSON:  Q  You can answer.  Yes.
14    A   Can you repeat the question one more time,
15  please?
16    Q   Yes.  Certainly.  What would you say about the
17  percentage of leads that loan officers worked from while
18  they were at Smart Mortgage?
19    A   I would say it was a good percentage.  I
20  couldn't tell you exactly numbers or percentages or
21  anything like that, but I can tell you they did provide
22  leads for those who wanted them.
23    Q   And are you aware of any loan officer that ever
24  asked you as an operations manager while you were at

Page 16

1  Smart Mortgage in that role about any changes to their
2  compensation?
3    A   Any changes to any compensation wouldn't have
4  been my decision to make.  That was always handled by
5  Rich Birk, and that was open to if you ever needed or
6  wanted to, and you talked to Rich Birk about it.
7    Q   I understand.  So -- But regardless of the fact
8  that they should have gone to Richard Birk, did anybody
9  ever speak to you about their compensation or wanting to
10  change it?
11    MR. PERSON:  Objection.  Asked and answered.
12    MS. STEPHENSON:  Q  You can still answer.
13    A   I couldn't tell you a specific one or a time,
14  but if it was brought up, it was go talk to Richie about
15  it would have been my answer.  Anything regarding payroll
16  or anything like that, it was go talk to Richie.  That
17  was how it was.
18    Q   Okay.  Did any loan officer -- did you ever
19  have any conversations with them about deductions from
20  their compensation?
21    A   You have my same answer.  Any deductions, they
22  would have to go talk to Richie about it.
23    Q   So if I understand correctly, Richard Birk had
24  the authority to make all deductions from loan officer

Page 17

1  compensation?
2    A   Yeah.  I mean, if it was part of their employee
3  agreement, you know, and there were standards deductions
4  that they were aware of, then, yes, that would have came
5  from Richie.
6    Q   And are you aware of any standard deductions
7  from a loan officer's compensation?
8    A   Specifically, no.  I could tell you ones that
9  would have been.  Would be maybe a credit report that
10  they didn't collect from a client, maybe a verification
11  of employment fee that didn't get collected from the
12  client when it should have, possibly appraisal if that
13  wasn't collected as it should have.
14    Q   Aside from a credit reporting fee, verification
15  of employment, and the appraisal fee, is there any others
16  sitting here today that you can think of that you've seen
17  be deducted?
18    A   Not that I can think of, no.
19    Q   Are you aware of Smart Mortgage deducting from
20  loan officer's pay expenses for marketing?
21    A   I'm not aware of that.
22    Q   And are you aware of Smart Mortgage deducting
23  for any company expenses from loan officer commissions?
24    MR. PERSON:  Objection as to form.

5 (Pages 14 - 17)

Page 18

1    THE WITNESS:  Not that I'm aware of.
2    MS. STEPHENSON:  Q  Okay.  At any point did you
3  have to inform Richard Birk or Brian Birk about a
4  deduction that needed to be made on a loan officer's
5  commission?
6    A  No, I did not do that.
7    Q  Okay.  And were you ever instructed by Richard
8  Birk or Brian Birk to warn loan officers about any
9  deductions from their pay?
10    A  I don't recall.
11    Q  But you wouldn't have the authority to make a
12  deduction unilaterally yourself, is that correct?
13    A  Sure.
14    Q  Okay.  And you were also a loan officer at some
15  point in the past 20 years, is that correct?
16    A  Yes, that's correct.
17    Q  Have you had any deductions from your
18  commission taken by Smart Mortgage?
19    A  I don't -- I don't know like specific.  Again,
20  you're talking a 20-year period.  I would assume I missed
21  a credit report here or there or verification.
22    Q  Okay.  So I'd like to introduce an exhibit,
23  and, Mr. Butusov, I'm going to share my screen, but if
24  you'd like to open the folder that I sent you, that would

Page 19

1  be fine as well.  This exhibit is what was previously
2  marked as Brian Birk 12.  I'm going to go ahead and share
3  my screen now.
4    (Exhibit 12 tendered to the witness)
5    A  What folder are you referring to?
6    Q  I sent you a folder that was titled exhibits,
7  John Butusov-exhibits.  I'm going to share my screen
8  right now so we can all see.
9    A  Where did you send that, to email?
10    Q  Yes.  This morning.  Are you able to see my
11  screen, Mr. Butusov?
12    MR. PERSON:  Are you able to make that larger?
13  That's pretty small.
14    MS. STEPHENSON:  Sure.
15    Q  Are you able to see my screen now?
16    A  Yes, I can see some of that.
17    Q  This was previously marked, and I'll go ahead
18  and scroll down so you can see this is previously marked
19  as Deposition Exhibit 12.  Can you see that it has in the
20  bottom corner Plaintiff's 0268?
21    A  Yeah.
22    Q  Okay.  I'm going to scroll back up.
23    And is this what looks to be an email from you,
24  Mr. Butusov, from your Smart Mortgage email?

Page 20

1    A  Yeah.  It has my name on there.  I'm just
2  reading what I have.
3    Q  Feel free to take a minute to read it, and then
4  let me know when you're done and I'll go ahead and
5  proceed with some questions.
6    A  Okay.
7    Q  So is it accurate that this appears to be an
8  email sent from you at your Smart Mortgage email to
9  various loan officers?
10    A  It appears so.
11    MR. PERSON:  Object to this document here.  This is
12  not an email.  It's a screenshot of an email.  If you
13  could clarify that for the record.
14    MS. STEPHENSON:  Q  Do you see a portion of an
15  email displayed on the screen right now, Mr. Butusov?
16    MR. PERSON:  I'm going to object to it's still a
17  screenshot of an email just to clarify for the record.
18    MS. STEPHENSON:  That's fine.  I'm asking if the
19  document that's being shown reflects an email.
20    Q  So do you see that there is a portion of an
21  email on the screen right now, Mr. Butusov?
22    A  Appears to be, yes.
23    Q  Okay.  And do you recall sending this email?
24    A  No.

Page 21

1    Q  But you have no reason to believe that you did
2  not send this email or do you have any reason to believe
3  that you didn't?
4    A  I don't recall.  I mean, what's the date on
5  that thing anyway?
6    MR. PERSON:  I'm going to -- It's the same objection
7  about this being a screenshot of an email, so I just
8  wanted to make sure that's on the record.
9    MS. STEPHENSON:  Q  Okay.  So I'm going to go ahead
10  and read one of the portions underlined -- that's in red
11  text.  It says:  It's unfortunate that this email is not
12  the first or even second, so seeing it is the third time,
13  any file moving forward that either of the four items
14  above is not done per company procedure, you will lose 50
15  percent of your compensation for the file.
16    Did I read that correctly, Mr. Butusov?
17    A  Yes.
18    Q  And so you don't recall sending this email, but
19  did this email appear to warn loan officers if they don't
20  file -- they don't follow the company file process
21  they'll receive a 50 percent reduction in their
22  compensation?
23    A  Appears so.
24    Q  And you had said previously that you would not

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 22

1  have had authority to unilaterally make this decision.
2  Do you have any reason to think that you had authority to
3  send this email yourself?
4      A   No, I would not have.
5      Q   Is it fair to say this would have had to come
6  from Richard Birk or Brian Birk instructing you to send
7  this email?
8      MR. PERSON:  Objection as to form.  Can you ask a
9  single question?
10     MS. STEPHENSON:  I'll rephrase.
11     Q   Would it be fair to say this would have to come
12  from somebody else at Smart Mortgage instructing you to
13  send this email?
14     A   Yes.
15     Q   Okay.  And I'll go ahead and stop sharing my
16  screen now.
17         Are you aware of any instruction that was made
18  to loan officers about getting positive reviews from
19  customers?
20     A   Well, we always liked to have positive reviews.
21     Q   Do you know if those reviews have ever been
22  tied to compensation?
23     A   I don't believe so.
24     Q   Okay.  I'm going to go ahead and open another

Page 23

1  exhibit.  This was previously marked as Exhibit 11.
2         (Exhibit 11 tendered to the witness)
3      Q   Then if you'll just give me one more second to
4  share my screen, I'll do so again.
5         Are you able to see my screen, Mr. Butusov?
6      MR. PERSON:  The same objection to this exhibit.
7      MS. STEPHENSON:  I'll go ahead and give you a minute
8  to read it, and let me know once you've had an
9  opportunity to do so.
10     MR. PERSON:  Ms. Stephenson, what is the origin of
11  this document or screenshot?
12     MS. STEPHENSON:  This was an exhibit previously used
13  in another deposition.
14     MR. PERSON:  Right.  But what is the origin?  How
15  did you come to have that document --
16     MS. STEPHENSON:  It was produced in discovery.
17     MR. PERSON:  Okay.
18         Was this the video of the screenshots or of the
19  emails?  Is this the one you're referring to?
20     MS. STEPHENSON:  It was produced in this format,
21  this format being a PDF.
22     MR. PERSON:  So it was not produced as a video?
23     MS. STEPHENSON:  This particular one, no.  I'm
24  sorry.  I scrolled.

Page 24

1      Q   Mr. Butusov, do you need more time to review
2  the exhibit?
3      A   I'm still reading.
4      MR. PERSON:  Can you enlarge it a little bit if you
5  don't mind?
6      MS. STEPHENSON:  What did you say?
7      MR. PERSON:  Can you enlarge it and can you go to
8  the left?  There's a left part of it that has I guess
9  emails.  Is that the full document or is that cut off,
10  the left part of it?
11     MS. STEPHENSON:  So once -- once Mr. Butusov is done
12  reviewing it, I will make it a little bit less large so
13  you can see the full document.  It's also number 11 that
14  was emailed to you.
15     MR. PERSON:  Thank you.
16     THE WITNESS:  Okay.
17     MS. STEPHENSON:  Q   I'm going to go ahead and make
18  it a little bit less large.
19         Do you see that this exhibit has -- has the
20  demarcation Plaintiff's 0262 in the bottom right-hand
21  corner?
22     A   Yeah.
23     Q   This appears to be to -- this -- this document
24  appears to reflect an email sent from Brian Birk that you

Page 25

1  are a recipient of?
2      A   Okay.
3      Q   That's a question.  Does email -- does this
4  document appear to you to reflect an email from Brian
5  Birk in which you were one of the recipients?
6      MR. PERSON:  Objection.  This is a screenshot of an
7  email, correct?
8      MS. STEPHENSON:  I'm showing him the document.  I'm
9  not going to answer any questions at the moment.  This
10  was a document produced in discovery and your objection
11  is noted for the record.
12     MR. PERSON:  Well, on the left side I still am not
13  able to see -- looks like that's from an email box.  Are
14  you able to widen that out a little bit so this is cut
15  off?
16     MS. STEPHENSON:  This is the full document that was
17  produced.  I haven't made any alterations to it.  I don't
18  have any capacity to make the left side larger or
19  smaller.
20     MR. PERSON:  Okay.  Thank you.
21     MS. STEPHENSON:  This is in the original format as
22  it was produced.
23     THE WITNESS:  To answer, it appears to be an email,
24  yes.

7 (Pages 22 - 25)

Page 26

1    MS. STEPHENSON: Q Do you acknowledge you are one
2 of the recipients listed?
3    A   My name is on it, yes.
4    Q   I'm going to read a line from it. It's the
5 third paragraph, the second sentence. It says: As of
6 8-23-17, if anyone receives a review under 4 stars or a
7 negative review, we will deduct 20 BPS off of the next
8 file that closes.
9        Did I read that correctly?
10   A   The right side is where all of you are so I
11 can't read anything after off on that sentence.
12   Q   Okay. That's fine. We will attach the
13 exhibit.
14       But regardless of what came after the words
15 off, do you understand this email to indicate that
16 compensation can be adjusted based on a negative review
17 to a loan officer at Smart Mortgage?
18   A   Appears the email states that.
19   Q   And if you became aware after this email was
20 sent of a loan officer who did receive a negative review,
21 would you be required to report that in any way?
22   A   I don't -- I was never in charge of any of
23 that. So I wouldn't -- a deduction or payroll, that was
24 not in my scope of work.

Page 27

1    Q   And so in line with that, has anyone ever --
2 regardless of whether or not they were supposed to, has
3 any loan officer ever come to you to dispute a deduction
4 that was taken off of their payroll?
5    A   I don't recall anybody getting a deduction for
6 bad reviews at all. The only deductions I'm aware of are
7 the basic ones I spoke to you about earlier this morning.
8    Q   Okay.
9    A   VOE, the appraisal.
10   Q   I'm going to go ahead and stop sharing my
11 screen. I just have a few more questions.
12       We were talking before about how loan officers
13 could receive leads from the company. Can you tell me
14 about how a lead would come in, what that process looked
15 like?
16   A   So they have a system called the mail box which
17 is online. So they can access that via their cell phone
18 or home computer, they can log in, get leads from there,
19 turn themselves on to accept leads, turn it off to not
20 take leads at the time, and that's how the leads are
21 managed.
22   Q   And if they were in the physical Smart office
23 location, would they be able to get leads there too?
24   A   They would still be logging into the same

Page 28

1 system.
2    Q   When would leads come in? Was there a
3 particular time of day?
4    A   No. They were completely random.
5    Q   Is it, you know, common for leads to come in
6 before working hours?
7    A   Again, they would come in whenever somebody
8 would fill them out online. We had no control over when.
9    Q   So it's possible they could receive leads at
10 9:00 o'clock at night if that's when the customer filled
11 out the form?
12   A   Possibly, yes.
13   Q   And how often did you go into the Smart
14 physical office location while you were an operations
15 manager?
16   MR. PERSON: Objection as to form.
17   THE WITNESS: I frequently went into the office.
18   MS. STEPHENSON: Q Every day?
19   A   Probably so.
20   Q   And were there other loan officers that also
21 came in as you as to the Smart physical office?
22   A   I could say there were a few, yeah that came
23 in.
24   Q   Do you recall any names?

Page 29

1    A   Ryan, Brian.
2    Q   Do you know their last names just so --
3    A   Sure. Brian Noe, Ryan Klaic, that was me
4 probably -- in the last few years that were coming in to
5 use the office, yeah.
6    Q   Okay. And while you were there, would you guys
7 -- would you be working together, or did you all have
8 your own sort of independent space?
9    A   We all had individual space, but we all kind of
10 worked together. It was water cooler talk per se,
11 friendships, stuff like that, so.
12   Q   And did you ever work -- did you ever come into
13 the Smart physical office on the week ends?
14   A   Not really, no, because I have other stuff. I
15 got a family. So my weekends were pretty much taken care
16 of doing baseball games and stuff like that with my kids.
17   Q   Do you know whether other loan officers came in
18 frequently on the weekends?
19   A   I couldn't tell you frequently, no.
20   Q   And when you would go in on a weekday to the
21 Smart physical office, did you go during a certain hourly
22 schedule?
23   A   No. I mean, I just kind of, you know, made
24 myself a little habit to, you know, get the kids off to

8 (Pages 26 - 29)

Page 30

1  school, get coffee, go to the office, work, and then when
2  I needed to leave, I just left.
3      Q   Would you say you left before or after
4  5:00 p.m. on a typical day?
5      A   Probably a little before 5:00 or maybe
6  somewhere around 5:00. Depending on what I had to do, if
7  I had to go get the kids or, you know, take them to the
8  doctor or whatever I had to do, I would just get up and
9  go.
10     Q   Right. That makes sense. If you left at 5:00
11 or before 5:00 on a certain day, did you ever see Brian
12 Noe or Ryan Klaic staying later than you?
13     A   They may have, but again I won't be able to
14 tell you when they got in, you know. Nobody had set
15 hours in that office so you could come and go as you
16 please if you wanted to take a -- you know, come in and
17 then leave and do something half the day and then stop
18 back by. Most of the people would come in to use the
19 office because it was more convenient for them and less
20 distracting than working from home. That's exactly why
21 -- where I'm at. I used the office primarily because it
22 was easier and more productive for me to be there.
23     Q   If one of your loan officers wasn't inside the
24 Smart physical office and it was a weekday, did you

Page 31

1  understand that they were working from home or --
2      MR. PERSON: Objection as to form. Loan officers
3  are not his.
4      MS. STEPHENSON: Q  You can answer the question if
5  you understood it.
6      A   Can you repeat it?
7      Q   Yeah. Did you understand while you were --
8  I'll rephrase.
9          Did you understand that if loan officers were
10 not in the physical office that they would be working
11 from home?
12     A   Well, I understood if they weren't there I
13 wouldn't know what they were doing. They could have been
14 working, maybe, but they could have been doing something
15 else.
16     Q   Uh-huh. And to your knowledge every loan
17 officer had the capacity to work from home, is that
18 correct?
19     A   Yeah. I mean, the lead system was all online,
20 the VPNs, you could connect the computers from home. So
21 they definitely made it very possible to work from home.
22     Q   Okay. And do you know whether loan officers
23 frequently attended the loan closing in person?
24     MR. PERSON: Objection.

Page 32

1      THE WITNESS: I couldn't tell you how many people
2  actually did. I couldn't honestly tell you how many
3  people actually did.
4      MS. STEPHENSON: Q  Do you know --
5      MR. PERSON: Objection as to form. What time period
6  are you talking about? Pre-pandemic, post pandemic, or
7  pandemic?
8      MS. STEPHENSON: Q  How many closings have you
9  attended in person? We can go the last five years.
10     A   I couldn't even give you that number. I
11 honestly don't know. I honestly couldn't give you a
12 definitive answer.
13     Q   Would you say it's less than 10?
14     A   I couldn't tell you. I don't know.
15     Q   Okay.
16     A   I could tell you during the pandemic we pretty
17 much didn't attend, not a lot of people were allowed to.
18 Typically it was the client and the notary from the title
19 company, and that was the two people, and maybe their
20 attorney, and that was it.
21     Q   Mr. Butusov, I'd like to take a quick break, if
22 that's okay. I think maybe five to ten minutes, and then
23 I'll let you know if I feel like there are a substantial
24 additional amount of questions, but I don't think that

Page 33

1  there are. Is that okay with you to take a ten-minute
2  break and we'll be back at 10:55?
3      A   Do we just leave this up?
4      Q   Go ahead and mute yourself and stop your video
5  and then we will all return and we'll go back on the
6  record, but you can certainly leave it up.
7      A   Okay.
8      Q   We'll all be back at 9:55.
9          (Off the record)
10     MS. STEPHENSON: Q  Just two last questions,
11 Mr. Butusov.
12         How often did you see Richard Birk come into
13 the Smart physical office, just an average the whole time
14 you were at Smart Mortgage?
15     A   About every day.
16     Q   And what about on the weekends?
17     A   Again, I wasn't there on the weekends, so I
18 don't know.
19     Q   And about how often throughout your entire time
20 at Smart Mortgage did you see Brian Birk come into the
21 Smart physical office?
22     A   Just about every day as well.
23     MS. STEPHENSON: I have no further questions.
24

9 (Pages 30 - 33)

Page 34

1       EXAMINATION
2           By Mr. Person:
3       Q   I have just a few questions for you.  I do
4   appreciate your time this morning.
5           In terms of tracking hours or recording hours
6   of loan officers, your personal case, did you ever record
7   your hours while working at Smart Mortgage?
8       A   No.
9       Q   And was there any requirement that you record
10  hours?
11      A   No.
12      Q   And you didn't have any responsibility to
13  record or track hours for any other of your, I guess,
14  coworkers, correct?
15      A   No, I wasn't -- didn't do that or anything to
16  do with payroll or pay structures or commissions or
17  anything like that.
18      Q   I know we don't have -- or your employment
19  agreement was at least referenced, but you don't have it
20  in front of you, you don't recall in your employment
21  agreement that you had any supervisory role over loan
22  officers, correct?
23      A   I don't -- I don't know what -- to be honest
24  with you, I haven't read the employment agreement so I

Page 35

1   couldn't even tell you.
2       Q   Okay.  And you were asked about when you left
3   in the afternoon whether you saw Ryan Klaic or Brian Noe
4   in the office.  Were you in charge of monitoring them in
5   terms of when they worked or what time they left?
6       A   No.
7       Q   So you wouldn't have any idea how much they
8   worked, correct?
9       A   No.
10      Q   And also earlier you talked about a VPN.  Is
11  that VPN -- Can you only access that at the Smart
12  Mortgage office or at home, or can you access it anywhere
13  where there's Internet?
14      A   A VPN is a virtual private network, so you can
15  access the computer anywhere you have a computer
16  remotely.  That was the purpose of the VPN is to access
17  your computer in the office or anywhere.
18      Q   You wouldn't necessarily have to be at home,
19  you could be at a coffee shop or anywhere, right?
20      A   Anywhere.
21      Q   In your role as a loan officer, you didn't have
22  any responsibility to hire and fire employees, right?
23      A   Nope.
24      Q   And you did not control employees' work

Page 36

1   schedule or their conditions of employment, correct?
2       A   I did not.
3       MS. STEPHENSON:  Object as to form.
4       MR. PERSON:  What is your specific objection?
5       MS. STEPHENSON:  That was a compound.
6       MR. PERSON:  Q   Okay.  During your role at Smart
7   Mortgage, you did not supervise and control employees,
8   correct?
9       A   Correct.
10      Q   You did not schedule -- set their schedule or
11  their conditions of employment, correct?
12      A   I did not.
13      Q   You didn't determine their rate of pay or
14  method of payment, correct?
15      A   I did not.
16      Q   You were not in charge of maintaining any
17  employment records, correct?
18      A   I was not.
19      Q   And you don't have any ownership interest in
20  Smart Mortgage, correct?
21      A   No, I do not.
22      Q   Just a few more questions here.  You mentioned
23  if you missed or if a loan officer potentially missed
24  getting a VOE of employment or a credit report that that

Page 37

1   would be deducted from a loan officer's commission, is
2   that correct?
3       A   Correct.
4       Q   And in your case how did you -- how did you
5   find out if you missed something?  I mean, you mentioned
6   you worked there 20 years, but how would you know if you
7   missed something?
8       A   Pretty much the final closing papers that the
9   title company sent over, you know, that we processors
10  would go through and check off, make sure everything
11  balanced as far as the check coming from the title
12  company versus the expenses that the company paid.
13      Q   Okay.  Did you receive an email from Brian Birk
14  before the closing that identified any type of -- I guess
15  not identified, but basically set forth your payment in
16  terms of your commission for that particular loan?
17      A   Can you repeat that question, please.
18      Q   Prior to closing did you receive an email that
19  talked about your commission statement in terms of how
20  much money you received and if you had indeed missed some
21  type of VOE or credit report?
22      A   Well, we were aware of the deduction before we
23  got paid because everybody got a commission sheet before
24  they got on the payroll.  I wouldn't say it was before

Page 38

1 the closing happened because those checks and balances
2 were done after the closing when we received the check
3 from the closing.
4 Q Okay. So before you actually got paid, you had
5 notice of any potential deduction?
6 A Correct.
7 Q Okay. And during your time at Smart Mortgage,
8 my understanding you worked with Brian Noe and also
9 Eileen Pruitt as well, correct?
10 A Correct.
11 Q And Ryan Klaic. Do you recall at any time any
12 of those three loan officers complaining about not
13 receiving overtime pay?
14 A No.
15 Q Do you recall any time any of those three
16 Eileen Pruitt, Ryan Klaic, or Brian Noe complaining that
17 they did not receive minimum wage?
18 A No.
19 MR. PERSON: I have no further questions. Thank you
20 for your time.
21 MS. STEPHENSON: I don't have any follow-up
22 questions either. So, yes thank you, Mr. Butusov.
23 And do you need anything from him, Carol, or
24 can we let him go?

Page 39

1 Mr. Butusov, after you take a deposition, you
2 are entitled to review it and make any corrections that
3 you would like to make, so Carol -- you have
4 Mr. Butusov's email to give him a copy of that. There
5 are instructions in there about how to submit any
6 corrections.
7 (Off the record at 10:04 a.m.)
8 - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 40

1 STATE OF ILLINOIS )
) SS:
2 COUNTY OF C O O K )
3
4 The within and foregoing deposition of the
5 aforementioned witness was taken before CAROL CONNOLLY,
6 CSR, CRR and Notary Public, at the place, date and time
7 aforementioned.
8 There were present during the taking of the
9 deposition the previously named counsel.
10 The said witness was first duly sworn and was
11 then examined upon oral interrogatories; the questions
12 and answers were taken down in shorthand by the
13 undersigned, acting as stenographer and Notary Public;
14 and the within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the forementioned witness, at the time
17 and place hereinabove referred to.
18 The signature of the witness was not waived,
19 and the deposition was submitted, pursuant to Rule 30 (e)
20 and 32 (d) 4 of the Rules of Civil Procedure for the
21 United States District Courts, to the deponent per copy
22 of the attached letter.
23
24

Page 41

1 The undersigned is not interested in the within
2 case, nor of kin or counsel to any of the parties.
3 Witness my official signature and seal as
4 Notary Public in and for Cook County, Illinois on this
5 23rd day of November, A.D.
6 2022.
7
8 *Carol Connolly*
9 CAROL CONNOLLY, CSR, CRR
CSR No. 084-003113
10 Notary Public
One North Franklin Street
11 Suite 3000
Chicago, Illinois 60606
12 Phone: (312) 386-2000
13
14
15
16
17
18
19
20
21
22
23
24

11 (Pages 38 - 41)

Page 42

1    Noe, Brian Et Al v. Smart Mortgage Centers Inc Et Al
2              Jon Butusov
3       INSTRUCTIONS TO THE WITNESS
4       Please read your deposition over
5    carefully and make any necessary corrections.
6    You should state the reason in the
7    appropriate space on the errata sheet for any
8    corrections that are made.
9       After doing so, please sign the errata
10   sheet and date it.
11      You are signing same subject to the
12   changes you have noted on the errata sheet,
13   which will be attached to your deposition.
14      It is imperative that you return the
15   original errata sheet to the deposing
16   attorney within thirty (30) days of receipt
17   of the deposition transcript by you.  If you
18   fail to do so, the deposition transcript may
19   be deemed to be accurate and may be used in
20   court.
21
22
23
24   5581200

Page 43

1    Noe, Brian Et Al v. Smart Mortgage Centers Inc Et Al
2              Jon Butusov
3          E R R A T A
4             - - - - -
5    PAGE  LINE   CHANGE
6    ___ ___  _____
7    Reason:_____
8    ___ ___  _____
9    Reason:_____
10   ___ ___  _____
11   Reason:_____
12   ___ ___  _____
13   Reason:_____
14   ___ ___  _____
15   Reason:_____
16   ___ ___  _____
17   Reason:_____
18   ___ ___  _____
19   Reason:_____
20   ___ ___  _____
21   Reason:_____
22   ___ ___  _____
23   Reason:_____
24   5581200

Page 44

1    Noe, Brian Et Al v. Smart Mortgage Centers Inc Et Al
2              Jon Butusov
3       ACKNOWLEDGMENT OF DEPONENT
4       I, _____, do
5    hereby certify that I have read the foregoing
6    pages and that the same is a correct
7    transcription of the answers given by
8    me to the questions therein propounded,
9    except for the corrections or changes in form
10   or substance, if any, noted in the attached
11   Errata Sheet.
12
13   _____    _____
14   DATE          SIGNATURE
15
16
17
18
19
20
21
22
23
24   5581200

12 (Pages 42 - 44)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

| 0 | 4 | acknowledgm... | 27:5 |
|---|---|---|---|
| **01668** 1:6 | **4** 3:6 26:6 40:20 | 44:3 | **anyway** 21:5 |
| **0262** 24:20 | **5** | **acting** 40:13 | **apologies** 9:19 |
| **0268** 19:20 | **50** 21:14,21 | **additional** 32:24 | **appear** 21:19 |
| **084-003113** 41:9 | **500,000** 13:3 | **adjusted** 26:16 | 25:4 |
| **1** | **516** 2:5 | **affect** 6:1,5 | **appeared** 2:6,11 |
| **10** 32:13 | **5581200** 42:24 | **aforementioned** | **appears** 20:7,10 |
| **10:04** 39:7 | 43:24 44:24 | 40:5,7 | 20:22 21:23 |
| **10:55** 33:2 | **6** | **afternoon** 35:3 | 24:23,24 25:23 |
| **11** 23:1,2 24:13 | **60585** 2:9 | **agree** 4:1,4 | 26:18 |
| **1120** 2:4 | **60606** 41:11 | **agreement** 11:21 | **appraisal** 17:12 |
| **12** 19:2,4,19 | **8** | 12:1 17:3 34:19 | 17:15 27:9 |
| **17** 3:3 | **8-23-17** 26:6 | 34:21,24 | **appreciate** 34:4 |
| **17th** 1:16 | **815** 2:10 | **agreements** | **appropriate** |
| **2** | **874-3520** 2:5 | 11:17 | 42:7 |
| **20** 10:19 18:15 | **9** | **ahead** 19:2,17 | **area** 6:12 |
| 18:20 26:7 37:6 | **9:00** 28:10 | 20:4 21:9 22:15 | **arielle** 2:3 4:12 |
| **20036** 2:4 | **9:02** 1:16 | 22:24 23:7 | **aside** 17:14 |
| **2022** 1:17 3:3 | **9:55** 33:8 | 24:17 27:10 | **asked** 5:1,13 |
| 41:6 | **a** | 33:4 | 7:11,13,15 15:24 |
| **20551** 41:8 | **a.d.** 1:17 41:5 | **al** 1:4 42:1,1 | 16:11 35:2 |
| **20th** 2:4 | **a.m.** 1:16 39:7 | 43:1,1 44:1,1 | 40:15 |
| **21** 1:6 | **ability** 6:1,5 | **allowed** 32:17 | **asking** 20:18 |
| **23rd** 41:5 | **able** 13:4 15:1 | **alterations** | **assisting** 10:14 |
| **24330** 2:9 | 19:10,12,15 23:5 | 25:17 | **assists** 12:8 |
| **254-2467** 2:10 | 25:13,14 27:23 | **amount** 32:24 | **assume** 10:9 |
| **3** | 30:13 | **annual** 12:24 | 18:20 |
| **30** 40:19 42:16 | **accept** 27:19 | **answer** 5:7,12 | **astephenson** 2:5 |
| **3000** 41:11 | **access** 27:17 | 5:19 11:22,23 | **attach** 26:12 |
| **312** 41:12 | 35:11,12,15,16 | 15:12,13 16:12 | **attached** 40:22 |
| **32** 40:20 | **account** 10:15 | 16:15,21 25:9,23 | 42:13 44:10 |
| **34** 3:7 | **accurate** 20:7 | 31:4 32:12 | **attend** 32:17 |
| **386-2000** 41:12 | 40:14 42:19 | **answered** 16:11 | **attended** 31:23 |
| | **acknowledge** | **answers** 5:4 | 32:9 |
| | 26:1 | 40:12,16 44:7 | **attending** 7:6 |
| | | **anybody** 7:6,9 | **attorney** 4:15 |
| | | 7:23 10:22 11:3 | 32:20 42:16 |
| | | 13:8,13 16:8 | |

**audits** 10:12
12:19 13:5
**authority** 16:24
18:11 22:1,2
**average** 33:13
**aware** 8:5,8,9,24
11:12 15:23
17:4,6,19,21,22
18:1 22:17
26:19 27:6
37:22
**awareness** 4:24

**b**

**back** 19:22
30:18 33:2,5,8
**bad** 27:6
**balanced** 37:11
**balances** 38:1
**baseball** 29:16
**based** 26:16
**basic** 27:7
**basically** 37:15
**behalf** 2:6,11
**believe** 9:1 13:2
21:1,2 22:23
**birk** 1:8,8 2:14
2:14 8:15,16
13:7,10,14,16,19
13:21 16:5,6,8
16:23 18:3,3,8,8
19:2 22:6,6
24:24 25:5
33:12,20 37:13
**bit** 24:4,12,18
25:14
**bottom** 19:20
24:20

**bought** 15:5
**box** 25:13 27:16
**bps** 26:7
**break** 5:11,13
32:21 33:2
**brian** 1:4,8 2:14
8:16 13:16,21
18:3,8 19:2 22:6
24:24 25:4 29:1
29:3 30:11
33:20 35:3
37:13 38:8,16
42:1 43:1 44:1
**briefly** 4:23
**brought** 16:14
**business** 12:3
**butusov** 1:12 3:2
4:6,12,18 8:19
18:23 19:7,11,24
20:15,21 21:16
23:5 24:1,11
32:21 33:11
38:22 39:1 42:2
43:2 44:2
**butusov's** 39:4

**c**

**c** 40:2
**call** 7:11,14,15
11:18
**called** 4:7 27:16
**capacity** 25:18
31:17
**care** 29:15
**carefully** 42:5
**carol** 1:13 5:3
38:23 39:3 40:5
41:9

**case** 8:1,3,4,5,12
8:13,18,22 34:6
37:4 41:2
**cases** 8:20
**cell** 27:17
**centers** 1:7 8:14
11:5,14,18 12:4
13:9 42:1 43:1
44:1
**certain** 29:21
30:11
**certainly** 15:16
33:6
**certify** 44:5
**change** 10:8
16:10 43:5
**changed** 10:7
**changes** 16:1,3
42:12 44:9
**charge** 26:22
35:4 36:16
**check** 37:10,11
38:2
**checks** 38:1
**chicago** 41:11
**civil** 1:14 40:20
**claims** 8:16
**clarify** 20:13,17
**client** 17:10,12
32:18
**clients** 15:5
**close** 10:18
**closes** 12:11,13
26:8
**closing** 31:23
37:8,14,18 38:1
38:2,3

**closings** 32:8
**coffee** 30:1 35:19
**collect** 17:10
**collected** 17:11
17:13
**come** 22:5,11
23:15 27:3,14
28:2,5,7 29:12
30:15,16,18
33:12,20
**coming** 29:4
37:11
**commencing**
1:16
**comments** 5:5
**commission**
14:15,19,20,22
14:24 18:5,18
37:1,16,19,23
**commissions**
17:23 34:16
**common** 28:5
**company** 12:5
17:23 21:14,20
27:13 32:19
37:9,12,12
**compensation**
16:2,3,9,20 17:1
17:7 21:15,22
22:22 26:16
**complaining**
38:12,16
**complete** 40:15
**completely** 6:6
28:4
**compound** 36:5
**computer** 6:8,16
27:18 35:15,15

35:17
**computers** 31:20
**concerns** 8:16
**conditions** 36:1
36:11
**conducted** 4:2
**conducting** 4:15
**confirm** 7:9
**connect** 31:20
**connolly** 1:13
40:5 41:9
**consensus** 11:15
**control** 28:8
35:24 36:7
**convenient**
30:19
**conversations**
7:6,23 9:3 16:19
**cook** 41:4
**cooler** 29:10
**copy** 39:4 40:21
**corner** 19:20
24:21
**correct** 9:10
18:12,15,16 25:7
31:18 34:14,22
35:8 36:1,8,9,11
36:14,17,20 37:2
37:3 38:6,9,10
44:6
**corrections** 39:2
39:6 42:5,8 44:9
**correctly** 16:23
21:16 26:9
**counsel** 2:2 4:19
5:15 40:9 41:2
**county** 40:2 41:4

**court** 1:1 5:2,3
5:21 42:20
**courts** 1:15
40:21
**coworkers** 34:14
**credit** 17:9,14
18:21 36:24
37:21
**crr** 1:13 40:6
41:9
**csr** 1:13 40:6
41:9,9
**cue** 5:7
**current** 9:17
**currently** 9:6
13:24
**customer** 28:10
**customers** 22:19
**cut** 24:9 25:14
**cv** 1:6

**d**

**d** 3:1 40:20
**date** 21:4 40:6
42:10 44:14
**dates** 10:3,5
**day** 1:16 28:3,18
30:4,11,17 33:15
33:22 41:5
**days** 42:16
**dc** 2:4
**decided** 9:16
**decision** 16:4
22:1
**deduct** 26:7
**deducted** 17:17
37:1

**deducting** 17:19
17:22
**deduction** 18:4
18:12 26:23
27:3,5 37:22
38:5
**deductions** 8:17
8:23 16:19,21,24
17:3,6 18:9,17
27:6
**deemed** 42:19
**defendant** 2:11
**defendant's** 5:15
**defendants** 1:9
**definitely** 10:20
11:8 31:21
**definition** 10:24
11:11
**definitions** 11:9
**definitive** 32:12
**demarcation**
24:20
**depending** 30:6
**deponent** 40:21
44:3
**deposed** 4:21
**deposing** 42:15
**deposition** 1:12
2:2 3:2 4:2,5,15
4:24 6:13,21 7:5
7:7,10,24 19:19
23:13 39:1 40:4
40:9,19 42:4,13
42:17,18
**depositions** 1:16
**describe** 11:16
12:2

**described** 8:22
**determine** 36:13
**different** 8:12
9:16 11:2,8,9
**directly** 11:4
**discovery** 23:16
25:10
**discuss** 8:4
**displayed** 20:15
**dispute** 27:3
**distracting**
30:20
**district** 1:1,1,15
8:15 40:21
**division** 1:2
**doctor** 30:8
**document** 20:11
20:19 23:11,15
24:9,13,23 25:4
25:8,10,16
**documents** 6:8
6:12,22
**doing** 9:7 10:12
29:16 31:13,14
42:9
**duly** 4:7 40:10
**duties** 10:10

**e**

**e** 3:1 40:19 43:3
**earlier** 27:7
35:10
**easier** 30:22
**eastern** 1:2
**eileen** 1:4 38:9
38:16
**either** 21:13
38:22

**[email - happened]**                    Page 4

email 7:16 19:9
   19:23,24 20:8,8
   20:12,12,15,17
   20:19,21,23 21:2
   21:7,11,18,19
   22:3,7,13 24:24
   25:3,4,7,13,23
   26:15,18,19
   37:13,18 39:4
emailed 24:14
emails 23:19
   24:9
employed 10:16
   11:14 14:10
employee 9:10
   17:2
employees 35:22
   35:24 36:7
employment
   11:17,20 12:1
   17:11,15 34:18
   34:20,24 36:1,11
   36:17,24
ends 29:13
enlarge 24:4,7
entire 33:19
entitled 39:2
errata 42:7,9,12
   42:15 44:11
et 1:4 42:1,1
   43:1,1 44:1,1
everybody 37:23
exact 10:2,5
exactly 15:20
   30:20
examination 3:5
   4:10 34:1

examined 4:8
   40:11
example 13:16
executives 10:15
exhibit 18:22
   19:1,4,19 23:1,1
   23:2,6,12 24:2
   24:19 26:13
exhibits 3:12
   6:24 19:6,7
expenses 17:20
   17:23 37:12
explain 4:23

**f**

fact 16:7
fail 42:18
fair 14:9 22:5,11
family 29:15
far 10:12 11:7
   37:11
federal 1:14
fee 17:11,14,15
feel 20:3 32:23
fields 11:9
file 12:11,13,17
   12:18 13:6
   21:13,15,20,20
   26:8
filed 8:3
files 10:13
fill 28:8
filled 28:10
final 37:8
find 37:5
fine 19:1 20:18
   26:12

finish 8:7
fire 35:22
firm 4:13
first 4:7 21:12
   40:10
five 32:9,22
folder 18:24
   19:5,6
follow 21:20
   38:21
following 2:2
follows 4:9
foregoing 40:4
   40:14 44:5
forementioned
   40:16
form 11:1 15:11
   17:24 22:8
   28:11,16 31:2
   32:5 36:3 44:9
format 23:20,21
   25:21
forth 37:15
forward 21:13
four 21:13
franklin 41:10
free 20:3
frequently 28:17
   29:18,19 31:23
friendships
   29:11
front 5:2 34:20
full 4:16 24:9,13
   25:16
further 33:23
   38:19

**g**

games 29:16
getting 22:18
   27:5 36:24
give 5:20 23:3,7
   32:10,11 39:4
given 11:13 44:7
go 5:14 11:7
   16:14,16,22 19:2
   19:17 20:4 21:9
   22:15,24 23:7
   24:7,17 27:10
   28:13 29:20,21
   30:1,7,9,15 32:9
   33:4,5 37:10
   38:24
going 4:23 5:6
   8:11 14:1 18:23
   19:2,7,22 20:16
   21:6,9 22:24
   24:17 25:9 26:4
   27:10
good 15:19
ground 4:23
guess 24:8 34:13
   37:14
guys 29:6

**h**

habit 29:24
half 30:17
hand 24:20
handed 13:6
handled 16:4
happen 5:1
happened 7:17
   38:1

**happens** 12:7
**happy** 5:10
**hard** 10:2
**held** 1:12 3:2
**help** 11:7
**hereinabove**
　40:17
**hire** 35:22
**home** 27:18
　30:20 31:1,11,17
　31:20,21 35:12
　35:18
**honest** 12:1
　34:23
**honestly** 6:2
　11:10 32:2,11,11
**hourly** 14:16,17
　14:19 29:21
**hours** 28:6 30:15
　34:5,5,7,10,13
**huh** 12:12 31:16

**i**

**idea** 14:1 35:7
**identified** 37:14
　37:15
**illinois** 1:1 2:9
　8:15 40:1 41:4
　41:11
**impairment** 6:5
**imperative**
　42:14
**income** 13:6
**increase** 14:22
**independent**
　29:8
**indicate** 26:15

**individual** 29:9
**industry** 9:15
**influence** 5:24
**inform** 18:3
**inside** 30:23
**instructed** 18:7
**instructing** 22:6
　22:12
**instruction**
　22:17
**instructions** 39:5
　42:3
**interest** 36:19
**interested** 41:1
**internal** 9:3
**internet** 35:13
**interrogatories**
　4:8 40:11
**introduce** 18:22
**items** 21:13

**j**

**job** 9:17 12:16
**john** 19:7
**joining** 6:21
**jon** 1:12 3:2 4:6
　4:18 42:2 43:2
　44:2
**judge** 5:2

**k**

**k** 40:2
**kids** 29:16,24
　30:7
**kin** 41:2
**kind** 29:9,23
**klaic** 29:3 30:12
　35:3 38:11,16

**knew** 8:20
**know** 5:9,12 7:3
　10:15 12:7,20,22
　12:23 13:2,2,23
　14:18,21 15:2
　17:3 18:19 20:4
　22:21 23:8 28:5
　29:2,17,23,24
　30:7,14,16 31:13
　31:22 32:4,11,14
　32:23 33:18
　34:18,23 37:6,9
**knowledge** 31:16

**l**

**lane** 2:9
**large** 24:12,18
**larger** 19:12
　25:18
**law** 2:8 4:13
**lawsuit** 8:24 9:4
**lead** 27:14 31:19
**leads** 15:5,6,8,10
　15:17,22 27:13
　27:18,19,20,20
　27:23 28:2,5,9
**leave** 30:2,17
　33:3,6
**left** 24:8,8,10
　25:12,18 30:2,3
　30:10 35:2,5
**leski** 2:9
**letter** 40:22
**light** 5:10
**liked** 22:20
**line** 26:4 27:1
　43:5

**link** 7:16,21
**listed** 26:2
**little** 24:4,12,18
　25:14 29:24
　30:5
**llc** 2:3
**loan** 9:20 11:6
　11:12 12:7,10,11
　13:23 14:13,18
　14:21 15:10,17
　15:23 16:18,24
　17:7,20,23 18:4
　18:8,14 20:9
　21:19 22:18
　26:17,20 27:3,12
　28:20 29:17
　30:23 31:2,9,16
　31:22,23 34:6,21
　35:21 36:23
　37:1,16 38:12
**loans** 10:14
　12:21 14:23
　15:2,7
**location** 27:23
　28:14
**log** 27:18
**logging** 27:24
**long** 10:16
**look** 9:16
**looked** 27:14
**looks** 19:23
　25:13
**lose** 21:14
**lot** 32:17

**m**

**mail** 27:16

| | | | |
|---|---|---|---|
| **main** 13:15 | **mitchell** 2:3 4:13 | **necessary** 42:5 | **o'clock** 28:10 |
| **maintaining** 36:16 | **mitchellsandle...** 2:5 | **need** 5:6 7:12,19 24:1 38:23 | **oath** 5:2 |
| **managed** 27:21 | **moment** 25:9 | **needed** 11:7 16:5 18:4 30:2 | **object** 5:16,20 8:11 20:11,16 36:3 |
| **manager** 9:24 10:1,4,8,11,23 11:5,13,19 12:16 14:3 15:24 28:15 | **money** 37:20 **monitoring** 35:4 **morning** 6:21 19:10 27:7 34:4 | **negative** 26:7,16 26:20 **network** 35:14 | **objection** 11:1 11:20 14:5 15:11 16:11 17:24 21:6 22:8 23:6 25:6,10 28:16 31:2,24 32:5 36:4 |
| **managers** 14:7 14:10 | **mortgage** 1:7 7:10 8:4,14 9:6 9:13,19,22 10:17 | **never** 26:22 **nicely** 12:18 **night** 7:4 28:10 | **obtain** 15:2 |
| **marked** 3:12 19:2,17,18 23:1 | 10:23 11:5,14,18 12:3,5,8 13:9,24 | **nod** 5:7 **noe** 1:4 8:13 | **obviously** 7:2 **office** 2:8 8:6 9:1 |
| **market** 12:21 | 14:11,14 15:6,18 16:1 17:19,22 | 29:3 30:12 35:3 38:8,16 42:1 | 9:8 27:22 28:14 28:17,21 29:5,13 |
| **marketing** 15:4 17:20 | 18:18 19:24 20:8 22:12 | 43:1 44:1 **nonverbal** 5:7 | 29:21 30:1,15,19 30:21,24 31:10 |
| **matter** 4:14 **mean** 6:10 8:6 11:6 17:2 21:4 29:23 31:19 37:5 | 26:17 33:14,20 34:7 35:12 36:7 36:20 38:7 42:1 43:1 44:1 | **nope** 35:23 **north** 41:10 **northern** 1:1 8:14 | 33:13,21 35:4,12 35:17 **officer** 12:7 14:21 15:23 16:18,24 17:23 |
| **means** 5:17 | **mortgage's** 12:23 | **notary** 1:13 32:18 40:6,13 | 18:14 26:17,20 27:3 31:17 |
| **medication** 6:1 | **mortgages** 12:6 | 41:4,10 | 35:21 36:23 |
| **meeting** 6:16 | **moving** 21:13 | **noted** 25:11 | **officer's** 17:7,20 |
| **mental** 6:4 | **mute** 33:4 | 42:12 44:10 | 18:4 37:1 |
| **mentioned** 36:22 37:5 | | **notes** 6:11 **notice** 38:5 | **officers** 11:6,12 13:23 14:13,18 |
| **method** 36:14 | **n** | **november** 1:17 3:3 41:5 | 15:10,17 18:8 20:9 21:19 |
| **michelle** 14:8 | **n** 3:1 | **number** 24:13 | 22:18 27:12 |
| **mind** 4:16 24:5 | **name** 4:12,16 20:1 26:3 | 32:10 | 28:20 29:17 |
| **minimum** 8:16 8:23 38:17 | **named** 40:9 | **numbers** 15:20 **nw** 2:4 | 30:23 31:2,9,22 34:6,22 38:12 |
| **minute** 20:3 23:7 33:1 | **names** 28:24 29:2 | | |
| **minutes** 32:22 | **near** 6:8,12 | **o** | |
| **missed** 18:20 36:23,23 37:5,7 37:20 | **necessarily** 35:18 | **o** 40:2,2 | |

[official - previously]

Page 7

official 41:3
okay 7:5,21 8:21
 10:16 11:12
 12:2 13:8 16:18
 18:2,7,14,22
 19:22 20:6,23
 21:9 22:15,24
 23:17 24:16
 25:2,20 26:12
 27:8 29:6 31:22
 32:15,22 33:1,7
 35:2 36:6 37:13
 38:4,7
once 23:8 24:11
 24:11
ones 17:8 27:7
online 27:17
 28:8 31:19
open 6:15 16:5
 18:24 22:24
operation 11:5
operations 9:23
 10:1,4,7,10,15
 10:23 12:16
 14:3,7,10 15:24
 28:14
opportunities
 9:14
opportunity
 5:20 9:16 23:9
oral 4:8 40:11
origin 23:10,14
original 25:21
 42:15
originate 12:5
 12:10
originating 12:8

originator 9:20
 10:3,5
originator's
 12:15
originators
 10:13 11:16
outside 9:8
overtime 8:17,23
 38:13
overview 7:4
ownership 36:19

**p**

p.m. 30:4
page 3:5 43:5
pages 44:6
paid 14:13,16,19
 37:12,23 38:4
pandemic 32:6,6
 32:7,16
papers 6:12 7:2
 9:2 37:8
paragraph 26:5
part 7:24 9:4
 17:2 24:8,10
particular 23:23
 28:3 37:16
parties 41:2
pay 17:20 18:9
 34:16 36:13
 38:13
payment 36:14
 37:15
payroll 13:6
 16:15 26:23
 27:4 34:16
 37:24

pdf 23:21
pending 5:13
 8:14
people 30:18
 32:1,3,17,19
percent 21:15,21
percentage
 15:10,17,19
percentages
 15:20
period 18:20
 32:5
permissible 4:1
person 2:8,8 3:7
 4:4 5:16 8:11
 11:1,6,20 13:10
 13:15 14:5
 15:11 16:11
 17:24 19:12
 20:11,16 21:6
 22:8 23:6,10,14
 23:17,22 24:4,7
 24:15 25:6,12,20
 28:16 31:2,23,24
 32:5,9 34:2 36:4
 36:6 38:19
personal 34:6
personlaw.com
 2:10
pertaining 1:15
phone 27:17
 41:12
physical 6:4
 27:22 28:14,21
 29:13,21 30:24
 31:10 33:13,21
place 40:6,17

plainfield 2:9
plaintiff 1:5 2:6
plaintiff's 19:20
 24:20
plaintiffs 4:14
plan 14:15,16
please 4:16 5:9
 5:11 15:15
 30:16 37:17
 42:4,9
point 5:11,17 8:6
 11:13 12:16
 13:5 14:8 18:2
 18:15
portion 20:14,20
portions 21:10
positive 22:18,20
possible 28:9
 31:21
possibly 17:12
 28:12
post 32:6
potential 38:5
potentially
 36:23
pre 32:6
present 2:1,13
 5:16 9:1 40:8
presently 5:24
president 13:12
pretty 11:15
 12:15 14:20
 19:13 29:15
 32:16 37:8
previously 19:1
 19:17,18 21:24
 23:1,12 40:9

**pricing** 10:14
**primarily** 30:21
**prior** 6:20 7:5
  37:18
**private** 35:14
**probably** 10:18
  28:19 29:4 30:5
**problem** 5:18
**procedure** 1:14
  21:14 40:20
**proceed** 20:5
**process** 12:9,11
  12:12 15:2
  21:20 27:14
**processing** 10:14
**processors** 37:9
**produced** 23:16
  23:20,22 25:10
  25:17,22
**productive**
  30:22
**promotion** 10:9
**propounded**
  44:8
**provide** 5:6,19
  15:6,8,21
**pruitt** 1:4 38:9
  38:16
**psychological**
  6:5
**public** 1:13 40:6
  40:13 41:4,10
**purpose** 35:16
**pursuant** 1:14
  40:19
**pursued** 9:13
**put** 12:18

**q**

**question** 5:8,9
  5:12,13,16,18
  8:12 11:2 15:14
  22:9 25:3 31:4
  37:17
**questions** 5:1,22
  8:19,21 10:13
  20:5 25:9 27:11
  32:24 33:10,23
  34:3 36:22
  38:19,22 40:11
  40:15 44:8
**quick** 32:21
**quite** 10:18

**r**

**r** 43:3,3
**random** 28:4
**rate** 36:13
**reached** 8:4
**read** 7:3 20:3
  21:10,16 23:8
  26:4,9,11 34:24
  42:4 44:5
**reading** 20:2
  24:3
**really** 9:8 11:10
  29:14
**reason** 9:12 10:8
  21:1,2 22:2 42:6
  43:7,9,11,13,15
  43:17,19,21,23
**recall** 10:2,6
  11:24 13:1
  18:10 20:23
  21:4,18 27:5
  28:24 34:20

  38:11,15
**receipt** 42:16
**receive** 7:21
  21:21 26:20
  27:13 28:9
  37:13,18 38:17
**received** 37:20
  38:2
**receives** 26:6
**receiving** 38:13
**recipient** 25:1
**recipients** 25:5
  26:2
**record** 4:17 5:14
  20:13,17 21:8
  25:11 33:6,9
  34:6,9,13 39:7
  40:15
**recording** 34:5
**records** 36:17
**red** 21:10
**reduction** 21:21
**referenced** 34:19
**referrals** 15:5,7
**referred** 40:17
**referring** 6:9
  8:12,13,19,22
  11:21 19:5
  23:19
**reflect** 24:24
  25:4
**reflects** 20:19
**regarding** 8:23
  16:15
**regardless** 16:7
  26:14 27:2
**remotely** 1:12
  3:2 4:3 35:16

**repeat** 15:14
  31:6 37:17
**rephrase** 5:10,19
  22:10 31:8
**report** 13:8,13
  13:16,17 17:9
  18:21 26:21
  36:24 37:21
**reporter** 5:3,21
**reporting** 10:22
  10:24 17:14
**represent** 4:14
**represented** 4:19
**required** 5:19
  26:21
**requirement**
  34:9
**resold** 12:21
**response** 5:8
**responsibility**
  34:12 35:22
**responsible** 11:4
**rest** 8:21
**return** 33:5
  42:14
**review** 6:21 24:1
  26:6,7,16,20
  39:2
**reviewed** 7:1
**reviewing** 24:12
**reviews** 22:18,20
  22:21 27:6
**rich** 13:7,10 16:5
  16:6
**richard** 1:8 2:14
  8:15 13:13,19
  16:8,23 18:3,7
  22:6 33:12

**richie** 13:6 16:14
  16:16,22 17:5
**right** 4:12 7:17
  19:8 20:15,21
  23:14 24:20
  26:10 30:10
  35:19,22
**role** 11:11 16:1
  34:21 35:21
  36:6
**rule** 40:19
**rules** 1:14 4:23
  5:22 40:20
**ryan** 29:1,3
  30:12 35:3
  38:11,16

**s**

**sales** 11:13,18
  12:24
**sandler** 2:3 4:13
**saw** 35:3
**says** 21:11 26:5
**schedule** 29:22
  36:1,10,10
**school** 30:1
**scope** 26:24
**screen** 6:9 18:23
  19:3,7,11,15
  20:15,21 22:16
  23:4,5 27:11
**screenshot** 20:12
  20:17 21:7
  23:11 25:6
**screenshots**
  23:18
**scroll** 19:18,22

**scrolled** 23:24
**se** 29:10
**seal** 41:3
**second** 21:12
  23:3 26:5
**secondary** 12:21
**see** 5:15 11:24
  19:8,10,15,16,18
  19:19 20:14,20
  23:5 24:13,19
  25:13 30:11
  33:12,20
**seeing** 21:12
**seen** 17:16
**send** 7:20 19:9
  21:2 22:3,6,13
**sending** 20:23
  21:18
**sense** 30:10
**sent** 6:23,24 7:4
  7:16 18:24 19:6
  20:8 24:24
  26:20 37:9
**sentence** 26:5,11
**series** 5:1
**served** 7:2 9:2
  10:23
**set** 30:14 36:10
  37:15
**share** 18:23 19:2
  19:7 23:4
**sharing** 22:15
  27:10
**sheet** 37:23 42:7
  42:10,12,15
  44:11
**shop** 35:19

**shorthand** 40:12
**show** 11:20
**showing** 25:8
**shown** 20:19
**side** 25:12,18
  26:10
**sign** 42:9
**signature** 40:18
  41:3,8 44:14
**signing** 42:11
**single** 22:9
**sitting** 17:16
**situation** 8:8
**slowed** 9:13
**slowing** 9:15
**small** 19:13
**smaller** 25:19
**smart** 1:7 7:10
  8:3,14 9:6,13,19
  9:21 10:17,23
  11:5,14,18 12:3
  12:21,23 13:9,24
  14:10,13 15:6,18
  16:1 17:19,22
  18:18 19:24
  20:8 22:12
  26:17 27:22
  28:13,21 29:13
  29:21 30:24
  33:13,14,20,21
  34:7 35:11 36:6
  36:20 38:7 42:1
  43:1 44:1
**somebody** 22:12
  28:7
**sorry** 7:13 8:7
  23:24

**sort** 6:12 9:12
  29:8
**sources** 15:7
**space** 29:8,9
  42:7
**speak** 7:9 16:9
**specific** 16:13
  18:19 36:4
**specifically** 7:24
  17:8
**spoke** 27:7
**ss** 40:1
**stacked** 12:17
**staff** 10:14
**standard** 17:6
**standards** 17:3
**stars** 26:6
**state** 4:16 10:12
  12:18 13:5 40:1
  42:6
**statement** 37:19
**states** 1:1,15
  26:18 40:21
**staying** 30:12
**stenographer**
  40:13
**stephenson** 2:3
  3:6 4:1,11,13
  8:13 11:3,22
  14:7 15:13
  16:12 18:2
  19:14 20:14,18
  21:9 22:10 23:7
  23:10,12,16,20
  23:23 24:6,11,17
  25:8,16,21 26:1
  28:18 31:4 32:4
  32:8 33:10,23

| | t | thinks 5:17 | u |
|---|---|---|---|
| 36:3,5 38:21 | | third 21:12 26:5 | |
| stop 22:15 27:10 | t 43:3 | thirty 42:16 | uh 12:12 31:16 |
| 30:17 33:4 | take 5:11 20:3 | three 38:12,15 | underlined |
| street 2:4 41:10 | 27:20 30:7,16 | tied 22:22 | 21:10 |
| structures 34:16 | 32:21 33:1 39:1 | time 5:9 13:4 | undersigned |
| stuff 11:7 29:11 | taken 1:12 3:3 | 15:14 16:13 | 40:13 41:1 |
| 29:14,16 | 18:18 27:4 | 21:12 24:1 | understand 5:8 |
| subject 42:11 | 29:15 40:5,12 | 27:20 28:3 32:5 | 16:7,23 26:15 |
| submit 39:5 | talk 16:14,16,22 | 33:13,19 34:4 | 31:1,7,9 |
| submitted 40:19 | 29:10 | 35:5 38:7,11,15 | understanding |
| substance 6:1 | talked 16:6 | 38:20 40:6,16 | 12:3 38:8 |
| 44:10 | 35:10 37:19 | title 9:17,21,23 | understood 7:17 |
| substantial | talking 18:20 | 11:13 13:11 | 8:18 10:7 31:5 |
| 32:23 | 27:12 32:6 | 32:18 37:9,11 | 31:12 |
| suffer 6:4 | technically 9:11 | titled 19:6 | unfortunate |
| sufficient 6:20 | 11:11 | today 4:19 6:2,6 | 21:11 |
| suite 41:11 | tell 8:9 10:5,6 | 17:16 | unilaterally |
| supervise 36:7 | 13:4 15:20,21 | told 7:11,19 | 18:12 22:1 |
| supervised 13:18 | 16:13 17:8 | track 34:13 | united 1:1,15 |
| 13:18,21 | 27:13 29:19 | tracking 34:5 | 40:21 |
| supervising 11:4 | 30:14 32:1,2,14 | transcribing 5:3 | use 29:5 30:18 |
| supervisor 11:8 | 32:16 35:1 | transcript 42:17 | |
| 11:9,10 13:20 | ten 10:20 32:22 | 42:18 | v |
| supervisory | 33:1 | transcription | |
| 34:21 | tendered 19:4 | 44:7 | v 42:1 43:1 44:1 |
| supported 10:13 | 23:2 | true 40:14 | various 20:9 |
| supposed 27:2 | terms 34:5 35:5 | truthfully 6:2,6 | verbal 5:6 |
| sure 11:10 12:17 | 37:16,19 | turn 27:19,19 | verification |
| 14:20 18:13 | testified 4:9 | two 14:9 32:19 | 17:10,14 18:21 |
| 19:14 21:8 29:3 | testify 6:2,6 | 33:10 | veritext 6:19 |
| 37:10 | text 21:11 | type 12:3 37:14 | versus 8:14 |
| sworn 4:3,8 | thank 6:20 24:15 | 37:21 | 37:12 |
| 40:10 | 25:20 38:19,22 | typical 30:4 | video 23:18,22 |
| system 27:16 | thing 21:5 | typically 32:18 | 33:4 |
| 28:1 31:19 | things 4:24 | | virtual 35:14 |
| | think 6:17 9:9 | | voe 27:9 36:24 |
| | 11:8,15 17:16,18 | | 37:21 |
| | 22:2 32:22,24 | | volume 12:24 |

**[vpn - zoom]**

**vpn**   35:10,11,14
  35:16
**vpns**   31:20
**vs**   1:6

**w**

**wage**   8:16,23
  38:17
**waived**   40:18
**wanted**   15:22
  16:6 21:8 30:16
**wanting**   16:9
**warn**   18:8 21:19
**washington**   2:4
**water**   29:10
**way**   26:21
**ways**   15:7
**week**   29:13
**weekday**   29:20
  30:24
**weekends**   29:15
  29:18 33:16,17
**went**   28:17
**widen**   25:14
**wilton**   2:8,8 5:15
**windows**   6:15
**witness**   4:2,7
  11:22 14:6
  15:12 18:1 19:4
  23:2 24:16
  25:23 28:17
  32:1 40:5,10,16
  40:18 41:3 42:3
**words**   26:14
**work**   7:16 9:6,7
  9:13 10:12
  26:24 29:12
  30:1 31:17,21

  35:24
**worked**   15:10,17
  29:10 35:5,8
  37:6 38:8
**working**   10:15
  28:6 29:7 30:20
  31:1,10,14 34:7
**works**   14:24
**wperson**   2:10
**write**   5:21 14:23
**wrote**   6:11

**x**

**x**   3:1

**y**

**yeah**   9:7 10:21
  14:12 17:2
  19:21 20:1
  24:22 28:22
  29:5 31:7,19
**year**   9:9 13:3
  18:20
**years**   10:18
  18:15 29:4 32:9
  37:6
**yesterday**   7:15

**z**

**zoom**   2:3 4:2,5
  6:16,17

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.