**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRIAN NOE *et al.*, | |
| Plaintiffs, | No. 1:21-CV-01668 |
| v. | Honorable Edmond E. Chang |
| SMART MORTGAGE CENTERS, INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Brian Noe and Eileen Pruitt, and opt-in Plaintiffs Alan Platt, Ryan Klaic, Stephanie Holland, and Shian Jno-Lewis (collectively, the Plaintiffs), bring this law-suit alleging that their former employer, Smart Mortgage Centers, Inc., its president Richard Birk, and its vice president Brian Birk, violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*, the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*. R. 39.)[1] Specifically, the Plaintiffs allege that the Defendants failed to pay them required minimum and overtime wages and instead misclassified them as exempt from these requirements. *Id.* ¶ 1. The Plaintiffs also allege that Defendants improperly deducted

---

[1]In citations to the docket, page numbers are taken from the CM/ECF header (that is, the PDF pagination), rather than page numbering on the pages' bottoms—except in citations to deposition testimony, in which case the transcript page and line numbers are cited.

1

money from the employees' earnings in violation of the Wage Payment and Collection Act. *Id*. ¶¶ 3–4.

The case has been reassigned twice, and pending now are three motions for summary judgment: (1) the Defendants' motion targeting Noe's overtime claims, on the grounds that he is a commission-based employee at a qualifying business under § 207(i) of the Fair Labor Standards Act (known as the FLSA for short), R. 92; (2) the Defendants' motion against the Plaintiffs' claim for improper deductions under the Illinois Wage Payment & Collection Act (usually called the IWPCA in these kinds of cases), R. 120; and (3) the Plaintiffs' motion for summary judgment as to liability against the Defendants. R. 153. The Plaintiffs also filed a motion to strike, R. 128, the Defendants' second motion for summary judgment, R. 120, as to the IWPCA claim.

For the reasons explained in this Opinion, the Plaintiffs' motion to strike, R. 128, is denied; the Defendants' summary judgment motion, R. 92, against Noe's overtime claim is granted; the Defendants' summary judgment motion, R. 120, against the IWPCA claim is denied; and the Plaintiffs' summary judgment motion, R. 153, is granted in part and denied in part. As a preview, the Court decides as follows:

- Noe is exempt from overtime wages as a commission-based employee under § 207(i) of the FLSA;

- the Defendants misclassified the Plaintiffs as outside sales employees, thus entitling them to minimum wage under the FLSA and the IMWL, except that there is a triable issue of fact as to Noe;

2

- Brian Birk is individually liable for any FLSA violations, and there is a triable issue of fact as to Richard Birk's individual liability;

- there is a triable issue of fact as to whether the Defendants acted willfully as to the FLSA violations, which will determine the appropriate statute of limitations; and

- the Defendants violated the IWPCA by taking improper deductions for any instances in which the Plaintiffs did not sign any commission sheet that reflected the deductions, though there is a triable issue of fact as to which instances the Plaintiffs signed a commission sheet with that information.

## I. Motion to Strike Defense's Second Motion

Before addressing the summary judgment motions, there is the preliminary matter of the Plaintiffs' motion to strike the defense's second summary judgment motion on the IWPCA claims. The Plaintiffs say, with good reason, that "[s]uch piecemeal litigation is contrary to judiciary efficiency, [and] increases costs unnecessarily for Plaintiffs." R. 128 at 2. They also argue that the Defendants defied a prior order entered by the previously assigned judge after the Defendants filed their first motion against the IWPCA claim. That order stated:

> Defendants are advised that the court ordinarily allows only one motion for summary judgment and defendants may not be allowed to file another dispositive motion later in the case. The court generally rejects piecemeal partial motions for summary judgment. If defendants choose to persist in the pending motion, there is no guarantee they will be allowed to file summary judgment motions on other issues or against other plaintiffs.

R. 96.

On review of the docket, the Court certainly agrees that the parties have litigated this case in a highly inefficient, piecemeal manner. It should be rare (and there was no good reason here) to waste time on two—let alone three—sets of Rule 56.1 statements of facts, additional facts, responses to additional facts, and three briefs, all multiplied by three, to address the issues presented in the summary judgment motions. That said, the motion to strike is denied because the Plaintiffs' IWPCA claim is already presented to the Court on the Plaintiffs' own summary judgment motion. In retrospect, the multiplicity of motions should never have happened, but it has, and it is time to resolve all of them rather than leave the second motion's arguments for further litigation or trial.

## II. Factual Background

### A. Local Rule 56.1

Before summarizing the pertinent facts, there is yet one more preliminary matter. There unfortunately were a multitude of violations of Local Rule 56.1 by both sides in briefing the summary judgment motions. Local Rule 56.1(d) provides that the parties must submit a statement of material facts and a statement of additional facts "consisting of concise numbered paragraphs" which "should not contain legal argument." N.D. Ill. L. R. 56.1(d)(1), (4). L.R. 56.1(e) instructs on the content of responses to the statements of fact:

> Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact. If the response admits in part and disputes in part the asserted fact, it must specify which part of the asserted fact is admitted and which part is disputed. . . . A response may not assert legal

4

arguments except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support. … In the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver.

L.R. 56.1(e)(2). If a party disputes an asserted fact, the "party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3). A district court has "discretion to require strict compliance with its local rules governing summary judgment." *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000). "A district court is not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact.'" *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (quoting *Bordelon*, 233 F.3d at 529).

In the Defendants' Local Rule 56.1 statements, there are numerous unsupported assertions of "disputed" facts. For example, the Defendants supposedly "dispute" several of the Plaintiffs' additional facts that simply quote from employment agreements; as the basis of the objections, the defense cites the "rule of completeness," explain nothing more, and then finally concede that the quoted language is in the agreement. R. 150 ¶¶ 2–6. Also, both parties—the Defendants more so than the Plaintiffs—dispute that certain asserted facts are material, though they do so without "cit[ing] to specific evidentiary material that controverts the fact" and "concisely explaining how the cited material controverts the assert fact." L.R. 56.1(e)(3). The Court thus may overrule materiality objections and deem those facts as admitted. The

5

Defendants also often dispute facts and provide excessively long lists of citations to the record without the necessary concise explanation of how the citations refute the asserted fact, as required by Local Rule 56.1(e)(3). *See, e.g.*, R. 170 ¶ 35 at 11–12 (providing over 50 record citations to dispute one paragraph of the Plaintiffs' fact statement). Although the Court in its discretion could have stricken these statements of fact and responses and required the parties to resubmit them, the Court instead has considered the parties' filings, flawed as they may be, to move the case along. In summarizing the facts below, the Court notes where there are improperly presented disputes or improper objections.

## B. Background

Except as otherwise noted below, the recitation of the factual background represents the undisputed facts as presented in the parties' Local Rule 56.1 statements.[2] Where the facts are disputed, the Court sets forth each side's position. The Court also must give the benefit of reasonable inferences to the non-movant as to each summary judgment motion.

Smart Mortgage Centers is a mortgage brokerage firm that provides mortgage services and products to consumers in Illinois, Indiana, Florida, Colorado, Virginia, and Wisconsin. R. 137 ¶¶ 11, 12.[3] Despite the parties' attempts to dispute specific

---

[2]The Court cites in particular to the Defendants' responses to the Plaintiffs' statements of facts and additional facts, R. 150, 159, 170, and the Plaintiffs' responses to the Defendants' statements of fact and additional facts, R. 137, 147, 191, where both the asserted fact and the opposing party's response are set forth in one document.

[3]The Defendants at times attempt to dispute that Smart Mortgage sells loan products.

6

word choice and language in the various statements of fact, the basic nature of Smart Mortgage's services is undisputed. Smart Mortgage's services include procuring and closing loans for purchases of new and existing residences, procuring and closing second mortgages and home equity loans, and the refinancing of existing loans for Illinois consumers. *Id.* ¶ 13. The company's services are offered to the general public (or as the Plaintiffs say, "borrowers at large") and are not subcontracted, assigned or resold. *Id.* ¶¶ 15, 18. The Defendants assert that Smart Mortgage itself does not sell mortgage loans, which the Plaintiffs dispute. *Id.* ¶ 20. Smart Mortgage is paid a predetermined fee by qualified lenders based on the terms and nature of the specific loan. *Id.* ¶ 17.

Defendant Richard Birk, as President of Smart Mortgage, had the power to hire and fire employees, modify their commission, and determine their compensation. R. 170 ¶ 4; R. Birk Dep., R. 136-1 at 78:6–9, 79:10–12. Richard Birk made the decision, in consultation with an attorney, that Smart Mortgage loan-officer employment agreements would include a "Schedule B" or "Outside Sales Employee Rider to Smart Mortgage Centers, Inc. Loan Officer Retention Agreement," (for convenience's sake, the Opinion will call this the Outside Sales Employee Agreement). *Id.* ¶ 5; R. Birk Dep. R. 136-1 at 80:12–14, 19–25. The Outside Sales Employee Agreement was drafted by an attorney, and classifies the loan officers as outside sales employees,

---

*See, e.g.*, R. 150 ¶ 6. In their own statement of material facts, however, the Defendants clearly assert that Smart Mortgage "provides mortgage services *and products* to consumers." R. 137 ¶ 12. (emphasis added).

exempt from the overtime and minimum wage requirements of the FLSA and Illinois minimum wage and overtime laws. R. Birk Dep. R. 136-1 at 46:20–25, 47:1–7; R. 170 ¶ 5. The Plaintiffs signed the Outside Sales Employee Agreement. *See, e.g.*, R. 172-7 at 50–51.[4]

Defendant Brian Birk is Richard Birk's son and the Vice President of Smart Mortgage. *Id.* ¶ 6. Brian Birk consulted with Richard Birk about loan-officer compensation for new employees and modifications to existing loan officer compensation. *Id.* ¶ 8. Brian Birk also was responsible for maintaining payroll and employment records on behalf of Smart Mortgage. *Id.* ¶ 7. Email communications from Brian Birk reflect that he instructed the loan officers on how to communicate with borrowers. *See* R. 154-4 at 2; R. 154-8 at 2; R. 170 ¶¶ 32, 39. For example, in an email Brian Birk told several of the Plaintiffs that "leads need to be called everyday including weekends if you want to be successful," and informed the Plaintiffs that they "will be terminated from the program" if they failed to update a tracking section every 72 hours with calls. R. 154-4 at 2; R. 170 ¶ 32.[5] He also emailed some of the Plaintiffs instructions

---

[4]The Employment Agreement and attached Outside Sales Employee Agreement were initially filed under seal with court approval. To decide the current motions, it is necessary to quote the Outside Sales Employee Agreement, and this Opinion does so without revealing information that could reasonably be deemed to be confidential. To the extent that some information is disclosed that the parties believe would otherwise be confidential, it is necessary to explain the path of the Court's reasoning, which comes with a strong presumption that it must be on the public record. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000). The Court also notes that the Outside Sales Employee Agreement was read into the record during most of the depositions and thus much of the Outside Sales Employee Agreement is already publicly available on the docket.

[5]The Defendants dispute this statement of fact but do not provide a citation to the record to support their dispute. The Defendants also object that this email is "hearsay." R. 170 ¶ 32.

8

and templates for emailing and texting potential borrowers with the instruction, "Everyone needs to be concentrating on Phone calls and Texts." R. 154-8 at 2; R. 170 ¶ 39.[6] Brian Birk however, testified that he did not supervise the "Outside Sales Employees." B. Birk Dep. R. 146-6 at 76:8–15.

Plaintiffs Brian Noe, Eileen Pruitt, Alan Platt, Shian Jno-Lewis, Ryan Klaic, and Stephanie Holland were employees of Smart Mortgage as loan officers. The Plaintiffs were able to work from Smart Mortgage's physical office location in Naperville, Illinois, as well as remotely outside the office, including in their own homes, using Smart Mortgage's virtual private network. R. 137 ¶ 27; R. 170 ¶ 18. In their roles as loan officers, the Plaintiffs solicited borrowers and earned a commission for each loan that ultimately closed. R. 170 ¶ 19.

It is clear that one of the primary duties of each of Plaintiff was to follow up on leads, that is, to follow up on prospective borrowers. Brian Birk testified that a loan officer's "job was to go out and get business," but the Plaintiffs originated loans primarily using leads provided by the company. B. Birk Dep. R. 146-6 at 51:24–25; R.

---

But this email contains statements from Brian Birk, who is a party opponent, so the statements are exempted from the definition of hearsay. Fed. R. Evid. 801(d)(2)(A). The Defendants also object on the grounds of "rule of completeness" and they "dispute that the fact is material to Plaintiffs' allegations based upon the context of the email and its date." *Id.* These inapt objections are overruled.

[6]The Defendants attempt to dispute this statement of fact by again "disput[ing] that the fact is material to Plaintiffs' allegations," and citing to the Outside Sales Employee Agreements the Plaintiffs signed. These citations do not reflect a dispute as to whether Brian Birk sent an email telling Plaintiffs to "concentrat[e] on Phone calls and Texts." R. 154-8 at 2. This fact is thus not properly disputed and is deemed admitted.

170 ¶ 28.[7]  Indeed, between 82%–90% of the loan officers' leads were company gener-ated. R. 170 ¶ 28. Loan officers would receive company leads through text and email at any time, including outside of regular business hours. B. Birk Dep. R. 146-6 at 52:4–7; R. 170 ¶ 29. Loan officers would then follow up with the lead through email or a phone call. R. 154-4 at 2; R. 170 ¶ 38.) Loan officers had the ability to turn off notifications of new leads, but the Plaintiffs testified that Smart Mortgage discour-aged them from doing so. R. 170 ¶ 34 at 11. The Defendants dispute that Smart Mort-gage discouraged employees from turning off notifications for leads. *Id*. (citing B. Birk Dep., R. 146-6 at 51:1–3) (testifying that loan officers "had that option to on and off [notifications of the leads] whenever they wanted").

Loans officers at Smart Mortgage were offered a choice of being paid an hourly wage with a reduced commission or receiving 100% of their compensation from com-missions. R. 170 ¶ 20. Commissions were calculated based on loan amounts. B. Birk Dep. R. 146-6 at 10:8–15. The Plaintiffs here chose to have 100% of their compensa-tion come from commissions for the loans they closed with approved vendors. R. 137 ¶¶ 20, 33; R. 170 ¶¶ 19, 21. The Plaintiffs did not receive any salary, draw, base pay, hourly wages, or overtime compensation.[8]  R. 137 ¶ 34. Neither the Plaintiffs nor the Defendants kept a record of the hours that the Plaintiffs worked. R. 150 ¶ 30; R. 137

---

[7]The Defendants failed to comply with LR 56.1(e)(3) when attempting to dispute this fact by failing to cite to the record to support the dispute; thus, the fact is deemed admitted.

[8]Apparently one loan officer at the company (presumably not any of the Plaintiffs) "re-quested an hourly wage [and] received it," R. 137 ¶ 34.

¶ 31. Noe, Klaic, Pruitt, and Platt's testimonies and statements reflect that they remember routinely working more than 40 hours per workweek. R. 170 ¶ 34; *see also* R. 191 ¶¶ 29, 30. Jno-Lewis remembers working more than 40 hours per week on several occasions. R. 170 ¶ 35. Because 100% of the Plaintiffs' compensation came from commissions, they received no wages for the weeks in which they did not close any loans—even if they performed work that week. R. 170 ¶ 26.[9]

The Outside Sales Employee Agreement, which all of the Plaintiffs signed, contained a provision that encouraged the employees to devote time to working when they were not at the office: "Employee is expected to, and shall, spend a significant amount of time away from Employer's place of business in performing employee's primary duty of selling the mortgage loan products offered by Employer." R. 172-7 at 50. The Outside Sales Employee Agreement also set the expectation that the employees would meet potential borrowers away from the office: "Employee is expected to, and shall, meet with prospective borrowers at locations other than Employer's place of business, such as at the prospective borrower's home or other location away from Employer's place of business." *Id.*

Despite these provisions of the Outside Sales Employee Agreement, the Plaintiffs' testimony and responses to interrogatories reflect that the work that they performed was largely at the Smart Mortgage office or at the Plaintiffs' home offices.

---

[9]The Defendants "disputed that this is a material fact as … all Plaintiffs were paid on a 100% commission basis." But the Defendants failed to satisfy the requirement that the objection "cite specific evidentiary material that controverts the fact and … *concisely explain how the cited material controverts the asserted fact*." L.R. 56.1(e)(3) (emphasis added).

11

Noe, for example, testified that he met with some borrowers in person, but "[l]argely it was via phone or email, internet, versus in person." Noe Dep. R. 144 at 16:17–18. Platt averred that face-to-face meetings with realtors were "rare and infrequent," and Platt was unable "to provide the number of hours per week because such meetings happened on such an infrequent basis." Platt Resp. Interrog. No. 18, R. 154-5 at 14. Pruitt said that in-person meetings with borrowers comprised no more than 10 hours during her roughly eight-month tenure at Smart Mortgage, and Jno-Lewis said that those meetings comprised about only 10 hours of her two years of employment at Smart Mortgage. Pruitt Resp. to Defs.' Interrog. No. 18, R. 147-1 at 13, R. 170 ¶ 10; Jno-Lewis Resp. to Defs.' Interrog. No. 18, R. 154-2 at 14. Pruitt testified that she did not have to meet with individuals in person due to technology. Pruitt Dep. R. 147-2 at 34:6–11.

Noe further testified that loan officers at Smart Mortgage "were rewarded" with better leads "for being inside and working inside the office," and that the Outside Sales Employee Agreement conflicted with the reality of his role at Smart Mortgage. Noe Dep. R. 144 at 62:5–19. John Butusov, a loan originator for Smart Mortgage, testified that no one at Smart Mortgage had set hours and so employees could "come and go as [they] please." R. 191 ¶ 37; Butusov Dep. R. 175-17 at 9:6–7, 17–20. The Defendants, however, assert that Noe traveled frequently outside the office, pointing out that Noe claimed business deductions and a mileage tax deduction based on 9,100

business miles in 2018, and another 3,416 business miles in 2019 as a loan officer.[10] R. 191 ¶ 35.) During his deposition, Noe testified that "[t]here would be a chance" that he would drive for business but that he supposedly did not remember what the mileage claimed on his tax documents were related to. Noe Dep. R. 144 at 54:11–15; 61:3–8.

On the issue of deductions from compensation, the Plaintiffs' employment agreements contained a paragraph entitled, "Deposit of Funds," which authorized the company to deduct various loan-related fees and amounts from compensation:

> Loan Officer acknowledges that he/she shall be responsible for the collection of all fees in connection with mortgage Loans originated by Loan Officer, and, if not so collected by Loan Officer from Borrower at the time of Loan closing, then Smart shall have the right to set off and deduct from any amounts due Loan Officer hereunder any amounts not paid, including but not limited to the above … ; unpaid amounts due Smart; bounced Borrower(s) checks; any and all legal fees and costs relating to such matters; lender premium repayments for loans originated in violation of a lender's correspondent agreement with Smart and other items due Smart or third parties relating to Loan Officer, his or her Borrower(s) or otherwise.

R. 170 ¶ 57. Loan officers had all manner of fees deducted from their pay, including fees for verification of employment, credit reporting fees, subordination, text blast requested, lender credit cure, condo questionnaire, processing, appraisal, and pest

---

[10]The Plaintiffs object to the use of Noe's tax returns as hearsay as well as on other grounds. Noe testified that he did not prepare his tax documents and that his wife and accountant prepared them. Noe Dep. R. 144 at 31:11–18. But quite obviously the tax returns—filed in his name and under his signature—qualify as party-admissions. Fed. R. Evid. 801(d)(2)(A), (C). Noe asserts other nearly frivolous objections to the tax returns: legal conclusion, lack of foundation, the document speaks for itself, and immaterial facts. This fact is deemed admitted because Noe does not cite to controverting evidence.

inspection.[11] *Id*. ¶¶ 55, 58. At least some of these fees were not taken at a fixed amount. For example, credit report fees were deducted from Noe's commissions on three separate occasions in the varying amounts of $78.17, $72.87, and $110. R. 159 ¶ 3. Noe also was subjected to deductions under the line item "appraisal split" for differing amounts of $245, $250, and $362.50. R. 159 ¶ 4.

The loan officers received commission sheets, which contained the calculation and final commission due to the loan officer. *Id*. ¶ 60; *see, e.g.*, R. 147-3 at 2. The commission sheets contain a row showing deductions made to the loan officer's commission. *See, e.g.* R. 147-3 at 2 (listing the credit report fee of $78.17 in parentheses, deducted from the final amount.) The loan officers had 24–48 hours to review these commission sheets and could notify Brian Birk of any discrepancies. B. Birk Dep. R. 146-6 at 15:14–17. Under the row listing the commission due to the loan officer, there is a line stating, "Sign to acknowledge this commission is correct," and an empty space for the loan officer's signature. R. 170 ¶ 60; R. 147-3 at 2. Smart Mortgage accepted commission sheets without signatures, and it was common for them to be unsigned. R. 170 ¶ 61. Noe testified that loan officers "could raise a red flag about [a deduction], but it doesn't mean [the loan officer is] going to get what [he or she] want[s]." Noe Dep. R. 144 at 76:19–24, 77:1–2.

---

[11]The Defendants assert another dispute that fails to comply with the local rules in Paragraphs 55, 56, and 58–61. There, the Defendants state that the fact statement is "[d]isputed in part. Defendants do not dispute the statement. Defendants deny that the fact is material to Plaintiffs' allegations." R. 170 ¶¶ 55–56, 58–61. These paragraphs as deemed to be admitted.

### III. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### IV. Discussion

As noted earlier, three summary judgment motions are pending. (1) the Defendants' motion targeting Noe's overtime claims, on the grounds that he is a commission-based employee at a qualifying business under the FLSA, R. 92; (2) the

Defendants' motion against the Plaintiffs' claim for improper deductions under the Illinois Wage Payment & Collection Act, R. 120; and (3) the Plaintiffs' motion for summary judgment as to all claims as to liability against the Defendants. R. 153. First up is the motion on Noe's overtime claim.

### A. Overtime Exemption for Commission-Based—Section 207(i)

The Defendants move for summary judgment against Noe's overtime claim, arguing that, as a matter of law, Smart Mortgage was exempt from paying him overtime under the exemption for certain commission-based employees, 29 U.S.C. §§ 207(i), 213(a)(1). An employer bears the burden of proving that an employee is exempt under the FLSA. *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 (7th Cir. 2010). "FLSA exemptions are to be narrowly construed against … employers and are to be withheld except as to persons plainly and unmistakably within their terms and spirit." *Auer v. Robbins*, 519 U.S. 452, 462 (1997). The same standards apply to the overtime claim under the Illinois Minimum Wage Law "IMWL parallels the FLSA and the same analysis has generally been applied to both statutes." *Driver v. AppleIllinois, LLC*, 890 F. Supp. 2d 1008, 1010 (N.D. Ill. 2012).

Section 207(a) of the FLSA requires employers that are "engaged in commerce or in the production of goods for commerce" to compensate their employees 1½ times the regular rate at which the employees are paid when they work more than 40 hours per workweek—unless the employer or employee falls within an exemption. 29 U.S.C.

16

§ 207(a). Section 207(i) sets forth an exemption for certain commission-paid employees:

> No employer shall be deemed to have violated [Section 207](a) by employing any employee of a *retail or service establishment* for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in *excess of one and one-half times* the minimum hourly rate applicable to him … and (2) more than half his compensation for a representative period (not less than one month) represents *commissions* on goods or services.

29 U.S.C. § 207(i) (emphasis added); *see also* 820 ILCS 105/4a(2)(F) (providing that IMWL's overtime requirement is not applicable to "[a]ny commissioned employee as described in paragraph (i) of Section 7 of the [FLSA] and rules and regulations promulgated thereunder."). One element of the exemption is readily met: the parties do not dispute that more than half of Noe's compensation came from commissions. Indeed, commissions were his only form of compensation. The other two elements are disputed: (1) whether Smart Mortgage is a "retail or service establishment" under the FLSA; and (2) whether Noe's regular rate of pay exceeded 1½ times the minimum wage (that is, whether it exceeded $10.875 per hour). 29 U.S.C. § 206(a)(1)(C).

### 1. Retail or Service Establishment

The term "retail or service establishment" is not explicitly defined by the FLSA. *Alvarado v. Corporate Cleaning Servs., Inc.*, 782 F.3d 365, 369 (7th Cir. 2015). When Congress initially amended the FLSA to add the § 207(i) exemption in 1961, a Labor Department regulation "stated that the term 'retail or service establishment' should be defined as set out in § 213(a)(2)." *Gatto v. Mortgage Specialists*, 442 F. Supp. 2d 529, 537 (N.D. Ill. 2006) (citing 29 C.F.R. § 779.24). But Congress later repealed

17

§ 213(a)(2), which exempted intrastate businesses from the overtime and minimum wage requirements under the FLSA. The Department of Labor and many courts, however, continue to use the definition for "retail or service establishment" contained in the prior version of § 213(a)(2). *See* 29 C.F.R. § 779.24; *see, e.g., Reich v. Delcorp., Inc.*, 3 F.2d 1181, 1183 (8th Cir. 1993). The Seventh Circuit, however, has explicitly disavowed this approach given that § 207(i), the overtime exemption for commissioned employees, and § 213(a)(2), the repealed exemption for intrastate businesses, "serve different purposes." *Alvarado*, 782 F.3d at 370, 371 ("The Department of Labor and some courts … have woodenly ported the definition from section 213(a)(2) to the commission exemption with no sensitivity to the very different purpose of that exemption."). So the Court must rely only on case law interpreting "retail or service establishment" in the specific context of § 207(i).[12]

In *Alvarado*, the Seventh Circuit held that a business providing window-washing services to commercial and apartment buildings was exempt, reasoning that the business "is selling a service, not goods," which "is supportive of the exemption," 782 F.3d at 366). *Alvarado* also explained that being a *service* establishment was enough to meet the "retail *or* service establishment" requirement of § 207(i). *Id.* at 369

---

[12]Noe argues that Smart Mortgage is a financial institution and relies on *Mitchell v. Kentucky Finance Company*, 359 U.S. 290, 294–295 (1959), which held that financial institutions, like the loan provider in that case, were not exempt from overtime and record-keeping requirements as "retail or service establishment[s]" under § 213(a)(2). R. 136 at 11. But *Mitchell* only applied § 213(a)(2)—not § 201(i)—and indeed was decided decades before Congress added § 207(i). *Mitchell*'s analysis of § 213(a)(2) is of little value in interpreting § 207(i) in light of the Seventh Circuit's holding in *Alvarado*. *See* 782 F.3d at 371.

18

(emphasis in original). The Seventh Circuit also distinguished the business from a wholesaler: the window-washing company "sells its window-cleaning services to building owners and managers; they are the ultimate customers; they do not resell the window cleaning, and therefore [the business] is not a wholesaler." *Id.*; *see also Dyal v. PirTano Construction, Inc.*, 2018 WL 1508487, at *3–4 (N.D. Ill. Mar. 27, 2018) (holding that a cable, internet, and telephone installation business is a service establishment under § 207(i) and explaining that "[t]he customer receiving the goods and services is at the end of the stream of distribution and there is no reselling by that customer of the cable or internet products and services").

Here, those the parties dispute whether Smart Mortgage sells "mortgage products" or instead sells loans, the parties do not dispute the actual service that Smart Mortgage provides: "[Smart Mortgage]'s services include procuring and closing loans for purchases of new and existing residences, as well as procuring and closing second mortgages, home equity loans, and the refinancing of existing loans for Illinois consumers." R. 137 ¶ 13. Applying the reasoning of *Alvarado*, even giving the Plaintiffs the benefit of reasonable inferences, no reasonable factfinder could decide otherwise: Smart Mortgage provides a service by procuring and closing loans, which falls within the definition of "retail or service establishment" under § 207(i). The Plaintiffs argue that the exemption cannot apply because at least some of the loans closed by Smart Mortgage are resold by the loan providers. But the Defendants correctly respond that any reselling of the loans is irrelevant because *Smart Mortgage* is not involved in any

reselling. The Court agrees: the *service* that Smart Mortgage provides—procuring and closing the loan—is not resold. Yes, the loans themselves might be resold by the lenders, but the service of connecting a borrower with a loan is completed upon closing. *See Gatto v. Mortgage Specialists of Ill., Inc.*, 442 F. Supp. 2d 529, 541 (N.D. Ill. 2006) ("[Defendant] … is hired by purchasers of new and existing residences to perform the discreet tasks of finding and closing loans …. Once the loan has been closed or refinanced, [Defendant's] job is done.") (citations omitted). Smart Mortgage provides the service of brokering mortgage loans; the loan officers connect borrowers to loans provided by the lenders Smart Mortgage contracted with. Once the loan is closed, the service is complete—and the Plaintiffs admit that that particular service is not resold. R. 137 ¶ 18. Smart Mortgage provides a service that is not resold, so it is a retail establishment, and that element of the commission exemption is met.

### 2. Pay Rate 1½ Times the Minimum Wage

On the final element of the exemption, the employee's regular rate of pay must be "in excess of one and one-half times the minimum hourly rate applicable to him under section 206" of the FLSA. 29 U.S.C. § 207(i). Put another way, this element of § 207(i) requires that employees be regularly paid more than $10.875 hourly, given that the federal minimum wage is $7.25 per hour. *See* § 206(a)(1)(C). The "regular rate of pay" is:

> "the hourly rate actually paid the employee for the normal, nonovertime work-week for which he is employed." … It is a rate per hour, computed for the par-ticular workweek by a mathematical computation in which hours worked are

divided into straight-time earnings for such hours to obtain the statutory regular rate.

29 C.F.R. § 779.419(b) (quoting *Walling v. Youngerman-Reynolds Harwood Co.*, 325 U.S. 419, 424 (1945)).

Here, the Defendants argue that Noe's compensation clearly exceeded $10.875 per hour. It is undisputed that Noe earned $135,687.84 in 2018 and $155,496.00 in 2019, based on the W-2s for those years. R. 137 ¶¶ 38, 39. It is also undisputed that Smart Mortgage "did not routinely track or keep records as to the number of hours Noe worked," despite the FLSA's directive that every employer subject to any provision of the FLSA must record the wages and hours of its employees. R. 150 ¶ 30; 29 U.S.C. § 211(c). Noe testified that he worked between 60 and 70 hours per week, and sometimes up to 80 hours per week. R. 170 ¶ 34; Noe Dep. R. 144 at 22:20–24, 23:1–2.

Based on the record evidence, the Court agrees with the Defendants that there is no genuine factual issue on this element: even assuming Noe worked 80 hours every single week and took no weeks off, his earnings in 2018 and 2019 were well above $10.875 per hour. Eighty hours per week for 52 weeks is 4,160 hours. In 2018, Noe's total earnings of $135,687.84 divided by 4,160 hours would be the equivalent of an hourly rate of around $32.62 per hour. For 2019, Noe's hourly rate, again assuming he worked 80 hours every week, would be around $37.38 per hour.

Noe objects to this method of calculating his regular pay rate and argues that the Defendants cannot meet their burden of proving that this exemption applies

because they failed to keep records of his hours and wages as required by the FLSA. It is true that Smart Mortgage, as the employer, bears the burden of proving that Noe is exempt under § 207(i), and that its failure to comply with the FLSA's recordkeeping requirement leaves something of an evidentiary gap. *See Schmidt,* 599 F.3d at 631. And generally speaking employers should not "benefit from a relaxed burden when the evidentiary gap is caused by its own violation of the FLSA's recordkeeping requirements." *Evans v. Distance Learning Sys. Ind., Inc*., 2018 WL 6308818, at *7 (S.D. Ind. Aug. 15, 2018). But given the evidentiary record in this case and Noe's six- figure earnings over the relevant years, no reasonable jury could find that his regular pay rate was under $10.875 per hour. Noe himself testified as to the 80-hour-per week high watermark, thus providing the ceiling to calculate the pay rate.

Noe also objects to the method of calculation the pay rate, arguing that it impermissibly relies on averages. It is true that FLSA regulations prohibit employers from "averaging hours over 2 or more weeks" as a means of avoiding paying overtime compensation. 29 C.F.R. § 778.104 ("Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40.") But the Court is not averaging Noe's hours over two or more weeks to determine if he was owed overtime for any particular period. Instead, the methodology is generously assuming that he worked the maximum amount suggested by his testimony (80 hours per week) in each week of a given

22

year for the purposes of determining whether the exemption applies. What's more, the FLSA regulations specifically account for the need to take a "reasonable and equitable" approach when it is not possible to allocate commission wages to a specific workweek. 29 C.F.R. § 778.120 provides:

> If it is not possible or practicable to allocate the commission among the workweeks of the period in proportion to the amount of commission actually earned or reasonably presumed to be earned each week, *some other reasonable and equitable method must be adopted.*

(emphasis added); *see also Schwind v. EW & Assocs.*, 371 F. Supp. 2d 560, 568 (S.D.N.Y. 2005) (applying a similar method for calculating an employee's regular rate of pay as applied here and interpreting § 778.120 as "permit[ting] a court to adopt any method so long as it is 'reasonable and equitable.'"). Even viewing the evidence in Noe's favor, no reasonable jury could find that Noe's regular rate of pay did not exceed $10.875 per hour. He simply made too much money in those years to evade the exemption. The Defendants' motion for summary judgment against Noe's overtime claim is granted.

## B. Exemption from Minimum Wage—§ 213(a)(1)

Generally speaking, the FLSA and IMWL require an employer to pay its employees a minimum wage per hour. 29 U.S.C. § 206(a); 820 ILCS 105/4. Section 213(a)(1) of the FLSA, however, provides that employees "in the capacity of outside salesman," as defined by the Department of Labor, are exempt from the minimum wage requirement. 29 U.S.C. § 213(a)(1). Here, it is undisputed that the Plaintiffs did not receive a minimum hourly wage and instead received 100% of their compensation

23

from commissions as stated in their Outside Sales Employee Agreements. Thus, during weeks when they did not close a loan, they did not receive any wages at all despite the fact that they worked that week. R. 170 ¶ 26. The Plaintiffs argue that the Defendants misclassified them as outside sales employees and that they are entitled to a judgment as a matter of law that the Defendants violated the FLSA and IMWL by failing to pay them a minimum wage. To prevail on a minimum wage claim under the FLSA and IMWL, the Plaintiffs must show that the Defendants were their employer and that they were not paid the minimum wage. *Callahan v. City of Chicago*, 78 F. Supp. 3d 791, 793 (N.D. Ill 2015). The parties agree that the Plaintiffs were not paid a minimum wage, and thus the only issue is whether the Plaintiffs were exempt from the minimum-wage requirement as outside sales employees—and if there are no underlying, genuine factual disputes, then the question is resolvable by the Court as a matter of law. *See Silver v. Townstone Fin., Inc.*, 2016 WL 4179095, at *3 (N.D. Ill. Aug. 8, 2016) ("The question of how an employee spends his time is a question of fact, while the question of whether his activities fall within an exemption is a question of law.").

"Outside salesperson" is defined in the FLSA regulations "as an employee (1) whose 'primary duty' consists of 'making sales' or 'obtaining orders or contracts for services' and (2) who is 'customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.'" *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 (7th Cir. 2010) (quoting 29 C.F.R. § 541.500

24

(2009)). "Customarily and regularly" is defined as "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701. For the "outside" part of the term, the regulations further provide:

> Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls. Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business.

29 C.F.R. § 541.502.

The Plaintiffs argue that the undisputed facts reflect that the Plaintiffs were not *outside* sales employees. Although the Outside Sales Employee Agreement asserted—on paper—that the Plaintiffs would be meeting with borrowers in person outside the offices, the record evidence does conclusively establish (with the exception of Noe, as discussed later) that the work was in reality not performed outside the offices. As detailed earlier, the Plaintiffs testified that the communications with borrowers and realtors occurred over the phone or by email, and that the Plaintiffs largely completed their work in Smart Mortgage's physical office or their home offices. The Defendants attempt to dispute these facts by asserting that the Plaintiffs "made their own schedule, worked whatever hours they chose to work, performed a portion of their work outside of Smart Mortgage Center Inc.'s office, never submitted any time records, and never asked for overtime compensation." R. 169 at 2. But the Defendants

25

have failed to come forward with record *evidence* to dispute the Plaintiffs' testimony that any in-person meetings with borrowers or lenders were infrequent and not a customary or regular part of their duties as loan officers. The Defendants also refer to testimony suggesting that the Plaintiffs did not have set work schedules (the Plaintiffs dispute this). The specifics of the Plaintiffs' work schedules, however, are irrelevant to whether the Plaintiffs performed their work *outside* of the Defendants' fixed places of business, which include the Smart Mortgage office and the Plaintiffs' home offices. In other words, the factual dispute about *when* the Plaintiffs did their work does not inform the analysis of *where* and *how* it was completed.

The Court also notes that the Defendants failed to assert any legal arguments in their brief that the Plaintiffs were outside sales employees under the FLSA. *See* R. 169 at 7–9 (including only recitations of factual assertions on this issue and citing to no legal authority to offer any argument that the facts reflect that employees are exempt); *see also Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (stating that a party "waives an argument by failing to make it."). The only case Defendants cite in this section of their brief, *Blakes v. Illinois Bell Telephone Company*, 75 F. Supp. 3d 792 (N.D. Ill. 2014), does not even involve the outside-salesperson exemption under § 213(a)(1) of the FLSA. *See* R. 169 at 7–9. By failing to argue how the facts could support a legal conclusion that the Plaintiffs were exempt outside-sales employees, the Defendants have not successfully responded to the Plaintiffs'

26

presentation that they were exempt under § 213(a)(1).[13] No reasonable juror could find that the Plaintiffs (with the exception of Noe, as discussed below) regularly or customarily engaged in primary duties as loan officers outside of the Smart Mortgage office or their home offices. Thus, the Plaintiffs (except for Noe) are entitled to summary judgment declaring that they were not exempt as outside-sales employees under § 213(a)(1). The FLSA and IWML minimum-wage requirements thus applied to the Plaintiffs. Because it is undisputed that the Plaintiffs did not receive a minimum hourly wage during at least some weeks, the Court grants summary judgment in favor of the Plaintiffs (except Noe) on their claims that they were denied a minimum wage in violation of the FLSA on some weeks. Liability is established.

The one exception to the Plaintiffs' victory is Noe. As noted earlier, on his tax returns, Noe claimed business deductions and a mileage tax deduction based on 9,100 business miles in 2018 and 3,416 business miles in 2019 as a loan officer. R. 191 ¶ 35. When viewed in the defense's favor (as required when evaluating the Plaintiffs', or more precisely, Noe's summary judgment motion), there is a genuine fact question on whether Noe was customarily and regularly traveling around outside the office to meet with borrowers. He has not established liability, so summary judgment is denied

---

[13]The Court notes that Richard Birk testified in a signed declaration that Plaintiffs "performed a portion of their work outside of Smart Mortgage Centers Inc's office." R. 172-1 ¶ 36.) Defendants do not incorporate this evidence from the record into their argument that Plaintiffs were outside sales employees under the FLSA. It is unclear from this evidence whether Richard Birk is asserting that Plaintiffs conducted their work in person, not through telephone or email, or in their home offices. Thus, the Court does not see this evidence as creating a genuine dispute over the material fact that Plaintiffs regularly or customarily conducted their work inside of a fixed workspace.

27

as to him. There is a fact dispute for the jury to decide on whether Noe was an *outside*-sales employee.

### C. Individual Liability—Richard Birk and Brian Birk

The Plaintiffs next move for summary judgment on Richard Birk's and Brian Birk's individual liability for the alleged FLSA violations. The Defendants argue that that there are triable facts on whether either of the Birks are individually liable. Under the FLSA, "[a]ny employer who violates" the provisions requiring minimum wages, "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages." 29 U.S.C. § 216(b). The FLSA defines "employer" broadly to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

There is no controlling authority on the precise legal standard or test to determine when an individual is liable as an "employer" under the FLSA. *See Schneider v. Cornerstone Pints, Inc.* 148 F. Supp. 3d 690, 697 (N.D. Ill. 2015); *see also Dawkins v. NR 1 Transport, Inc.*, No. 20 C 4063, 2021 WL 4125086, at *4 (N.D. Ill. Sept. 8, 2021). In explaining the definition of employer, however, the Seventh Circuit has noted, "The word 'employer' is defined broadly enough in the [FLSA] to permit naming another employee rather than the employer as defendant, provided the defendant had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987). The Seventh Circuit has further suggested that courts should not limit their

28

consideration to only the "economic reality" factors, although they are relevant and consist of "whether the defendant (1) possessed the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Schneider*, 148 F. Supp. 3d at 697; *see Moldenhauer v. Tazewell-Pekin Consolidated Communications Center*, 536 F.3d 640, 644 (7th Cir. 2008). Taking this guidance, courts in this District have developed a test in which the courts "look at all facts surrounding the defendant's supervision of the employee and determine whether the defendant exercised control and authority over the employee in a manner that caused the FLSA violation (at least in part)." *Schneider*, 148 F. Supp. 3d at 698. The Court applies this test to each the Birks in evaluating the Plaintiffs' summary judgment motion.

### 1. Richard Birk

The Plaintiffs argue that Richard Birk, as president of Smart Mortgage, is individually liable for the FLSA violation because he had the power to hire and fire employees, determined their compensation, and approved and implemented the Outside Sales Employee Agreement, which stated that the Plaintiffs would not receive a minimum wage. R. 153-1 at 12. But there is a triable issue of fact as to whether Richard Birk exercised his authority as president in a manner that *violated* the FLSA. Although it is undisputed that Richard Birk approved the Outside Sales Employee Agreement, the agreement's existence by itself is not necessarily the *cause* of the

29

FLSA violation. Rather, the Plaintiffs (with the possible exception of Noe) were mis-classified as Outside Sales Employees because, in *reality*, they were not "customarily and regularly engaged away" from a fixed workplace and handled most, if not all, of their sales communications through phone calls, texts, and emails. 29 C.F.R. §§ 541.500(a)(2), 541.502. Based on the factual record, there is a triable issue as to whether Richard Birk knew how—in reality instead of on paper—the Plaintiffs were performing their jobs. Although he approved and signed the employment agreements containing the Outside Sales Employee Agreement, he also testified that he under-stood that loan officers at Smart Mortgage "are to spend time out of the office devel-oping realtor sources." R. Birk Dep., R. 136-1 at 61:13–17. Viewing the evidence in his favor on summary judgment, questions remain on whether Richard Birk was in-volved in or had knowledge of the contrast between the terms of the Outside Sales Employee Agreement and the day-to-day realities of the loan officers' duties. Sum-mary judgment is denied as against Richard Birk.

### 2. Brian Birk

In contrast, a reasonable jury would have to find that Brian Birk exercised sufficient control and authority over the Plaintiffs so that he would be individually liable for FLSA violations. Despite the on-paper requirement set by the Outside Sales Employee Agreements that called for significant work time outside the office, in fact Brian Birk sent emails instructing the Plaintiffs to "concentrat[e] on [p]hone calls and [t]exts," and further instructed them that "leads need to be called everyday." R.

30

154-8 at 2, R. 154-4 at 2. Brian Birk argues that the Plaintiffs have not shown that he exercised authority or control over them because they "did not have any fixed, required, or expected hours of work and did not account for or keep their time." R. 169 at 11. But it is undisputed that Brian Birk instructed the Plaintiffs to focus on phone calls and text messages to conduct business with borrowers, and even threatened them with termination if they did not comply with a 72-hour call tracking requirement. R. 154-4 at 2; R. 170 ¶ 32. By instructing the Plaintiffs to communicate with borrowers and leads through phone calls, texts, and emails, and even viewing the evidence in his favor, Brian Birk exercised control and authority over the employees in a way that caused the FLSA violation of mischaracterizing the Plaintiffs as outside sales employees. Individual liability as to Brian Birk is established.

### D. Statute of Limitations

The Plaintiffs argue that the applicable statute of limitations for their FLSA claims must be three years because the Defendants willfully violated the statute as a matter of law. Violations of the FLSA generally have a two-year statute of limitations "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). An employer willfully violates the FLSA when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *see also Sampra v. U.S. Dep't of Transp.*, 888 F.3d 330, 333 (7th Cir. 2018). The Plaintiffs argue that Richard and

31

Brian Birk willfully violated the FLSA because they had authority over how the Plaintiffs were compensated, and essentially failed to ensure that the Outside Sales Employee Agreement complied with the FLSA. Specifically, the Plaintiffs argue that Richard Birk testified that Smart Mortgage "did not at any point conduct an analysis as to whether loan officers were exempt from the FLSA." R. 153-1 at 13. As the Defendants note, however, Richard Birk's testimony does not exactly support that assertion. When asked if Smart Mortgage had anyone internally make the decision about whether the loan officers were exempt from the FLSA, Richard Birk testified that Smart Mortgage "had an attorney that made an employment agreement." R. Birk. Dep. R. 136-1 at 43:16–23. Richard Birk further testified that the loan officers decided whether to be exempt and that "[w]hen they sign the contract … they are choosing to be exempt." *Id*. at 41:12–15, 47:9 –12. Richard Birk testified that it was his belief that the loan officers were not entitled to minimum wage and that he believed they could make the decision to be exempt and have their salary be only based on commissions. *Id*. at 39:16–23, 42:13– 5. The Plaintiffs respond that this policy of allowing the loan officers to decide if they are exempt constitutes reckless disregard for whether Smart Mortgage's policy violated the FLSA. But Birk's testimony is sufficient to create a triable issue over this fact, that is, whether Birk acted with reckless disregard towards whether Smart Mortgage's practices and the Outside Sales Employee Agreement violated the FLSA by misclassifying the loan officers. His testimony must be credited at the summary judgment stage. In short, a jury will need to

determine whether the conduct at issue was willful. So the statute of limitations cannot be determined at the summary judgment stage.

### E. Deductions under IWPCA

The parties filed cross-motions for summary judgment on the Plaintiffs' claims that the Defendants made deductions from wages in violation of the Illinois Wage Payment Collection Act (IWPCA). The IWPCA prohibits employers from making deductions from wages or final compensation unless, as pertinent here, "such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; [or] (4) made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9. The Defendants argue that the deductions taken from the Plaintiffs' pay were all authorized pursuant to the employment agreement that the Plaintiffs signed,[14] and that the Court should apply basic contract law principles to find that these deductions were so authorized.[15] R. 121. The Plaintiffs argue that their commissions were subject to deductions that do not fall into any of categories recognized by the

---

[14]The Court notes that Noe signed the Employment Agreement twice, once on January 1, 2018, and also on October 29, 2013, when he commenced his employment at Smart Mortgage. R. 147 ¶ 20; R. 170 ¶ 9; R. 66-8.

[15]In the Defendants' reply on this claim, they argue that Noe "makes no argument that he did not benefit from the deduction by not having to repay Smart Mortgage out of pocket for these expenses." R. 158 at 4. To the extent that the Defendants attempt to argue that the deductions are lawful under the IWPCA as a benefit to the employee, the Court finds that the Defendants failed to properly present that argument, because they raised it for the first time on reply. *See Mendez v. Perla Dental*, 646 F.3d 420, 423–24 (7th Cir. 2011). Also, the Defendants have proffered any evidence that these deductions benefitted the Plaintiffs, unlike in *Bell v. Bimbo Foods Bakeries Dist.*, Inc. where the plaintiff testified that the deductions were a convenience to him, 2013 WL 6253450, at *4 (N.D. Ill. Dec. 3, 2013).

IWPCA and specifically that the Plaintiffs' signatures on the employment agreements do not constitute "written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9.

The regulations implementing the IWPCA set the parameters on how to consent to deductions:

> (a) Any written agreement between employer and claimant permitting or authorizing deductions from wages or final compensation must be given freely *at the time the deduction* is made. In the case of cash advances, the agreement may be made either at the time of the deduction or at the time of the advance itself.

> (b) When a deduction is to continue over a period of time and the written agreement provides for that period of time, provides for the *same amount of deduction* each period[,] and allows for voluntary withdrawal for the deduction, the agreement shall be considered to be given freely at the time the deduction is made.

56 Ill. Adm. Code 300.720 (emphases added). "These regulations support the idea that a proper consent entails the employee having some idea what the actual deductions would be." *Johnson v. Diakon Logistics*, 2018 WL 1519157, at *8 (N.D. Ill. Mar. 28, 2018); *see also Osorio v. Tile Shop, LLC*, 2016 WL 316941, at *2 (N.D. Ill. Jan. 27, 2016) (holding that deductions were lawful because they reimbursed the employer for subsidies received, similar to an advance under § 300.720(a), and the employee "knew exactly how much of each paycheck he would be required to give up.")

Here, the employment agreement that the Plaintiffs signed do not provide for specific or predictable amounts of deductions. This distinguishes this case from others in which courts have held that deductions were enforceable based on the prior consent

of an employee, because the employee authorized a specific amount, and the deductions never exceeded that amount. *See Bell v. Bimbo Foods Bakeries Dist., Inc.*, 2013 WL 6253450, at *4 (N.D. Ill. Dec. 3, 2013) (holding that a deduction did not violate the IWPCA where the deduction amount did not exceed the amount the plaintiff authorized when signing a prior authorization for the deductions). The Court thus agrees with the Plaintiffs that the employment agreements do not constitute express written consent of the employee, given freely at the time the deduction was made under the IWPCA. What's more, the employment agreement could not have authorized the deductions for credit report fees and appraisal splits under § 300.720(b), because those fees were in varying amounts. The Plaintiffs' signatures on the employment agreements thus do not constitute express written consent under the IWPCA.

But the commission sheets are a different story, given that the sheets provided the employees with the specific amount of the deduction and contained a signature line for the employee to sign, attesting that the commission—including the deduction taken—is correct. Unfortunately, the parties failed to develop any arguments as to whether these commissions sheets, when signed by the Plaintiffs, could constitute express written consent, freely given at the time the deduction is made. It is undisputed however, that these commission sheets were often left unsigned by the Plaintiffs. R. 170 ¶ 61. In the instances when the Plaintiffs did not sign the commission sheet, the Court concludes that the deductions were not made with the express

written consent of the employees, which qualifies as a violation of the IWPCA. Summary judgment is thus granted in part.

On the instances in which the Plaintiffs did sign the commission sheet, and thus acknowledged that the commission amount and the deduction amount were correct, there is a triable fact as to whether the employee freely gave written consent under the IWPCA. Brian Birk testified that employees could raise any discrepancies with him after having an opportunity to review the commission sheets. B. Birk Dep. 146-6 at 15:14–17. Noe, however, testified that although loan officers could raise concerns about a deduction, there was no assurance that Smart Mortgage would remove the deduction. Noe Dep. R. 144 at 76:19–24, 77:1–2. For the deductions made when there were signed commission sheets, neither side is entitled to summary judgment.

## V. Conclusion

For the reasons explained in the Opinion, the Plaintiffs' motion to strike the second summary judgment motion is denied. R. 128. The Defendants' motion for partial summary judgment with respect to Noe's overtime claim is granted and the claim is dismissed with prejudice. R. 92. The cross-motions for summary judgment on the claims under the Illinois Wage Payment and Collection Act are denied. R. 120. The Plaintiffs' motion for summary judgment on liability is granted in part and denied in part, R. 153, as follows: the Defendants misclassified the Plaintiffs (except for Noe) as outside sales employees, thus entitling them to minimum wage under the FLSA and the IMWL, except that there is a triable issue of fact as to Noe; Brian Birk is

36

individually liable for any FLSA violations, and there is a triable issue of fact as to Richard Birk's individual liability; there is a triable issue of fact as to whether the Defendants acted willfully as to the FLSA violations, which will determine the appropriate statute of limitations; and the Defendants violated the IWPCA by taking improper deductions for any instances in which the Plaintiffs did *not* sign any commission sheet that reflected the deductions, though for instances in which the Plaintiffs *signed* a commission sheet with that information, there is a triable issue of fact.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 29, 2024